No. 26-1861

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

THE PREGNANCY CARE CENTER OF ROCKFORD; THE DIOCESE OF
SPRINGFIELD IN ILLINOIS,

*Plaintiffs-Appellants,*

v.

JAMES BENNETT, in his official capacity as Director of the Illinois
Department of Human Rights; KWAME RAOUL, in his official capacity as
Illinois Attorney General,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 3:25-cv-50127 / Hon. Rebecca R. Pallmeyer

## OPENING BRIEF OF APPELLANTS

James A. Campbell
Ryan J. Tucker
Mark A. Lippelmann
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org

John J. Bursch
Caroline C. Lindsay
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
clindsay@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(571) 707-4655
dcortman@ADFlegal.org

*Counsel for Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1861

Short Caption: Pregnancy Care Center of Rockford, et al. v. James Bennett, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Pregnancy Care Center of Rockford

The Diocese of Springfield in Illinois

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom

Mauck & Baker, LLC

(3)  If the party, amicus or intervenor is a corporation:

  i)  Identify all its parent corporations, if any; and

None

  ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Caroline C. Lindsay          Date: 04/24/2026

Attorney's Printed Name:  Caroline C. Lindsay

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑ **No** ☐

Address:  440 First Street NW, Suite 600

Washington, DC 2001

Phone Number: (202) 393-8690          Fax Number: _____

E-Mail Address: clindsay@adflegal.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>26-1861</u>

Short Caption: <u>Pregnancy Care Center of Rockford, et al. v. James Bennett, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>The Pregnancy Care Center of Rockford</u>

<u>The Diocese of Springfield in Illinois</u>

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Alliance Defending Freedom</u>

<u>Mauck & Baker, LLC</u>

(3)      If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

         <u>None</u>

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         <u>None</u>

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/ John J. Bursch</u>      Date: <u>5/5/2026</u>

Attorney's Printed Name: <u>John J. Bursch</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: <u>440 First Street, NW, Suite 600</u>

<u>Washington, DC 20001</u>

Phone Number: <u>(202)393-8690</u>      Fax Number: _____

E-Mail Address: <u>jbursch@adflegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-1861

Short Caption: Pregnancy Care Center of Rockford, et al. v. James Bennett, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 The Pregnancy Care Center of Rockford

 The Diocese of Springfield in Illinois

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Alliance Defending Freedom

 Mauck & Baker, LLC

(3)    If the party, amicus or intervenor is a corporation:

 i)    Identify all its parent corporations, if any; and

   None

 ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

---

Attorney's Signature: s/ David Cortman                    Date: 4/27/2026

Attorney's Printed Name:  David Cortman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  1000 Hurricane Shoals Rd, NE Suite D-1100

 Lawrenceville, GA 30043

Phone Number: (770)339-0774                    Fax Number:  (770)339-6744

E-Mail Address: dcortman@adflegal.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-1861

Short Caption: Pregnancy Care Center of Rockford, et al. v. James Bennett, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Pregnancy Care Center of Rockford

The Diocese of Springfield in Illinois

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Alliance Defending Freedom

Mauck & Baker, LLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Ryan Tucker       Date: 4/30/2026

Attorney's Printed Name:  Ryan Tucker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address:  15100 N. 90th St.

    Scottsdale, AZ 85260

Phone Number: (480)444-0020       Fax Number:  480-444-0028

E-Mail Address: rtucker@adflegal.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-1861_____

Short Caption: Pregnancy Care Center of Rockford, et al. v. James Bennett, et al._____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Pregnancy Care Center of Rockford_____

The Diocese of Springfield in Illinois_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Alliance Defending Freedom_____

Mauck & Baker, LLC_____

(3)     If the party, amicus or intervenor is a corporation:

    i)       Identify all its parent corporations, if any; and

          None_____

    ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          None_____

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A_____

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A_____

Attorney's Signature: s/ Mark A. Lippelmann_____     Date: 5/1/2026_____

Attorney's Printed Name: Mark A. Lippelmann_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: 15100 N. 90th St._____

        Scottsdale, AZ 85260_____

Phone Number: (480)444-0020_____     Fax Number: 480-444-0028_____

E-Mail Address: mlippelmann@adflegal.org_____

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1861

Short Caption: Pregnancy Care Center of Rockford, et al. v. James Bennett, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The Pregnancy Care Center of Rockford

    The Diocese of Springfield in Illinois

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Alliance Defending Freedom

    Mauck & Baker, LLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

       None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: s/ James A. Campbell     Date: 06/02/2026

Attorney's Printed Name: James A. Campbell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: 15100 N. 90th Street

    Scottsdale, AZ 85260

Phone Number: (480) 444-0020     Fax Number: (480) 444-0028

E-Mail Address: jcampbell@adflegal.org

rev. 12/19 AK

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal raises complex constitutional questions regarding Article III and the First Amendment. Oral argument would materially assist the Court's resolution of those important questions.

# TABLE OF CONTENTS

Corporate Disclosure Statement...................................................................i

Statement Regarding Oral Argument ......................................................ii

Table of Authorities..................................................................................vi

Statement of Jurisdiction.........................................................................1

Statement of Issues ..................................................................................2

Introduction ..............................................................................................3

Statement of the Case ..............................................................................6

    A.    Two pro-life religious ministries rely on faithful
Christian employees to carry out their missions...................6

    B.    H.B. 4867 outlaws the ministries' employment conduct........9

        1.    Employment Clause...................................................10

        2.    The Offensive Speech Clause.....................................11

        3.    The Notice Clause ......................................................12

        4.    The Accommodation Clause........................................13

        5.    The Benefit Clause.....................................................13

    C.    The Department refuses to accommodate the Diocese's
religious beliefs.........................................................................14

    D.    Proceedings below .....................................................................16

Summary of the Argument .....................................................................17

Standard of Review .................................................................................20

Argument..................................................................................................21

I.    The ministries have Article III standing.......................................21

A. The ministries suffer an imminent future injury ................ 22

    1. The ministries' conduct is arguably affected with a constitutional interest ............................................. 22

    2. The ministries' conduct is arguably proscribed by the statute. ............................................................... 24

    3. The State refuses to disavow enforcement. ................. 27

    4. The district-court opinion's six-step "chain of possibilities" analysis is flawed at each step ............... 30

        a. The district-court opinion impermissibly doubted the Verified Complaint's sworn and well-pleaded facts ............................................... 31

        b. The district-court opinion's reasoning contravenes Supreme Court precedent. ............. 34

        c. The district-court opinion failed to address the Notice Clause claim. .................................... 36

B. The ministries suffer a present chilling injury. ................... 37

II. The ministries are entitled to a preliminary injunction. .............. 40

A. The Act triggers and fails strict scrutiny. ........................... 40

    1. The Employment Clause's forced inclusion of dissidents subverts the ministries' expressive associations. .............................................................. 40

        a. The ministries are expressive associations. ....... 41

        b. The Act forces the ministries to include those who would vitiate the ministries' messages ........................................................... 41

        c. The State's counterarguments fail. .................... 44

2. The Employment and Offensive Speech Clauses restrict speech based on content and viewpoint..........47

3. The Notice Clause compels the ministries to utter controversial falsehoods...............................49

4. The Act is neither neutral nor generally applicable, and it impermissibly burdens the ministries' free exercise. ..............................51

   a. The Act exempts comparable secular conduct. ...........................................52

   b. The Act provides for individualized exemptions. ........................................53

   c. The Act evinces the State's hostility toward religion. ............................................54

5. The Act fails strict scrutiny. .......................................56

   a. The State lacks a compelling interest in refusing the ministries an exemption................57

   b. The Act is not narrowly tailored.........................58

B. The remaining preliminary-injunction factors are satisfied. ..........................................................59

Conclusion ..................................................................................60

Certificate of Compliance...................................................62

Certificate of Service .........................................................63

Circuit Rule 30(d) Statement............................................64

Addendum

Required Short Appendix

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ...................................................... 29, 35, 45

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ............................................................ 46

*ACLU of Illinois v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ............................................. 27, 41

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................ 31

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) .............................................................. 39

*Bell v. Keating,*
  697 F.3d 445 (7th Cir. 2012) ............................................... 38

*Board of Education of City of Chicago v. Cady,*
  860 N.E.2d 526 (Ill. App. Ct. 2006) ..................................... 38

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ..................................................... passim

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) ............................................................ 58

*Brown v. Kemp,*
  86 F.4th 745 (7th Cir. 2023) .......................................... passim

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026) ..................................................... 27, 51

*Christian Legal Society v. Walker,*
  453 F.3d 853 (7th Cir. 2006) .......................................... passim

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................. 52, 53, 57, 59

*City of Boerne v. Flores,*
521 U.S. 507 (1997) .......................................................57

*Clapper v. Amnesty International U.S.A.,*
568 U.S. 398 (2013) ......................................................35

*Davis v. Federal Election Commission,*
554 U.S. 724 (2008) ......................................................35

*Demkovich v. St. Andrew the Apostle Parish, Calumet City,*
3 F.4th 968 (7th Cir. 2021).........................................32

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) ......................................................59

*Employment Division, Department of Human Resources of Oregon*
*v. Smith,*
494 U.S. 872 (1990) ......................................................52

*Evergreen Association, Inc. v. Hochul,*
2025 WL 359074 (N.D.N.Y. Jan. 31, 2025)................26

*Evergreen Square of Cudahy v. Wisconsin Housing & Economic*
*Development Authority,*
848 F.3d 822 (7th Cir. 2017) .......................................58

*Frisby v. Schultz,*
487 U.S. 474 (1988) ......................................................59

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ............................................. passim

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) ..................................................31, 46

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ..........................................................39

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
565 U.S. 171 (2012) .................................................42, 45

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
515 U.S. 557 (1995) ...................................................................... 45

*Illinois Republican Party v. Pritzker,*
973 F.3d 760 (7th Cir. 2020) ....................................................... 41

*In the Matter of Alexander v. 1212 Restaurant Group, LLC,*
2008 WL 10752418 (Chi. Comm'n on Hum. Rel. 2008) ................. 27

*Indiana Right to Life Victory Fund v. Morales,*
112 F.4th 466 (7th Cir. 2024) ....................................................... 27

*International Brotherhood of Teamsters v. United States,*
431 U.S. 324 (1977) ...................................................................... 38

*Jordan v. Jewel Food Stores, Inc.,*
743 F.3d 509 (2014) ...................................................................... 51

*Kennedy v. Bremerton School District,*
597 U.S. 507 (2022) ...................................................................... 57

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) .................................................. 41, 60

*Laird v. Tatum,*
408 U.S. 1 (1972) .......................................................................... 35

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................... 24

*Mack v. Resurgent Capital Services, L.P.,*
70 F.4th 395 (7th Cir. 2023) ......................................................... 20

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
584 U.S. 617 (2018) ................................................................ 55, 56

*National Institute of Family & Life Advocates v. Becerra,*
585 U.S. 755 (2018) ............................................................ 23, 50, 51

*National Institute of Family & Life Advocates v. Raoul,*
685 F. Supp. 3d 688 (N.D. Ill. 2023) ...................................... 29, 38

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................... 60

*Our Lady of Guadalupe School v. Morrissey-Berru,*
591 U.S. 732 (2020) ................................................. 23, 44

*Our Lady's Inn v. City of St. Louis,*
349 F. Supp. 3d 805 (E.D. Mo. 2018) ............................ 58

*Pacific Gas & Electric Company v. Public Utilities Commission of California,*
475 U.S. 1 (1986) ......................................................... 46

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ...................................................... 39

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ........................................ 23, 48, 49

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984) ...................................................... 58

*Roe v. Wade,*
410 U.S. 113 (1973) ...................................................... 59

*Rosenberger v. Rector & Visitors of University of Virginia,*
515 U.S. 819 (1995) ...................................................... 48

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
547 U.S. 47 (2006) .................................................. 39, 50

*Slattery v. Hochul,*
61 F.4th 278 (2d Cir. 2023) ................................ 42, 47, 58

*Society of Divine Word v. United States Citizenship & Immigration Services,*
129 F.4th 437 (7th Cir. 2025) ....................................... 22

*Sorrell v. IMS Health, Inc.,*
564 U.S. 552 (2011) ...................................................... 48

*Speech First, Inc. v. Killeen,*
968 F.3d 628 (7th Cir. 2020) ................................................22, 37

*St. John's United Church of Christ v. City of Chicago,*
502 F.3d 616 (7th Cir. 2007) ......................................................21

*Steffel v. Thompson,*
415 U.S. 452 (1974) ..............................................................21, 34

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ..................................... 22, 24, 29, 34

*Tandon v. Newsom,*
593 U.S. 61 (2021) .............................................. 53, 54, 57

*United States v. Furando,*
40 F.4th 567 (7th Cir. 2022) ..........................................................36

*Wooley v. Maynard,*
430 U.S. 705 (1977) ...................................................................50

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
471 U.S. 626 (1985) ....................................................................51

**Statutes**

28 U.S.C. § 1291 ...........................................................................1, 17

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

42 U.S.C. § 1983 ...........................................................................1, 16

42 U.S.C. § 2000e-3 ..........................................................................38

775 Ill. Comp. Stat. Ann. § 5/1-102 ..............................................9, 23

775 Ill. Comp. Stat. Ann. § 5/1-103 ....................................................9

775 Ill. Comp. Stat. Ann. § 5/2-101 ............................................ passim

775 Ill. Comp. Stat. Ann. § 5/2-102 .............................................. passim

775 Ill. Comp. Stat. Ann. § 5/2-104 ...................................................... 54

775 Ill. Comp. Stat. Ann. § 5/7-101 ...................................................... 30

775 Ill. Comp. Stat. Ann. § 5/7A-102 .................................................... 30

## Other Authorities

Guttmacher Institute, *Characteristics of Abortion Patients in 2014 and Changes Since 2008* (May 2016) ............................................ 32

Ill. Dep't of Hum. Rts., *Employer Notice* (Sept. 2022) ..................... 36, 51

Shout Your Abortion, *Stories* ............................................................. 33

## STATEMENT OF JURISDICTION

The United States District Court for the Northern District of Illinois had original jurisdiction of this case under 28 U.S.C. §§ 1331 & 1343. The district court's federal question jurisdiction was based on 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

This Court has jurisdiction to decide this appeal under 28 U.S.C. § 1291. This appeal is taken from the final decision of the U.S. District Court for the Northern District of Illinois entered on March 31, 2026, by the Honorable Rebecca R. Pallmeyer, dismissing Appellants' complaint and striking their motion for a preliminary injunction based on want of jurisdiction. Although the order was issued without prejudice to Appellants' refiling an amended complaint within 21 days, the order was final the day it was issued because amendment would have been futile in light of the district court's erroneous legal holdings. Moreover, the period provided by the district court for amendment has since lapsed, and the district court entered a Rule 58 judgment on May 11, 2026, confirming the order's finality.

Appellants filed the notice of appeal within the time designated by the Federal Rules of Appellate Procedure, on April 22, 2026, just after the period for amendment lapsed. There are no related or prior appellate court proceedings.

1

The current occupants of the named offices are Defendants James Bennett, Director of the Illinois Department of Human Rights, and Kwame Raoul, Attorney General of Illinois.

## STATEMENT OF ISSUES

1. Whether the plaintiff ministries have Article III standing to challenge the Act when they currently engage in constitutionally protected conduct arguably proscribed by the statute and the State refuses to disavow enforcement.

2. Whether the plaintiff ministries have Article III standing to challenge the Employment Clause when they self-censor their speech based on a reasonable fear of enforcement.

3. Whether the plaintiff ministries are entitled to a preliminary injunction when the Act violates their freedom of expressive association, freedom of speech, and free exercise of religion by (a) compelling the ministries to hire employees whose conduct flouts the ministries' pro-life message and religious beliefs, (b) censoring the ministries' expression based on its content and viewpoint and compelling the ministries' speech, and (c) forcing the ministries to violate their sincerely held religious beliefs with restrictions that are neither neutral nor generally applicable.

**INTRODUCTION**

Plaintiffs-Appellants The Pregnancy Care Center of Rockford and the Diocese of Springfield (together, "the ministries") exist to proclaim the Gospel of Jesus Christ and promote the sanctity of human life, marriage, and the family. For more than 40 years, Pregnancy Care has supported women facing unplanned pregnancies with free testing, ultrasounds, and material, emotional, and spiritual support, motivated by their religious mission to share the Gospel and protect the most vulnerable. The Diocese proclaims these same convictions to 120,000 Catholics across western Illinois, serving and evangelizing its communities through its parishes and various outreach programs, including its Respect Life apostolate. Both organizations rely on faithful employees who share and live the ministries' religious convictions— employees whose personal witness is inseparable from the ministries' missions and messages.

Illinois now forbids them to do so. At the start of 2025, "reproductive health decisions" was added as a protected characteristic under the Illinois Human Rights Act. This requires the ministries to hire and retain employees who violate the ministries' core religious beliefs by obtaining abortions or using contraception, IVF, and sterilization. The law further requires the ministries to give time off for obtaining an abortion and to extend equal benefits to employees who do so.

It gets worse. The ministries may no longer teach that abortion kills an innocent child and is unjustified and mortally sinful. Such a pervasive message risks creating a "hostile" work environment. And the ministries must post the State's notice telling employees that they may make reproductive decisions the ministries' faith forbids. In short, the Act compels these ministries to employ those who flout the very religious beliefs the ministries exist to spread, and it forbids the ministries from even trying to change these employees' minds about abortion.

The First Amendment bars all of this. Forcing the ministries to include individuals whose unrepentant reproductive choices contradict the organizations' defining religious beliefs subverts the ministries' freedom of expressive association. Restricting the ministries' speech based on its content and viewpoint—and forcing the ministries to mouth a government-approved falsehood—violates their freedom of speech. And requiring the ministries to condone, encourage, facilitate, or participate in violations of their sincerely held religious beliefs impermissibly burdens their free exercise, because the Act is neither neutral nor generally applicable. Each of these infringements on the ministries' fundamental rights triggers strict scrutiny—a fatal-in-fact standard that the State cannot and does not attempt to satisfy.

To vindicate these rights, the ministries promptly filed a pre-enforcement challenge in federal court and moved for a preliminary

injunction. Nearly a year later, the district court dismissed the complaint and refused the preliminary injunction in a four-page order, holding that the ministries lacked Article III standing because their injuries were speculative. That's wrong. The ministries currently engage in constitutionally protected conduct that the Act arguably proscribes, and the State has repeatedly refused to disavow enforcement. That credible threat creates an injury-in-fact sufficient for Article III. If it doesn't, nearly no pre-enforcement challenge could ever go forward.

Moreover, the ministries suffer an ongoing chilling injury, because they have self-censored certain speech out of a reasonable fear of enforcement. That present, concrete injury is more than enough for the federal courts to rule.

In sum, the district court had jurisdiction to enter a preliminary injunction, and the ministries are entitled to that injunction as a matter of law. Indeed, they were entitled to it a year ago. This Court should reverse and order the district court to enter it.

# STATEMENT OF THE CASE

## A. Two pro-life religious ministries rely on faithful Christian employees to carry out their missions.

The Pregnancy Care Center of Rockford is a religious nonprofit that provides help and hope to women and their families facing unplanned pregnancies. SA.7.[1] It has served the Rockford community for over four decades, providing lab-quality pregnancy testing, ultrasounds, tests for sexually transmitted infections, and material resources, including diapers, clothing, cribs, car seats, and other essential items to care for children—all free of charge. SA.7.

Pregnancy Care's pro-life religious beliefs are its animating purpose. Its religious mission is "[t]o share by word and deed the Gospel of Jesus Christ with all who seek [its] services," and it aims to see "God glorified through loving, empowering, and supporting all those facing pregnancy decisions, so that choosing abundant life today and for future generations is celebrated." SA.64, 79. Pregnancy Care maintains that "all human life is sacred and created by God in His image," that "life begins at conception," and that its ministry work requires it to "make special efforts to protect the most vulnerable." SA.69.

These convictions are implemented "on all levels of operations including client counsel, school presentations, and the expected lifestyle

---

[1] Cites throughout this brief marked "RSA" are to the Required Short Appendix. Those marked "SA" are to the Separate Appendix.

of all volunteers and staff." SA.82. Accordingly, "[a] personal relationship with Jesus Christ is a requirement for any employee, as well as believing that abortion is never a morally acceptable option." SA.82. But Pregnancy Care's requirements go beyond employees' beliefs: "referring [for], assisting in the procurement of, providing, or receiving an abortion" are grounds "for refusal to hire, and/or discipline up to an including termination." SA.82.

The Diocese of Springfield in Illinois is a religious nonprofit corporation of the Roman Catholic Church serving approximately 120,000 Catholics in western Illinois through 129 parishes. SA.14. Its mission is "to build a fervent community of intentional and dedicated missionary disciples of the Risen Lord and steadfast stewards of God's creation who seek to become saints." SA.14–15.

The Diocese proclaims and promotes all the teachings of the Catholic Church, including what it describes as "indispensable beliefs supporting the sanctity of life and the Christian view of marriage while opposing abortion, contraception, sterilization, and certain reproductive technologies that discard and destroy human life or that undermine the marital union." SA.15. Through its Office for Pro-Life Activities, its Office of Marriage and Family Life, its annual Mass for Life, its co-organization of the Illinois Pro-Life March, and more, the Diocese continuously expresses these beliefs to employees, parishioners, the Catholic faithful, and the broader public. SA.15–16.

The Diocese's Standards of Conduct require every employee, "as a representative of the Catholic Church to the faithful and to the outside world," to "conduct themselves in a moral and ethical manner consistent with Catholic principles" and to act "in a way that does not contradict the doctrine and moral teaching of the Catholic Church." SA.123. Failing to do so by encouraging or participating in abortion, contraception, sterilization, or certain reproductive technologies that discard and destroy human life or undermine the marital union (including IVF, ZIFT, ICSI, ovum donation, and surrogacy) are grounds for adverse employment action, including termination. SA.28, 123, 233.

Both the Diocese and Pregnancy Care rely on a variety of employees to carry out their pro-life missions and spread the Gospel message. The Diocese regularly employs approximately 125 people and hires about 15 each year. SA.18. When this suit was filed, one of the Diocese's open positions was its Respect Life Advocate—a role responsible for fostering awareness and education on issues of human dignity and reproductive life among diocesan parishes, clergy, and schools; developing pro-life communications strategies; and serving as the Diocese's primary contact for all pro-life ministries and programs. SA.126–27. The role required that the individual be a "[p]racticing Catholic in full communion with the teachings of the Church." SA.127.

Pregnancy Care has approximately fourteen employees and typically hires two to four each year. SA.11. When the suit was filed, one of

Pregnancy Care's open positions was a Staff Nurse—a role requiring "a committed Christ-follower" to counsel pregnant women at the impactful moment they first learn of new life and provide client education and pro-life options counseling. The Staff Nurse also is required to represent Pregnancy Care at fundraising events and during community tours. SA.117–18.

Both ministries understand that it would fatally undermine their missions and messages to fill these positions—and any other position across their organizations—with individuals whose actions flout the ministries' pro-life religious beliefs. SA.14, 17–18.

## B. H.B. 4867 outlaws the ministries' employment conduct

In August 2024, Governor JB Pritzker signed H.B. 4867, which amended the Illinois Human Rights Act ("the Act") to include "reproductive health decisions" as a protected characteristic. SA.2, 22–23; 775 ILL. COMP. STAT. ANN. §§ 5/1-102(A), 5/1-103(O-2), (Q) (Add.1). The Act defines "reproductive health decisions" to include a person's decisions regarding contraception, sterilization, fertility care, assisted reproductive technologies, miscarriage management care, healthcare related to the continuation or termination of pregnancy, and prenatal, intranatal, or postnatal care. 775 ILL. COMP. STAT. ANN. § 5/1-103(O-2) (Add.1).

Five provisions of the amended Act directly burden the ministries' expressive association, speech, and religious exercise, proscribing many of their current employment practices and policies.

### 1. Employment Clause

The Employment Clause makes it a civil-rights violation for any employer to refuse to hire or to take adverse employment action—including in recruitment, hiring, promotion, renewal, discipline, or termination—against any individual based on reproductive health decisions. 775 ILL. COMP. STAT. ANN. § 5/2-102(A) (Add.4). The State's nonregulatory guidance interprets this provision to prohibit employers from taking "adverse action against an employee for choosing to use or not use contraception, terminating an unplanned pregnancy, or seeking treatment for fertility issues." SA.148. Defendants say that prohibited adverse actions include "[t]hreatening a pregnant employee with termination" related to a decision to "terminate their pregnancy." SA.149.

Both ministries openly violate this provision. Pregnancy Care requires each employee to sign a Conduct Commitment promising never to refer for, assist in the procurement of, provide, or receive an abortion. SA.108–10. Violation of or refusal to sign this agreement "is cause for refusal to hire, and/or discipline up to and including termination." SA.82. In its hiring process, Pregnancy Care asks applicants directly:

"Have you had any personal experiences related to abortion? If so, please explain." SA.343. Those who answer "yes" must repent of their decision and complete a healing program or be denied employment. SA.27, 237, 343–44.

Likewise, the Diocese requires every employee to abstain from reproductive conduct that "contradict[s] the doctrine and moral teaching of the Catholic Church." SA.123. It subjects employees to discipline, including termination, for engaging in such conduct. SA.123. And when hiring, the Diocese structures its interviews to uncover any such conduct and ensure compliance with Catholic doctrine on reproduction. SA.29, 230–32.

### 2. The Offensive Speech Clause

The Offensive Speech Clause deems it unlawful "harassment" to express any message based on a protected characteristic that has the purpose or effect of "creating an intimidating, hostile, or offensive working environment." 775 ILL. COMP. STAT. ANN. §§ 5/2-102(A), 5/2-101(E-1) (Add.4). Defendants' guidance states that "[e]ither one extremely serious act of harassment, or a series of less severe acts, could be severe or pervasive enough" to constitute a violation, and cites as an example an employer "[a]ddressing a pregnant employee with derogatory terms after learning the pregnant employee plans to have an abortion." SA.147, 149.

Both ministries openly engage in pervasive and explicit pro-life expression in contexts this provision contemplates. Pregnancy Care communicates a message that abortion is "immoral, sinful, unjustified, and is murder of a human life" through daily counseling sessions, staff meetings, educational programs, internal retreats, and digital and print media. SA.30–31. The Diocese regularly communicates that objectionable reproductive decisions are "mortally sinful, immoral, unreasonable, unjust, unloving, [and] contrary to eternal salvation." SA.32.

### 3. The Notice Clause

The Notice Clause compels speech, making it a civil-rights violation for any employer to fail to post or include in any employee handbook a State-prepared or -approved notice summarizing employees' rights under the Act, including the right to be free from unlawful discrimination. 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1) (Add.7–8). The Department's approved notice states that employers "may not treat people differently based on … any [ ] protected class named in the Act."

Both ministries openly violate this provision, too. While the ministries maintain employee handbooks and workplaces where notices are customarily posted, the ministries refuse to include or post the State's notice because they believe it would communicate a falsehood— that their employees may make reproductive decisions prohibited by

their faith-based policies without adverse consequence. SA.36, 226–27, 239–40.

### 4.    The Accommodation Clause

The Accommodation Clause requires employers to make reasonable accommodations for pregnancy-related medical conditions, which Defendants' guidance extends to requests for time off for "abortion care" and fertility treatments. 775 ILL. COMP. STAT. ANN. § 5/2-102(J) (Add.5–7); SA.149–50.

Both ministries openly violate the Accommodation Clause by denying accommodations for employee or prospective-employee reproductive decisions that violate the ministries' religious beliefs. SA.33–34.

### 5.    The Benefit Clause

Finally, the Benefit Clause prohibits unequal terms and conditions of employment based on reproductive health decisions. 775 ILL. COMP. STAT. ANN. § 5/2-102(A) (Add.4).

Both ministries openly violate this provision, too. Pregnancy Care and the Diocese offer time off and other benefits for reproductive decisions they support (like giving birth) while withholding equivalent benefits for those that violate their religious beliefs (like aborting a baby). And the Diocese—while offering its employees a health plan—

specifically excludes abortion, contraception, sterilization, and certain reproductive technologies from coverage. SA.34–35, 239.

### C. The Department refuses to accommodate the Diocese's religious beliefs.

On behalf of the Diocese and other Catholic organizations, the Catholic Conference of Illinois emailed the Department of Human Rights during the legislative process, explaining that applying the Act's reproductive-decisions provisions to religious organizations would unconstitutionally enter a "religious thicket" and violate both the anti-entanglement principles of the Establishment Clause and the free-exercise rights of religious employers. SA.168–69. The Conference proposed two amendments to address these concerns: one clarifying that the Act's existing religious-employer exclusion, 775 ILL. COMP. STAT. ANN. § 5/2-101(B)(2) (Add.3–4), reaches reproductive-decisions coverage; and a second confirming that expressive associations may consider employees' reproductive decisions without violating the Act. SA.168–69.

The Department rejected both proposals without engaging their constitutional substance. The Department decreed that "the application of these protections, existing and new, to religious organizations has been and will continue to be appropriate." SA.168. In the Department's view, a religious organization was not entitled to a religious exemption if an employee rejected the organization's teachings and beliefs about

gender identity and sexual orientation, so the organization wasn't entitled to a religious exemption if an employee participated in abortion or used contraception, either. SA.168 ("[O]ur view is that the harms or concerns you expressed are not reasons to exempt religious organizations," because "religious organizations must already contend with the issues and scenarios you mentioned around gender identity and sexual orientation, which are already fully protected classes in the [Act] that do not carry exemptions like your proposals.").

The State has also publicly championed the Act in terms that flout the ministries' religious convictions. Attorney General Raoul affirmed his office is "proud to continue to partner with Gov. Pritzker's administration to draft legislation and identify new avenues to ensure Illinois is a safe haven for patients to access comprehensive abortion and gender-affirming care," and committed "to defend against legal challenges." SA.24. Director Bennett lamented the overruling of *Roe v. Wade* and announced that the Department had worked "diligently … to strengthen protections for reproductive rights." SA.24–25. Lieutenant Governor Stratton declared that "Illinois is not just protecting a right; it is championing fundamental principles" on reproduction—the very principles the ministries are organized to oppose. SA.4.

### D. Proceedings below

The Act went into effect on January 1, 2025. Weeks later, the ministries filed suit under 42 U.S.C. § 1983, alleging violations of their rights to expressive association, free exercise of religion, religious autonomy, free speech, and equal protection under the First and Fourteenth Amendments. Simultaneously, they moved for a preliminary injunction barring the Department and the Attorney General (together, "the State") from enforcing the Act against them with respect to their faith-based employment policies, speech, and conduct. In response, the State filed a combined motion to dismiss and opposition to the preliminary-injunction motion, arguing both that the ministries lacked standing and that their claims failed on the merits.

Nearly a year later, the district court issued a four-page order granting the State's motion to dismiss and striking the ministries' motion for a preliminary injunction, citing a lack of standing. RSA.4. Its analysis rested on three grounds. First, the court accepted the State's assertion that the ministries' employment actions were based on applicants' *beliefs* about reproductive decisions rather than on the decisions themselves. RSA.2. It thus held that those actions could not trigger an enforcement action under the Act. RSA.2. Second, the court held that the threat of enforcement was hypothetical, because the "chain of possibilities" required to trigger an enforcement action was "speculative." RSA.2–3. Third, the court concluded that the ministries

had not established a cognizable chilling effect because the Act regulates conduct rather than speech. RSA.3–4. The court did not address the State's refusal to disavow enforcement or the ministries' standing for their Notice Clause claim.

The district court issued its order without prejudice and gave the ministries 21 days to amend their complaint. Instead, the ministries filed a timely notice of appeal after the time for amendment had expired. Shortly thereafter, the district court entered a final judgment. RSA.5. This Court has jurisdiction over the district court's final decision under 28 U.S.C. § 1291.

## SUMMARY OF THE ARGUMENT

The district court dismissed the ministries' complaint and refused their request for a preliminary injunction based on the same erroneous legal conclusion: that the ministries lack Article III standing. That was wrong. The ministries are entitled to relief, so this Court should reverse with instructions to enter a preliminary injunction.

The ministries have standing. An organization need not await prosecution before challenging a statute that burdens its constitutional rights. It may instead show either (1) a credible threat of future enforcement, or (2) a present and objectively reasonable chill on speech. Here, the ministries have shown both.

Start with the threat of future enforcement. That threat constitutes an injury-in-fact because the ministries' employment conduct is arguably affected with a constitutional interest and arguably proscribed by the Act, and the State refuses to disavow enforcement. As expressive associations engaged in evangelization and pro-life advocacy, the ministries exercise fundamental First Amendment rights that the Act directly burdens: the right to choose who carries their religious and pro-life messages; to speak freely about their convictions while remaining free from compelled speech; and to refuse to condone, encourage, facilitate, or participate in violations of their faith.

The ministries' current policies—screening out applicants who have made objectionable reproductive choices, conditioning employment on refraining from such choices, withholding accommodations and equal benefits for the same, and refusing to post the State's required notice—are arguably proscribed by the Act's own terms, as the State's interpretive guidance makes clear. And the State has refused to disavow enforcement—which alone suffices to show a credible threat. Indeed, the State has repeatedly expressed an affirmative intent to enforce. No more is required.

Independent of that, the ministries suffer a present chilling injury. The ministries have written statements declaring that they cannot employ people who make objectionable reproductive decisions, and they wish to publish those statements in job postings right now.

But the ministries self-censor, reasonably fearing that publishing those statements would invite State enforcement. That self-censorship, too, is an injury-in-fact. So for two separate reasons, the district court had jurisdiction.

In holding otherwise, the district court disregarded the Verified Complaint's well-pleaded and sworn allegations, drew countless inferences against the ministries, contravened Supreme Court precedent, conflated the merits-injury standard with that of standing, and ignored the Notice Clause claim altogether. Each error warrants reversal.

So does the district court's error in holding that the ministries were not entitled to a preliminary injunction. In First Amendment cases, the analysis begins and ends with the likelihood of success on the merits. And the ministries are likely to succeed across the board because the Act triggers strict scrutiny in myriad ways, and the State has forfeited any attempt to satisfy that standard.

First, the Employment Clause triggers strict scrutiny by forcing the ministries to hire and retain individuals who unapologetically violate the ministries' sincerely held religious and pro-life beliefs. Such forced inclusion impairs the ministries' expressive associations.

Next, the Employment and Offensive Speech Clauses are subject to strict scrutiny because they regulate speech based on content and

viewpoint. As a result, the State allows expression that affirms objecttionable reproductive decisions while penalizing the ministries'
expression that criticizes such choices.

Likewise, the Notice Clause abridges the ministries' freedom of
speech by compelling them to lie to their employees, suggesting that the
ministries will tolerate reproductive decisions that their faith forbids.

Finally, the Act invites strict scrutiny because it forces the ministries to violate their sincerely held religious beliefs and is neither
neutral nor generally applicable.

The State has failed to carry its burden to justify these violations
under the most exacting form of First Amendment scrutiny—indeed, it
hasn't even tried. So the ministries are likely to succeed on the merits,
and the remaining injunction factors follow. This Court should reverse
and remand with an order to enter the preliminary injunction.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal for lack of standing
de novo. *Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 403 (7th Cir.
2023). When a district court refuses a preliminary injunction based on
the underlying complaint's dismissal, its decision is reviewed under the
usual standard for preliminary-injunction denials: "[F]indings of fact"
are reviewed "for clear error, its balancing of the factors … under the
abuse of discretion standard, and its legal conclusions de novo." *St.*

*John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (citation modified).

In assessing whether that preliminary injunction is warranted, this Court considers whether the movant has demonstrated "a reasonable likelihood of success on the merits," "irreparable harm" that will be "greater than the harm the opposing party will suffer if the preliminary injunction is granted," and that "the preliminary injunction will not harm the public interest." *Id.*

Because this case implicates the First Amendment, this Court is "required to make an independent review of the record" and "decide independently whether 'a given course of conduct falls on the near or far side of the line of constitutional protection.'" *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citation omitted).

## ARGUMENT

### I.  The ministries have Article III standing.

Article III does not require a plaintiff to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). In such a suit, there are two ways he can establish an injury-in-fact: First, he can show an imminent future injury if he intends to engage in arguably proscribed conduct affected with a constitutional interest and he faces a credible threat of

enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Second, he can show a present chilling effect on protected speech that is objectively reasonable. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). Either showing is sufficient. The ministries have made both. In holding otherwise, the district court misapplied governing doctrine, rested on factual assumptions the record refutes, and failed to address the ministries' standing for their Notice Clause claim. The decision below should be reversed.

### A. The ministries suffer an imminent future injury.

The threat of future enforcement is sufficiently imminent because (1) the Act arguably interferes with the ministries' First Amendment rights; (2) their past, present, and intended future conduct is arguably proscribed by the Act; and (3) the State refuses to disavow enforcement. The ministries readily establish an injury-in-fact.

#### 1. The ministries' conduct is arguably affected with a constitutional interest.

The constitutional-interest element of pre-enforcement standing is satisfied whenever a law arguably "interferes"—even indirectly—with a plaintiff's First Amendment rights. *Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 446 (7th Cir. 2025). Conduct that is not itself constitutionally protected still satisfies this element if it is "closely tied to expression" or another protected activity. *Brown v. Kemp*, 86 F.4th 745, 763 (7th Cir. 2023).

As expressive associations engaged in evangelization, religious exercise, and advocacy, the ministries engage in myriad constitutionally protected activities that are impaired by the Act. The Constitution protects their rights to choose whom they entrust with their Christian and pro-life mission and message, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); to discuss theological matters in the workplace free from viewpoint-based restrictions and compelled falsehoods, *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018); and to refrain from offering benefits and terms of employment that would cause them to violate their sincerely held religious beliefs, *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). The Act directly infringes each of these rights. *See* 775 ILL. COMP. STAT. ANN. § 5/1-102(A) (Employment and Benefit Clauses) (Add.1); *Id.* §§ 5/1-102(A) & 5/2-101(E-1) (Offensive Speech Clause) (Add.4); *Id.* § 5/2-102(K)(1) (Notice Clause) (Add.7–8); *Id.* § 5/2-102(J) (Accommodation Clause) (Add.5–7); *see also infra* at § II.A.

The Act's Employment Clause also interferes with the ministries' ability to communicate their pro-life message both internally and to clients, parishioners, and the public. The selection of an organization's spokespersons and representatives is "closely tied to expression." *Brown*, 86 F.4th at 763. When the ministries send staff into their communities to advance their faith-based and pro-life missions, those

individuals carry the organization's messages through their words, their presence, and their personal witness. A statute compelling the ministries to employ—and thereby to be represented by—persons whose reproductive choices contradict those messages does not merely regulate hiring; it undermines the ministries' messages and missions.

Pre-enforcement standing requires that the plaintiff's conduct be only "arguably" affected with a constitutional interest. *Susan B. Anthony List*, 573 U.S. at 159. By failing to argue otherwise below, the State has effectively conceded that the ministries' conduct meets this standard. And the district court did not hold otherwise. So the ministries satisfy the first prong of pre-enforcement standing.

### 2. The ministries' conduct is arguably proscribed by the statute.

For pre-enforcement standing, a plaintiff's "intended course of conduct need only be … 'arguably' proscribed by the challenged statute." *Brown*, 86 F.4th at 762. The ministries clear this low threshold on multiple grounds, any one of which is enough to warrant reversal. And contrary to the district court's assertion, they do not "'some day' inten[d]" to engage in the arguably proscribed conduct. RSA.3 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)). They do so today.

The Court need look no further than the State's own interpretive guidance to confirm that the ministries' conduct is arguably proscribed. Take, for example, the Employment Clause. The State's guidance says

that an employer violates that Clause by threatening employees with termination for having an abortion. SA.149. And both ministries openly issue such threats. SA.27–28.

Other current policies and practices of the ministries arguably violate the Act's Employment, Accommodation, Benefit, Notice, and Offensive Speech Clauses. 775 ILL. COMP. STAT. ANN. 5/2-102, *et. seq*. The ministries refuse to hire applicants who have had or facilitated objectionable reproductive choices and screen their applicants accordingly. SA.26–29. Pregnancy Care conditions employment on a written agreement not to obtain or facilitate an abortion. SA.26. When confronted with an applicant who has had an abortion, the ministries treat that applicant differently by requiring her to repent and undergo a healing program—conditions other applicants don't face. SA.27, 237, 343–44. The ministries deny equal benefits to employees making objectionable reproductive decisions. SA.34–35. The ministries refuse to post any notice that references—directly or indirectly—the Act's protections for objectionable reproductive choices in their employee handbooks or on workplace posters. SA.36. And much of the speech the ministries engage in about abortion and other objectionable reproductive choices is viewed by many as unwelcome or offensive, creating what the State would consider a "hostile" employment environment. SA.30–33.

The district court characterized some of this discriminatory conduct as "based not on the applicant's 'reproductive health decisions' but on her *beliefs* about those decisions." RSA.2 (citing *Evergreen Ass'n, Inc. v. Hochul*, No. 1:20-CV-0112, 2025 WL 359074, at \*5 (N.D.N.Y. Jan. 31, 2025)). In the district court's view, the Act does not protect beliefs, so the ministries' conduct falls outside its scope. RSA.2. But that reasoning fails as a matter of fact and law.

Start with the facts. The ministries take adverse action against *all* applicants and employees who make objectionable reproductive choices—not just those who hold a particular belief. All such individuals are subjected to disparate treatment because they face additional hurdles to employment that are not applied to applicants and employees who have not made objectionable reproductive choices. Specifically, those who make objectionable choices are required to demonstrate repentance through, for example, a post-abortion healing program. SA.27, 237, 343–44.

Those who refuse to comply with this extra condition face a second adverse action when they are denied employment. Yet applicants and employees with no history of objectionable reproductive decisions face neither adverse action. This differential treatment is exactly the kind of unequal term of employment the Act bars, and it turns on the repro-ductive choice—not the individual's belief. 775 Ill. Comp. Stat. Ann. 5/2-102(A) (Add.4).

Next, the law. The Act does not apply only when the protected characteristic is the exclusive reason behind an adverse employment action; it applies whenever the characteristic "played a part" in the decision. *In the Matter of Alexander v. 1212 Rest. Grp., LLC*, No. 00-E-100, 2008 WL 10752418, at *12, n.14 (Chi. Comm'n on Hum. Rel. 2008). Here, the objectionable reproductive decision is inextricable from the individual's belief about it. So even if the ministries' adverse employment actions were only triggered by certain beliefs about one's objectionable reproductive choices—and they are not—the underlying choice has still "played a part." *Id.* At the very least, such an employment action is *arguably* proscribed by the Act under this framework. That's enough.

### 3.  The State refuses to disavow enforcement.

When a plaintiff intends to engage in arguably constitutionally protected conduct that is arguably proscribed by a statute, "the statute poses a threat of enforcement latent in the statute's existence." *Ind. Right to Life Victory Fund v. Morales*, 112 F.4th 466, 470 (7th Cir. 2024); *see also ACLU of Ill. v. Alvarez*, 679 F.3d 583, 593 (7th Cir. 2012). So when the State "expressly decline[s] to disavow enforcement against [the plaintiff]," "no more is required." *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026) (citation modified).

Here, the district-court opinion ignores that the State has refused disavowal at any stage of this litigation. Indeed, the State has repeatedly *affirmed* its intention to enforce the Act against the ministries. The threat of enforcement is thus substantial.

This threat first became clear at the legislative stage. The Diocese, as a member of the Illinois Catholic Conference, proposed two amendments that would have carved out religious organizations and expressive associations from the Act's reach. SA.168–70. The Department of Human Rights refused both. It explained that religious employers already must contend with the Act when it comes to gender identity and sexual orientation—protected classes that carry no religious exemption—and it saw no reason to treat reproductive decisions any differently. SA.168. That was not a neutral response. It was a considered, affirmative decision to keep religious employers like the Diocese and Pregnancy Care exposed to enforcement.

Attorney General Raoul's litigation positions confirm the threat. In addition to vigorously defending this suit for the past year, he has fought elsewhere to prevent identical religious exemptions from protecting religious organizations like the ministries. Specifically, the Attorney General co-authored a brief to the Supreme Court arguing that a religious exemption textually identical to the one in this Act does not authorize religious organizations to take adverse action based on reproductive decisions, even when that action is consistent with or

mandated by religious tenets. Br. of Amici Curiae Virginia, Ill., et al. at 8, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, No. 19-267 (U.S. Mar. 11, 2020), https://perma.cc/FP8L-EKFR. Illinois's chief law-enforcement officer has held fast to the position that no religious exemption protects what the ministries are doing here.

This is also not a dormant statute. Defendants receive more than 10,000 complaints and inquiries each year under the Act. SA.21–22. Since the 2024 amendments took effect just over a year before this appeal, officials have made repeated public statements expressing their zeal to enforce the new provisions. SA.24–25. And the Office of the Attorney General has a demonstrated history of targeting pro-life organizations. *See Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 696 (N.D. Ill. 2023). The ministries have every reason to expect they are next.

Finally, the Act's private right of action heightens the threat. Any person can file a complaint and trigger a burdensome administrative process—without waiting for the State to act. That private enforcement mechanism independently supports standing. *Brown*, 86 F.4th at 768; *303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023); *Susan B. Anthony List*, 573 U.S. at 164–65. The ministries interact with the public, their employees, and potential applicants daily. Any one of them could file tomorrow. That suffices for Article III.

### 4. The district-court opinion's six-step "chain of possibilities" analysis is flawed at each step.

The district-court opinion described the ministries' future injury as "hypothetical." RSA.2–3. Specifically, the opinion identified six contingencies between the ministries and an injury: an employee or applicant must (1) make an objectionable reproductive decision, (2) seek employment at the ministries despite that decision, (3) disclose the decision, (4) refuse to repent, (5) face adverse action, and then (6) sue. RSA.3.

As an initial matter, all future injuries alleged in pre-enforcement actions depend on the last two contingencies: the plaintiff must actually engage in his intended conduct and the enforcement action must be initiated.[2] So those two contingencies cannot cut against standing here. And as explained, the ministries take adverse action against *all* employees and applicants who make objectionable reproductive choices—not just those who refuse to repent. So the fourth contingency is irrelevant to the injury.

Turning to the remaining three contingencies, the district-court opinion erred in finding them too "speculative." The opinion's reasoning disregards the well-pleaded facts of the complaint and conflicts with

---

[2] To the extent the district-court opinion suggested that enforcement could only occur if an employee or applicant sued, that was additional error. Anyone can initiate administrative processes by filing a complaint, 775 ILL. COMP. STAT. ANN. § 5/7A-102, and the State can do so on its own initiative. 775 ILL. COMP. STAT. ANN. § 5/7-101.

Supreme Court precedent. Moreover, the opinion failed to address the ministries' standing to bring their Notice Clause claim. Independently and cumulatively, these errors warrant reversal.

### a. The district-court opinion impermissibly doubted the Verified Complaint's sworn and well-pleaded facts.

In evaluating a motion to dismiss, a court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The district-court opinion did neither.

Start with the opinion's assumption that people who make objectionable reproductive choices would not seek work at these ministries. This is refuted by the record and reason. Many women regret their abortions, and some seek to become pro-life advocates as a result. Indeed, several of Pregnancy Care's volunteer apprentices have had this experience. SA.27. And these apprentices' hiring processes arguably violated the Act, because they faced extra hurdles to employment due to their prior reproductive choices.[3]

---

[3] The Act defines "employee" to include "apprentice[s]," so these individuals are arguably covered by the Act. 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(1)(b). And, in any event, their example powerfully refutes the district court's assumption that post-abortive individuals would not apply to Pregnancy Care.

The ministries' allegations also support the reasonable inference that an individual who does not repent of her objectionable reproductive choice might nevertheless apply to work at the ministries, simply out of a need for employment. SA.12, 18. The ministries regularly receive applications from those who *disagree* with the ministries' Christian and pro-life mission. SA.11–12, 18; *see also* SA.344–45 (recounting an application for its receptionist opening that reflected a disagreement with Pregnancy Care's pro-life mission). The district-court opinion failed to accept these allegations as true and draw a favorable inference from them. Instead, the opinion assumed the opposite.

The district-court opinion also assumed that none of the ministries' current employees would ever make an objectionable reproductive decision. This unsupported assumption belies reason. As cases like *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968 (7th Cir. 2021), confirm, a co-religionist filter is not a perfect screen; individuals whose lifestyles diverge from Church teaching do seek work at dioceses and similar religious organizations. *See* SA.233 ("The Diocese has taken adverse action against employees for violating its conduct policy in matters of human sexuality."); *see also* Guttmacher Institute, *Characteristics of Abortion Patients in 2014 and Changes Since 2008* (May 2016), https://perma.cc/M7QV-NZAC (reporting that a majority of abortion patients identify as Christian). Given that one

wayward employee is enough to trigger the Act, the ministries' fear of enforcement is not speculative.

Finally, the district-court opinion doubted that the ministries would even know of an employee's reproductive decisions, given such decisions' private nature. RSA.2. But many individuals do not keep such decisions private. *See, e.g.,* Shout Your Abortion, *Stories*, https://perma.cc/TB6C-K6XZ (online platform for women to publicly share their abortion stories headlined with a photo of two women wearing shirts that read: "EVERYONE KNOWS I HAD AN ABORTION"). And some decisions leave visible vestiges (*i.e.* late-term abortions). Even for those decisions that are not apparent, inferences from the complaint, confirmed by the preliminary injunction record, provide the answer: Pregnancy Care asks every applicant to disclose personal experiences related to abortion. SA.344–45. And the Diocese structures its interviews to elicit the relevant information and has its Vicar General conduct a final interview for each position to ensure compliance with Catholic doctrine on reproduction. SA.29, 230–32. Those practices work. *See* SA.27. The district court inexplicably assumed otherwise.

Instead of accepting the ministries' allegations as true and drawing all reasonable inferences in their favor, the district-court opinion doubted key facts and embraced unfavorable, unsupported assumptions. This was error.

### b. The district-court opinion's reasoning contravenes Supreme Court precedent.

The district-court opinion says none of the ministries' employees have ever disclosed an objectionable reproductive decision and suffered an adverse employment action. RSA.2. First, that's wrong factually: Pregnancy Care alleged that some volunteer apprentices—who qualify as "employees" under the Act, *see* 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(1)(b)—disclosed objectionable reproductive decisions and were subjected to disparate treatment requiring them to repent and undergo healing programs.

More important, that's not required. As the Supreme Court has repeatedly made clear, a plaintiff must merely *intend* to violate a statute—not have already done so. *Susan B. Anthony List*, 573 U.S. at 159. Requiring plaintiffs to "expose [themselves]" to liability as the price of admission to federal court would flip pre-enforcement doctrine on its head. *Steffel*, 415 U.S. at 459. If a state passed a law requiring abortion clinics not to discriminate based on an applicant's pro-life advocacy, a clinic would not have to wait until after it declined to hire a pro-life applicant—risking a lawsuit—before seeking judicial review.

That the ministries' intended violation of the law depends on third-party decisions likewise presents no obstacle to review. Consider *303 Creative*. There, the plaintiff had not even launched the wedding-website business that would violate Colorado's public-accommodations

34

law, let alone had the opportunity to discriminate in the provision of those services. The Court still found standing under the pre-enforcement doctrine. 600 U.S. at 583–84.

The "chain of possibilities" was even more attenuated in *Davis v. Federal Election Commission*, 554 U.S. 724 (2008). There, the plaintiff's injury would only occur if his opponent qualified for asymmetrical contribution limits, third-party donors chose to contribute in asym-metrically higher amounts, and the opponent accepted those dona-tions—which, ultimately, he did not. The Court still found standing. *Id.* at 734.

If these future injuries were not too "speculative," neither is the one here. Indeed, unlike the plaintiff in *303 Creative*, the ministries are already actively engaged in business practices that arguably violate the Act. This sets them apart from plaintiffs like the organizations in *Clapper v. Amnesty International U.S.A.*, 568 U.S. 398 (2013). *See* RSA.1–4. There, the plaintiffs alleged only a "speculative fear" that the challenged statute would increase the probability that their data might be incidentally intercepted and the government might then take some *other* action against them unrelated to the challenged law. *Clapper*, 568 U.S. at 410, 417–18 (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). In other words, the plaintiffs' fears were "subjective" because they were not "subject to the regulations, proscriptions, or compulsions that [they] w[ere] challenging." *Laird*, 408 U.S. at 11, 13. Here, the ministries are

not just subjected to the Act—they're actively violating it. Any wayward employee, reformed applicant, tester, or troll could trigger an enforcement action. The ministries need not wait for that other shoe to drop to seek the Constitution's protection.

### c. The district-court opinion failed to address the Notice Clause claim.

Separately, there's no basis to affirm dismissal of the ministries' Notice Clause claim. That's because the district-court opinion never analyzed that claim, despite its obligation to examine standing separately for each claim. *United States v. Furando*, 40 F.4th 567, 575 (7th Cir. 2022). That silence alone requires reversal.

The Notice Clause requires employers to post a State-prepared or State-approved notice in workplaces and employee handbooks that summarizes the Act's requirements. 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1) (Add.7–8). The State-approved notice tells employees that their employer may not treat them differently based on any protected class under the Act—including reproductive choices. Ill. Dep't of Hum. Rts., *Employer Notice* (Sept. 2022), https://perma.cc/PK9A-SVUB.

The ministries won't post it. To do so would require them to deceive their employees, suggesting that the ministries do not take adverse employment action based on employees' reproductive decisions. But the ministries do; their missions depend on it. Such a notice could also provide tacit encouragement to their employees to make

objectionable reproductive choices. The ministries want no part of it. SA.36. Because the Act requires them to choose between uttering this falsehood or facing sanctions, they have (again) established an injury-in-fact.

The State seeks to minimize this injury, arguing below that the Amendments don't require the ministries to expressly name reproductive choices as a covered characteristic in the posted notice. That doesn't help. The religious organization's objection is to the falsehood communicated, not to the specific words used. An indirect representation that the ministries comply with the Act's nondiscrimination mandate is just as false as an explicit one.

The ministries' Notice Clause violation is complete. It doesn't depend on future actions of third parties. And the State has not disclaimed enforcement. *See supra* at § I.A.3. The ministries have standing to bring this claim. And the district court has not found otherwise. Its dismissal should be reversed.

### B. The ministries suffer a present chilling injury.

The ministries have standing to challenge the Employment Clause on a second, independent ground: The Act has a chilling effect on the ministries' speech that is objectively reasonable, and they self-censor as a result. *Speech First*, 968 F.3d at 638–39. To establish a cognizable chilling injury, the ministries need only show that their fear of

enforcement is real and that it has already suppressed speech. They have shown both.

The ministries have written statements clarifying that they cannot employ people who make objectionable reproductive decisions. To clarify their beliefs and policies in light of the new law, they want to publish those statements in job postings and on career websites. SA.27–30. But because doing so would increase the visibility of their violations and thus increase their threat of enforcement, they have reasonably held back. That self-censorship "is, unquestionably, an injury supporting standing." *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012).

It is also objectively reasonable. Illinois courts have held that discriminatory language in job postings constitutes direct evidence of employment discrimination under 775 ILL. COMP. STAT. ANN. § 5/2-102(A). *See Bd. of Educ. of City of Chi. v. Cady*, 860 N.E.2d 526, 532 (Ill. App. Ct. 2006); *see also* 42 U.S.C. § 2000e-3(b) (expressly barring the publication of job advertisements that indicate a discriminatory preference). And the Supreme Court has held that such postings discriminate against potential candidates who never apply. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). This context—combined with the State's refusal to disavow enforcement—makes the ministries' fear of enforcement reasonable and well-founded. *See Raoul*, 685 F. Supp. 3d at 699 ("Only fools would not have their First Amendment rights chilled under these circumstances.").

Instead of addressing these questions, the district-court opinion categorically held that chilled speech could not support standing because the Employment Clause regulates only conduct, not speech. RSA.3. That's wrong for two reasons. First, the Employment Clause *does* restrict speech, as well as conduct. *Infra* at § II.A.2–3. Second, statutes and enforcement architectures nominally aimed at conduct can still produce an immediate First Amendment injury when they target or foreseeably suppress speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963). And they do here.

But more fundamentally, the district-court opinion erroneously conflates a merits issue with standing. The opinion's reliance on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), and *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), betrays this error. RSA.3–4. Both are merits decisions. Neither addresses injury-in-fact.

The question for standing is not whether the Act *ultimately* violates the First Amendment. The question is whether the ministries suffer an injury by refraining from speech under threat of enforcement. Those are different inquiries. *Brown*, 86 F.4th at 761–62. A plaintiff can establish pre-enforcement standing based on chilled speech yet lose on the merits of his First Amendment claim. *E.g., Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (holding that the plaintiffs established pre-enforcement standing but lost on the merits).

The ministries have established an objectively reasonable chill on their speech advertising job openings. This provides an independent basis for standing on their Employment Clause claim. The dismissal should be reversed.

## II. The ministries are entitled to a preliminary injunction.

Plaintiffs deserve a preliminary injunction because they have shown a likelihood of success on the merits, irreparable harm, and that both the equities and public interest weigh in their favor. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). In First Amendment cases, the analysis "begins and ends with the likelihood of success on the merits." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). That's because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and because both the equities and the public interest counsel enjoining conduct that is likely unconstitutional. *Alvarez*, 679 F.3d at 589 (citation modified).

### A. The Act triggers and fails strict scrutiny.

#### 1. The Employment Clause's forced inclusion of dissidents subverts the ministries' expressive associations.

The First Amendment protects the right to "gather together to express ideas—the freedom to associate." *Christian Legal Soc'y*, 453 F.3d at 861. This freedom "assures that the majority (or a powerful or

vocal minority) cannot force its views on groups that choose to express unpopular ideas." *Id.* Thus, the government generally cannot "force[] a group to accept for membership someone the group does not welcome" if (a) the group is an "expressive association," and (b) the interloper's presence "affects in a significant way the group's ability to advocate its viewpoint." *Id.* (citation modified).

### a. The ministries are expressive associations.

A group "that seeks to transmit . . . a system of values" is an expressive association. *Dale*, 530 U.S. at 650. The ministries here are therefore "the archetype of" expressive associations. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring). They proclaim the sanctity of human life, counsel pregnant women based on Christian doctrine, organize pro-life marches and ministries, and communicate theological commitments through every aspect of their work. *See Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023) (holding that pro-life organizations engaged in identical conduct were expressive associations). There is no doubt that this element of the ministries' claim is satisfied.

### b. The Act forces the ministries to include those who would vitiate the ministries' messages.

The only question, then, is whether the forced inclusion of unrepentant individuals who have violated the ministries' core beliefs

41

would "significantly affect [the organizations'] ability to express [their] disapproval" of those choices. *Christian Legal Soc'y*, 453 F.3d at 862. The answer is yes.

This Court said so in *Christian Legal Society*, a case presenting very similar circumstances. There, "a faith-based organization" that believed "sexual conduct outside of traditional marriage is immoral" was forced to include students who actively engaged in such conduct. *Id.* at 863. This Court easily found significant impairment of the group's ability to express its message: "It would be difficult for [the organization] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." *Id.* Because its "beliefs about sexual morality are among [the organization's] defining values," the forced inclusion of those who oppose or violate those beliefs "would cause the group as it currently identifies itself to cease to exist." *Id.*

So too here. The ministries cannot effectively oppose abortion and other objectionable reproductive decisions if individuals who unapologetically commit such acts and advocate for them remain within their ranks. *See* SA.14, 17–18. The ministries' "defining values" are their beliefs in the sanctity of human life and the authority of Christian doctrine. *Christian Legal Soc'y*, 453 F.3d at 863. Forced inclusion of those who have defied these beliefs and refused to repent would do more than "impair" expression—it would cause the ministries in their current

forms "to cease to exist." *Id.* Thus, "[t]here can be little doubt" that requiring the ministries to hire or retain unrepentant individuals who made objectionable reproductive choices "would impair its ability to express disapproval" of those choices. *Id.*

What's more, *Dale* instructs that courts must defer to an association's "view of what would impair its expression." 530 U.S. at 653. That's especially true here, where the determination as to what would impair the organizations' missions and messages is a religious question. Courts lack the competency to second-guess such theological matters, and the "First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746.

The ministries maintain that retaining or employing any employee who unrepentantly made reproductive decisions that violate their religious beliefs would "fatally undermine" the ministries' missions and messages. SA.14, 17. It's not difficult to imagine why, when Pregnancy Care is attempting to explain that unborn life is precious and worthy of protection, it undermines the message if delivered by someone who just had an abortion. In other words, the forced inclusions would significantly impair the ministries' ability to "credibly and effectively counsel families to forego objectionable reproductive decisions," "undermine[] [their] public and internal message that [they are] sincerely committed to its mission," and limit other employees'

ability "to speak freely and persuasively on sensitive topics like reproduction" in the workplace. SA.14, 17–18.

The ministries "cannot depend on someone to be an effective advocate for [their] religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). Because the Act would require the ministries to accept employees who can neither affirm nor credibly convey their religious beliefs, it "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

### c. The State's counterarguments fail.

The State attempts to avoid controlling precedent by arguing that (1) associations forfeit protection when they hire their members, and (2) the private nature of reproductive choices negates any impairment. Both arguments fail.

Start with the scope of employers' association rights. According to the State, the Boy Scouts would have been forced to hire Dale as a paid leader for their organization even though its right to exclude him as an unpaid volunteer is constitutionally protected. That makes no sense. Even for-profit companies have First Amendment rights. *See 303 Creative*, 600 U.S. at 594 (Speakers do not "shed their First Amendment

protections by employing the corporate form to disseminate their speech."); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986). That's equally true of nonprofits. And nothing in the First Amendment's text or history supports categorically cabining the freedom of association in the manner the State suggests. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment) (noting that the Framers "did not distinguish between commercial and noncommercial messages").

Neither does precedent. The State's prior invocation of *Hishon v. King & Spalding*, 467 U.S. 69 (1984), comes up short. The First Amendment holding in this pre-*Dale* case had nothing to do with the law firm's status as an employer. In the Court's four-sentence constitutional analysis, it said only that the firm had "not shown how its ability to fulfill [its expressive] function would be inhibited" by the forced inclusion. *Id.* at 78. It then analogized its ruling to a case involving private school admissions, confirming that the firm's role as employer was constitutionally irrelevant. *Id.*

*Dale*, on the other hand, thoroughly and directly addressed the scope of this freedom and concluded that the sole factor for determining whether a group is protected is "whether the group engages in 'expressive association.'" 530 U.S. at 648. The Court rejected any suggestion of a narrower scope, stating that the right was "not reserved for advocacy

groups" and extended to all organizations "engage[d] in some form of expression, whether it be public or private." *Id.*

To be sure, expressive employers' right to exclude is "not absolute." *Id.* Forced inclusions that either do not significantly impair the group's expression or are narrowly tailored to serve a compelling state interest do not run afoul of the First Amendment. *Id.* But without such a showing, the State cannot avoid *Dale* by carving out new commercial exemptions to the First Amendment. *See Slattery*, 61 F.4th at 286–91 (confirming the right applies to employers challenging a similar state law).

Next, the State tries to dodge *Dale* by contrasting the private nature of reproductive health choices with Dale's public advocacy. This argument proves too much. First, the State once again overstates the private nature of these objectionable reproductive decisions. As explained, many people choose to make these decisions public, and some decisions are visibly apparent to those who engage with the individual regularly, including the ministries' clients, parishioners, donors, and colleagues. *See supra* at § I.A.4.a. At minimum, the organizations themselves uncover these decisions during the hiring process. *See* SA.27, 29, 230–32, 344–45. And that internal knowledge of the reproductive decisions, even if they never become public, significantly impairs intra-organizational expression. *See Dale*, 530 U.S. at 654–56; SA.12–14, 17–20, 30–31 (describing the importance of internal job

duties and activities). That's especially true given the Act's Offensive Speech Clause. *Infra* at § II.A.2.

*Christian Legal Society* confirms this. There, the conduct resulting in exclusion—an individual's refusal to sign the group's statement of faith—was a private, internal disclosure, not public advocacy. 453 F.3d at 858, 863. This Court held that such discrete dissidence suffced for significant impairment. *Id.* at 863. So too here.

### 2. The Employment and Offensive Speech Clauses restrict speech based on content and viewpoint.

The Act's Employment and Offensive Speech Clauses trigger strict scrutiny as content- and viewpoint-based speech regulations. A law is content-based if its application "depend[s] entirely on the communicative content of the [speech]." *Reed*, 576 U.S. at 163. And it is viewpoint-based if it authorizes speech favoring one position while penalizing speech critical of it. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Generally, in First Amendment challenges, "it is all but dispositive" to conclude that a law is content- or viewpoint-based. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011). Either is "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

Start with the Offensive Speech Clause. It forbids any "unwelcome" response to an individual's reproductive decisions that renders the working environment "intimidating, hostile, or offensive." 775 ILL. COMP. STAT. ANN. §§ 5/2-102(A), 5/2-101(E-1) (Add.4). That regulation is

47

content-based, because its application "depend[s] entirely on the communicative content" of an employer's message. *Reed*, 576 U.S. at 164.

It's also viewpoint-based. Speech that an employee finds *welcome* because it affirms her decision escapes regulation. Speech that she finds *unwelcome* because it criticizes that decision faces potential liability. That's the paradigm of viewpoint discrimination. *See Brown*, 86 F.4th at 781 (characterizing as viewpoint-discriminatory a law prohibiting First Amendment activities "intended to impede or obstruct" hunting while allowing the same activities if they were supportive (citation omitted)). "[P]eople on one side of debates" about abortion, IVF, and contraception are allowed "to display their views freely," while those who disagree, like the ministries, are censored. *Id.*

The Employment Clause is of a piece. It restricts acting "with respect to recruitment, hiring, … discipline, tenure or terms, privileges or conditions of employment on the basis of" reproductive health choices. 775 ILL. COMP. STAT. ANN. § 5/2-102(A) (Add.4). This restriction is content-based, because it applies only to certain employment communications relating to reproductive choices. *Reed*, 576 U.S. at 164. The ministries can make statements in their policies, employment handbooks, position descriptions, and job postings expressing preferences for education requirements, work experience, community involvement, and other subjects. But they cannot do the same when it comes to an applicant's or employee's reproductive decisions.

Relying on *Rumsfeld*, the State characterizes this Clause as a restriction of speech incidental to conduct, analogizing the ministries' job postings to a "White Applicants Only" sign. 547 U.S. at 62. That's an inpat analogy. That hypothetical sign is not expressive because it advertises nothing other than the employer's discriminatory purpose with respect to a morally and legally indefensible characteristic. By contrast, the ministries' proposed hiring statements communicate a coherent theological position about the sanctity of human life, the role of personal witness in ministry work, and the standards an organization requires of those who speak for it. The communicative content is not incidental to the hiring decision; *it is the reason for it*. An expressive religious organization communicating its mission-based employment criteria is more analogous to *Hurley*'s parade organizers choosing who could march under their banner than to *Rumsfeld*'s hypothetical employer using a sign to perpetuate race discrimination.

### 3. The Notice Clause compels the ministries to utter controversial falsehoods.

The First Amendment protects the right to stay silent as surely as the right to speak. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The government may not coerce unwanted expression—especially when it is controversial and false. *NIFLA*, 585 U.S. at 768–69.

The Notice Clause defies this principle. It requires the ministries to post a State-prepared or State-approved notice telling their employees that they may make objectionable reproductive decisions without facing adverse employment action. 775 ILL. COMP. STAT. ANN. § 5/2-102(K)(1) (Add.7–8). That's false. The ministries communicate the exact opposite message to their employees in their employee handbooks and throughout their hiring processes. The First Amendment does not tolerate such compelled incoherence. *See NIFLA*, 585 U.S. at 766 (rejecting state's attempt to compel pregnancy centers to provide government notice on abortions).

The State-prepared notice is a far cry from the factual, noncontroversial commercial disclosures that the Supreme Court condoned in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). The notice tells employees: "*[Y]ou* have the right to be free from unlawful discrimination" based on "protected class[es] named in the Act," including reproductive choices. Ill. Dep't of Hum. Rts., *Employer Notice* (Sept. 2022), https://perma.cc/PK9A-SVUB (emphasis added). It forces the ministries to voice a personalized message to their employees that violates their core beliefs and existing policies. SA.226–27, 239–40. Such a statement is neither factual— indeed, it's false and deceptive—nor uncontroversial. Moreover, *Zauderer* governs only commercial speech: disclosures in advertising about the terms of commercial transactions. *See Chiles*, 146 S. Ct. at

1022. The ministries' relationships with their employees over faith-based governance is not commercial. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (2014).

The State says that the requisite notice was not affected by H.B. 4867 because the poster language was not revised to explicitly include "reproductive health choices." That argument misses the mark. The notice expressly references all "protected class[es] named in the Act," which—after H.B. 4867—includes reproductive health choices. By cross-referencing the Act itself, the notice intentionally directs employees to the statutory text, which anyone with internet access can see. The fact that the notice indirectly references reproductive health choices does not make the statement any less controversial or any truer. Because the Notice Clause compels the ministries to speak a particularized message that contradicts their beliefs, it triggers strict scrutiny.

### 4. The Act is neither neutral nor generally applicable, and it impermissibly burdens the ministries' free exercise.

A law that requires one to violate his religion is subject to strict scrutiny unless it is neutral or generally applicable. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879–80 (1990).[4] The

---

[4] *Smith* should be overruled because its test "provides no protection" from laws that have "a devastating effect on religious freedom." *Fulton*, 593 U.S. at 545 (Alito, J., joined by Thomas & Gorsuch, JJ., concurring).

Act is neither, because it (a) favors comparable secular conduct, (b) provides a mechanism for individualized exemptions, and (3) arose from the State's hostility toward religion.

### a. The Act exempts comparable secular conduct.

A law lacks general applicability when it treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). This destroys neutrality, too, because it "devalues religious reasons … judging them to be of lesser import." *Lukumi*, 508 U.S. at 537–38. The Act authorizes certain secular entities to discriminate based on reproductive choices while prohibiting the ministries here from doing the same. Thus, it is neither neutral nor generally applicable.

Specifically, the Act exempts from all its requirements—including those regarding reproductive decisions—certain secular employers whose workforce is excluded from the statutory definition of "employee." The Act's definition of "employee" excludes: (1) elected public officials or the members of their immediate personal staffs; (2) principal administrative officers of the State or of any political subdivision, municipal corporation, or other governmental unit or agency; and (3) a person in a vocational rehabilitation facility certified under federal law who has

---

The ministries reserve the right to press this argument in a petition for certiorari to the United States Supreme Court.

been designated an evaluee, trainee, or work activity client. 775 ILL. COMP. STAT. ANN. § 5/2-101(A)(1) (Add.2–3).

Thus, any of the secular employers who work with such individuals may discriminate against them based on their reproductive health choices, while the ministries are prohibited from taking adverse employment action based on their sincerely held religious beliefs. This favors "comparable secular activity" and "permit[s] secular conduct that undermines the [States'] asserted interest[]." *Tandon*, 593 U.S. at 62; *Fulton*, 593 U.S. at 533–34. These secular exemptions therefore destroy both the Act's general applicability and its neutrality.

### b. The Act provides for individualized exemptions.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (citation modified). That is precisely what the Act does with its BFOQ mechanism. 775 ILL. COMP. STAT. ANN. § 5/2-104(A). It provides a statutory "exemption" authorizing individualized governmental determinations about whether an employer's hiring criterion is mission-critical. In other words, the government wields the power to "consider the particular reasons" for the ministries' employment decisions and determine whether adherence to their religious beliefs is genuinely essential to their work. *Fulton*, 593 U.S. at 533.

*Fulton* condemned the mere existence of any mechanism granting governmental discretion to determine "which reasons for not complying with the [law] are worthy of solicitude," regardless of whether that discretion has been exercised. *Id.* at 537. Here, the Act's BFOQ exemption provides such a mechanism. This renders the Act not generally applicable.

### c. The Act evinces the State's hostility toward religion.

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. Neutrality forbids even "subtle departures" from governmental impartiality toward religion. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (citation modified). The Department's response to the Catholic Conference of Illinois's proposed statutory amendments fails that standard—not because it rejected the proposals, but because of *why* it did: "their religious nature." *Fulton*, 593 U.S. at 533.

In rejecting the Conference's religious-exemption proposals, the Department did not evaluate the merits. Instead, it declared categorically that religious organizations "must already contend with the issues and scenarios you mentioned around gender identity and sexual orientation, which are already fully protected classes in the [Act] that do not carry exemptions like your proposals." SA.168. That's not a statutory or

constitutional analysis—it's a policy judgment: because religious employers have already been subjected to other anti-discrimination requirements without exemption, they are categorically ineligible for exemptions now. That logic subordinates a constitutionally grounded religious claim to an administrative uniformity preference—without engaging the constitutional substance of the claim at all.

*Masterpiece Cakeshop* found a neutrality violation when the Commission showed "elements of a clear and impermissible hostility" toward religious belief, including statements "disparag[ing] [the claimant's] religion" and failing to give his religious claims "neutral and respectful consideration." *Masterpiece Cakeshop*, 584 U.S. at 634–35. Here, the Department made an explicit categorical judgment—that the Catholic Conference's exemption requests were unworthy of accommodation because religious employers have already been subjected to other coverage. That's a policy ranking of anti-discrimination uniformity over religious exemption. And it's the kind of "dismissive" governmental posture *Masterpiece Cakeshop* condemned. *Id.* at 635.

The State's antagonistic posture is confirmed by its officials' repeated statements opposing the ministries' religious views and pro-life missions. Defendant Attorney General Raoul pledged his office to ensuring Illinois would be "a safe haven for patients to [obtain] comprehensive abortion … care." SA.24. Director Bennett lamented the overruling of *Roe v. Wade,* vowing to "strengthen protections for

reproductive rights." SA.24–25. Lieutenant Governor Stratton declared that the Act "is not just protecting a right; it is championing fundamental principles" on reproduction—the very principles the ministries are religiously required to oppose. SA.4.

Because the challenged clauses—each of which compel the ministries to violate their sincerely held beliefs—are motivated by hostility toward religion, they are *per se* unconstitutional and cannot be enforced. *See Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 525 n.1 (2022).

### 5. The Act fails strict scrutiny.

Aside from religious animus's *per se* invalidity, all roads lead to strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). A law can survive strict scrutiny "only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton,* 593 U.S. at 541 (quotation omitted). Laws pass this test "only in rare cases," *Lukumi,* 508 U.S. at 546, and this isn't one of them.

The State bears "the burden to establish that" the Act survives strict scrutiny. *Tandon,* 593 U.S. at 62. But it declined to do so below. Its brief included merely a perfunctory assertion of a compelling state interest in "preventing invidious discrimination." SA.272. But the State did not develop this argument further, and it failed to address narrow

tailoring altogether. The argument is therefore forfeited. *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017).

Regardless, the argument fails. The State lacks a compelling interest in refusing to exempt the ministries from the Act's challenged provisions, which are not narrowly tailored.

### a. The State lacks a compelling interest in refusing the ministries an exemption.

To survive strict scrutiny, the State must show a compelling interest "in denying an exception to [the ministries]"—not in the abstract goal of preventing employment discrimination generally. *Fulton*, 593 U.S. at 541. If an exemption for these pro-life ministries is granted, the Act will continue to apply to every other Illinois employer. The State's asserted anti-discrimination interest would be "impaired only to the limited extent that a person [could not] join a specific group or groups" with which they fundamentally disagree. *Slattery*, 61 F.4th at 289.

The State cannot show a compelling interest in avoiding that minor setback to its anti-discrimination policies. In fact, when it comes to reproductive-decisions discrimination, the State has offered no evidence of "an 'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (quotation omitted); *see Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo.

2018). And the purported discrimination here is anything but "invidious." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). Unlike racial and sex discrimination—which target immutable characteristics, reflect centuries of systemic exclusion, and impose injuries wholly unrelated to the victim's conduct—the ministries' employment policies rest on a sincere religious conviction about the value of human life that the Supreme Court has long acknowledged as "important and legitimate." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 274 (2022) (quoting *Roe v. Wade*, 410 U.S. 113, 163 (1973)).

### b. The Act is not narrowly tailored.

Because the Act extends far beyond "the exact source of the evil it seeks to remedy," it is not narrowly tailored. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation modified). Indeed, less restrictive means were available—the Diocese proposed them. The first would have clarified that the religious-employer exclusion in § 5/2-101(B)(2) applies to employees' reproductive choices. The second would have confirmed that expressive associations may consider those choices in employment. The Department rejected both proposals without engaging their constitutional substance. A government that refuses specific, workable, less-restrictive alternatives without explanation cannot satisfy narrow tailoring. *Fulton*, 593 U.S. at 541; *Lukumi*, 508 U.S. at 546.

The Act's dense exemption structure confirms this. A statute riddled with carve-outs for elected officials, vocational-rehabilitation clients, and public-accommodation religious expression has already demonstrated that its stated interest "can brook [some] departures." *Fulton*, 593 U.S. at 542. The State cannot credibly insist that two more would compromise the Act's integrity. *Korte*, 735 F.3d at 686.

## B. The remaining preliminary-injunction factors are satisfied.

The ministries are entitled to a preliminary injunction if they establish a likelihood of success on even one of their claims. *Korte*, 735 F.3d at 666. This is because that "determinative factor" establishes that the remaining preliminary-injunction factors are likewise met: "[T]he loss of First Amendment freedoms … unquestionably constitutes irreparable injury" and "injunctions protecting [those] freedoms are always in the public interest." *Id.* (citation modified)*; see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that the last two preliminary injunction factors "merge when the Government is the opposing party").

## CONCLUSION

The State enacted a law that abridges the free-speech, free-exercise, and associational rights of the ministries, effectively forcing them to hire employees and speak messages at odds with the ministries' pro-life and religious missions. The ministries have already engaged in conduct that arguably violates the law, and they will continue to do so. The State has not disavowed but instead promises to enforce. In these circumstances, the ministries have Article III standing and are entitled to a preliminary injunction. The situation would be no different if a pro-life state government was forcing abortion clinics to hire pro-life employees and speak pro-life messages. The First Amendment doesn't allow any of it.

Accordingly, this Court should reverse and remand with an order to enter a preliminary injunction.

Dated: June 2, 2026

Respectfully submitted,

*s/ Caroline C. Lindsay*

James A. Campbell
Ryan J. Tucker
Mark A. Lippelmann
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jcampbell@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org

John J. Bursch
Caroline C. Lindsay
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
clindsay@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(571) 707-4655
dcortman@ADFlegal.org

*Counsel for Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 12,603 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: June 2, 2026

*s/Caroline C. Lindsay*
Caroline C. Lindsay
*Counsel for Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/ Caroline C. Lindsay*
Caroline C. Lindsay
*Counsel for Appellants*

# CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) and (b) are included in the attached required short appendix and separate appendix filed concurrently with this brief.

*s/ Caroline C. Lindsay*
Caroline C. Lindsay
*Counsel for Appellants*

# ADDENDUM

**775 Ill. Comp. Stat. Ann. § 5/1-102(A)**
**Declaration of policy**

It is the public policy of this State:

(A) Freedom from Unlawful Discrimination. To secure for all individuals within Illinois the freedom from discrimination based on race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, physical or mental disability, military status, sexual orientation, pregnancy, reproductive health decisions, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations, including in elementary, secondary, and higher education.

**775 Ill. Comp. Stat. Ann. § 5/1-103(O-2), (Q)**
**General definitions**

* * *

(O-2) Reproductive Health Decisions. "Reproductive Health Decisions" means a person's decisions regarding the person's use of: contraception; fertility or sterilization care; assisted reproductive technologies; miscarriage management care; healthcare related to the continuation or termination of pregnancy; or prenatal, intranatal, or postnatal care.

* * *

(Q) Unlawful discrimination. "Unlawful discrimination" means discrimination against a person because of his or her actual or perceived: race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, reproductive health decisions, or unfavorable discharge from military service as those terms are defined in this Section.

**775 Ill. Comp. Stat. Ann. § 5/2-101(A), (B), (E-1)
Definitions**

The following definitions are applicable strictly in the context of this Article.

(A) Employee.

(1) "Employee" includes:

(a) Any individual performing services for remuneration within this State for an employer;

(b) An apprentice;

(c) An applicant for any apprenticeship.

For purposes of subsection (D) of Section 2-102 of this Act, "employee" also includes an unpaid intern. An unpaid intern is a person who performs work for an employer under the following circumstances:

(i) the employer is not committed to hiring the person performing the work at the conclusion of the intern's tenure;

(ii) the employer and the person performing the work agree that the person is not entitled to wages for the work performed; and

(iii) the work performed:

(I) supplements training given in an educational environment that may enhance the employability of the intern;

(II) provides experience for the benefit of the person performing the work;

(III) does not displace regular employees;

(IV) is performed under the close supervision of existing staff; and

(V) provides no immediate advantage to the employer providing the training and may occasionally impede the operations of the employer.

(2) "Employee" does not include:

(a) (Blank);

(b) Individuals employed by persons who are not "employers" as defined by this Act;

(c) Elected public officials or the members of their immediate personal staffs;

(d) Principal administrative officers of the State or of any political subdivision, municipal corporation or other governmental unit or agency;

(e) A person in a vocational rehabilitation facility certified under federal law who has been designated an evaluee, trainee, or work activity client.

(B) Employer.

(1) "Employer" includes:

(a) Any person employing one or more employees within Illinois during 20 or more calendar weeks within the calendar year of or preceding the alleged violation;

(b) Any person employing one or more employees when a complainant alleges civil rights violation due to unlawful discrimination based upon his or her physical or mental disability unrelated to ability, pregnancy, or sexual harassment;

(c) The State and any political subdivision, municipal corporation or other governmental unit or agency, without regard to the number of employees;

(d) Any party to a public contract without regard to the number of employees;

(e) A joint apprenticeship or training committee without regard to the number of employees.

(2) "Employer" does not include any place of worship, religious corporation, association, educational institution, society, or nonprofit

nursing institution conducted by and for those who rely upon treatment by prayer through spiritual means in accordance with the tenets of a recognized church or religious denomination with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such place of worship, corporation, association, educational institution, society, or nonprofit nursing institution of its activities.

* * *

(E-1) Harassment. "Harassment" means any unwelcome conduct on the basis of an individual's actual or perceived race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, pregnancy, unfavorable discharge from military service, citizenship status, work authorization status, or family responsibilities that has the purpose or effect of substantially interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment. For purposes of this definition, the phrase "working environment" is not limited to a physical location an employee is assigned to perform his or her duties.

**775 Ill. Comp. Stat. Ann. § 5/2-102(A), (J), (K)(1)**
**Civil rights violations; employment.**

It is a civil rights violation:

(A) Employers. For any employer to refuse to hire, to segregate, to engage in harassment as defined in subsection (E-1) of Section 2-101, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination, citizenship status, work authorization status, or family responsibilities. An employer is responsible for harassment by the employer's nonmanagerial and nonsupervisory employees only if the employer becomes aware of the conduct and fails to take reasonable corrective measures.

* * *

(J) Pregnancy; reasonable accommodations.

(1) If after a job applicant or employee, including a part-time, full-time, or probationary employee, requests a reasonable accommodation, for an employer to not make reasonable accommodations for any medical or common condition of a job applicant or employee related to pregnancy or childbirth, unless the employer can demonstrate that the accommodation would impose an undue hardship on the ordinary operation of the business of the employer. The employer may request documentation from the employee's health care provider concerning the need for the requested reasonable accommodation or accommodations to the same extent documentation is requested for conditions related to disability if the employer's request for documentation is job-related and consistent with business necessity. The employer may require only the medical justification for the requested accommodation or accommodations, a description of the reasonable accommodation or accommodations medically advisable, the date the reasonable accommodation or accommodations became medically advisable, and the probable duration of the reasonable accommodation or accommodations. It is the duty of the individual seeking a reasonable accommodation or accommodations to submit to the employer any documentation that is requested in accordance with this paragraph. Notwithstanding the provisions of this paragraph, the employer may require documentation by the employee's health care provider to determine compliance with other laws. The employee and employer shall engage in a timely, good faith, and meaningful exchange to determine effective reasonable accommodations.

(2) For an employer to deny employment opportunities or benefits to or take adverse action against an otherwise qualified job applicant or employee, including a part-time, full-time, or probationary employee, if the denial or adverse action is based on the need of the employer to make reasonable accommodations to the known medical or common conditions related to the pregnancy or childbirth of the applicant or employee.

(3) For an employer to require a job applicant or employee, including a part-time, full-time, or probationary employee, affected by pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth to accept an accommodation when the applicant or employee did not request an accommodation and the applicant or employee chooses not to accept the employer's accommodation.

(4) For an employer to require an employee, including a part-time, full-time, or probationary employee, to take leave under any leave law or policy of the employer if another reasonable accommodation can be provided to the known medical or common conditions related to the pregnancy or childbirth of an employee. No employer shall fail or refuse to reinstate the employee affected by pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits, and other applicable service credits upon her signifying her intent to return or when her need for reasonable accommodation ceases, unless the employer can demonstrate that the accommodation would impose an undue hardship on the ordinary operation of the business of the employer.

For the purposes of this subdivision (J), "reasonable accommodations" means reasonable modifications or adjustments to the job application process or work environment, or to the manner or circumstances under which the position desired or held is customarily performed, that enable an applicant or employee affected by pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth to be considered for the position the applicant desires or to perform the essential functions of that position, and may include, but is not limited to: more frequent or longer bathroom breaks, breaks for increased water intake, and breaks for periodic rest; private non-bathroom space for expressing breast milk and breastfeeding; seating; assistance with manual labor; light duty; temporary transfer to a less strenuous or hazardous position; the provision of an accessible worksite; acquisition or modification of equipment; job restructuring; a part-time or modified work schedule; appropriate adjustment or modifications of examinations, training materials, or policies; reassignment to a vacant position; time off to recover from conditions related to childbirth; and

leave necessitated by pregnancy, childbirth, or medical or common conditions resulting from pregnancy or childbirth.

For the purposes of this subdivision (J), "undue hardship" means an action that is prohibitively expensive or disruptive when considered in light of the following factors: (i) the nature and cost of the accommodation needed; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at the facility, the effect on expenses and resources, or the impact otherwise of the accommodation upon the operation of the facility; (iii) the overall financial resources of the employer, the overall size of the business of the employer with respect to the number of its employees, and the number, type, and location of its facilities; and (iv) the type of operation or operations of the employer, including the composition, structure, and functions of the workforce of the employer, the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the employer. The employer has the burden of proving undue hardship. The fact that the employer provides or would be required to provide a similar accommodation to similarly situated employees creates a rebuttable presumption that the accommodation does not impose an undue hardship on the employer.

No employer is required by this subdivision (J) to create additional employment that the employer would not otherwise have created, unless the employer does so or would do so for other classes of employees who need accommodation. The employer is not required to discharge any employee, transfer any employee with more seniority, or promote any employee who is not qualified to perform the job, unless the employer does so or would do so to accommodate other classes of employees who need it.

(K) Notice.

(1) For an employer to fail to post or keep posted in a conspicuous location on the premises of the employer where notices to employees are customarily posted, or fail to include in any employee handbook information concerning an employee's rights under this Article, a notice, to be prepared or approved by the Department, summarizing the

requirements of this Article and information pertaining to the filing of a charge, including the right to be free from unlawful discrimination, the right to be free from sexual harassment, and the right to certain reasonable accommodations. The Department shall make the documents required under this paragraph available for retrieval from the Department's website.

# REQUIRED SHORT APPENDIX

Order.................................................................................. RSA.1

Judgment.......................................................................... RSA.5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| THE PREGNANCY CARE CENTER OF ROCKFORD; and DIOCESE OF SPRINGFIELD IN ILLINOIS,<br><br>             **Plaintiffs,**<br><br>      **v.**<br><br>JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; and KWAME RAOUL, in his official capacity as Illinois Attorney General,<br><br>             **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)  **No.  3:25 C 50127**<br>)<br>)  **Judge Rebecca R. Pallmeyer**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Defendant's Motion to Dismiss [40] is granted without prejudice to the filing of an amended complaint within 21 days.  The parties are directed to confer and contact the court, also within 21 days, with a joint plan for conducting limited jurisdictional discovery.  Plaintiffs' Motion for a Preliminary Injunction [29] is stricken without prejudice to renewal following a determination that the court has jurisdiction over this case.  The court will issue a prompt ruling on such motion.

## STATEMENT

In 2024, the Illinois General Assembly passed H.B. 4867, which amends the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq., by prohibiting private employers from discriminating against employees for their "reproductive health decisions."  Under this statute, a private employer may not take action against employees for their use of contraception, fertility treatments, abortion, or other forms of reproductive health care.  Plaintiffs in this case are two religious organizations, the Pregnancy Care Center of Rockford and the Diocese of Springfield in Illinois, that assert many reproductive health decisions, most notably abortion, violate their religious beliefs.  In this lawsuit, Plaintiffs claim that H.B. 4867 is unconstitutional as applied to them because it prevents them from penalizing employees or job applicants that receive abortions, use contraception, or take other actions that violate Plaintiffs' religious beliefs, and do not repent of that conduct.  Plaintiffs bring a pre-enforcement challenge under the Civil Rights Act of 1871, 42 U.S.C. § 1983, asserting that H.B. 4867 violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, and seek a preliminary injunction barring Defendants from enforcing H.B. 4867 against them.

Defendants have moved to dismiss this case for lack of standing.  (Motion to Dismiss [40] at 2.)  In assessing the parties' arguments on this motion, the court notes, first, that because neither Defendants nor any private party have sought to enforce H.B. 4867 against Plaintiffs, the pending complaint is a pre-enforcement challenge to the statute's constitutionality.  It is well-established that "[a] party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality if there are 'circumstances that render the

RSA.001

threatened enforcement sufficiently imminent.' " *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)). Instead, they have standing to sue immediately so long as they plausibly allege "an intention to engage in a course of conduct arguably affected by a policy, and that [they] face[] a credible threat the policy will be enforced" against them, when they do engage in that conduct. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citing *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012)).

Plaintiffs contend that they face a credible threat of enforcement because they have violated (and will continue to violate) certain provisions of H.B. 4867 by virtue of having a policy of taking action against prospective and existing employees who engage in certain reproductive health behavior. (Pls.' Opp'n [42] at 17–19.) Yet it appears that the harm they fear is, for now, hypothetical. For example, Plaintiffs allege they are soliciting job applications for several open positions and will refuse to hire any applicant who has received an abortion and is "unrepentant" about that conduct. (Compl. [1] ¶ 68.) But such harm would occur only in the event that such an applicant will seek work at an organization explicitly opposed to the practice, and that the applicant will disclose her conduct and her unwillingness to repent of it, or that the information will otherwise become available. These circumstances appear to be speculative. They would also involve Plaintiffs' taking action based not on the applicant's "reproductive health decisions" but on her beliefs about those decisions; since political views are not protected by H.B. 4867, actions taken on that basis would not give rise to standing. As the Northern District of New York observed in a case involving a similar New York statute, if "an applicant who has had an abortion but has become a pro-life advocate has been, and can still be, hired, the decision not to hire a similar applicant who did not become a pro-life advocate after having an abortion is based on that applicant's beliefs, not the applicant's reproductive health decisions." *Evergreen Ass'n, Inc. v. Hochul* ("*Evergreen I*"), No. 1:20-CV-0112, 2025 WL 359074, at *5 (N.D.N.Y. Jan. 31, 2025). Indeed, Plaintiffs here themselves acknowledge that women who have previously received an abortion, but now regret it, are often effective messengers for the pro-life movement. (Hoefler Decl. [30-2] ¶ 39.)

Other questions about standing remain. Plaintiffs have not alleged that any of their employees has *ever* made an objectionable reproductive health decision, nor whether Plaintiffs have taken, or considered taking, adverse action against that employee.[1] They also do not explain how they expect to learn that employees (or applicants) have had an abortion, have used contraception, or have engaged in similar behavior, given that such sensitive information is typically private.

The court takes Plaintiffs at their word that they would take adverse action against a current or hypothetical future employee who engages in what they deem unacceptable behavior, and will assume the employee would challenge that action as a violation of H.B. 4867. But the

---

[1] Plaintiffs vaguely claim the Center and Diocese "have taken adverse action against existing employees for violating 'pro-life beliefs' and 'conduct policies in matters of human sexuality.' " (Pls.' Opp'n [42] at 20 (emphasis removed).) But discrimination on the basis of "pro-life beliefs" and sexual "conduct" is not prohibited by the Act. This allegation sweeps more broadly than the statute—if Plaintiffs terminated an employee for attending a pro-choice rally, for example, or for engaging in an extramarital affair, they would not run afoul of the Act, and Plaintiffs would thus not have standing to challenge it.

RSA.002

court doubts that hypothetical future adverse action is sufficient to support Article III standing.[2] "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" required by Article III. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 564 (1992) (emphasis removed); *see also Satanic Temple, Inc. v. Rokita,* 163 F.4th 1061, 1071 (7th Cir. 2026) ("To support a pre-enforcement challenge, a future harm amounts to injury in fact if the harm is certainly impending or poses a substantial risk of occurring but not if the harm is merely possible." (citation and internal quotation marks omitted)).

At their core, Plaintiffs' claims "rest[] on their highly speculative fear" that (1) a prospective job applicant or current employee has an abortion, uses contraception, or engages in similar behavior; (2) that person applies (or continues) to work for Plaintiffs despite Plaintiffs' vehement opposition to such activities; (3) Plaintiffs discover that the individual has engaged in the disapproved behavior; (4) the applicant or employee refuses to disavow or repent for such action; (5) Plaintiffs take an adverse employment action against that individual; and (6) Plaintiffs are sued. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013). It is, of course, possible that this "chain of possibilities" will occur; but, again, without more information suggesting that such events are likely, Plaintiffs' plan to refuse to hire unrepentant women who have had an abortion or used contraceptives appears to be speculative and conjectural. *See Evergreen Ass'n, Inc. v. City of New York* ("*Evergreen II*"), No. 20-CV-0580, 2025 WL 416903, at *10, 12 (E.D.N.Y. Feb. 6, 2025) ("[T]here is almost no chance that Plaintiff will face an enforcement action . . . because the individuals they hire strongly believe in and, for 40 years have abided by, the organization's values, and because Plaintiff does not police its employees' healthcare decisions or require them to self-report regarding those decisions.").

Plaintiffs also contend that they have standing to challenge H.B. 4867 because it has a chilling effect on speech. Specifically, they allege they "have written statements clarifying that they cannot hire employees who make objectionable reproductive decisions" and want "to publish these statements on career websites and job postings"—but have refrained due to fear of H.B. 4867. (Pls.' Opp'n [42] at 15–16.) To be sure, in the First Amendment context a plaintiff has standing to challenge a law if they can show that protected speech is chilled by threatened enforcement of the law. *Speech First*, 968 F.3d at 638–39. But what Plaintiffs challenge in this case is a statute that proscribes adverse employment actions—that is *conduct*, not speech. The Supreme Court has repeatedly held that statutes regulating conduct do not run afoul of the First Amendment, even if they have incidental impacts on speech of some kind. *See, e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992). And unlike the statute recently before the Supreme Court in *Chiles v. Salazar*, No. 24-539, 2026 WL 872307 (U.S. March 31, 2026), the government does not seek to apply H.B.

---

[2] While Defendants do have limited authority to enforce the Human Rights Act, *see* 775 ILCS 5/7-101, the Human Rights Act is primarily enforced by private individuals. Plaintiffs request declaratory relief that would ostensibly prevent *private* enforcement of the Act as well (Compl. [1] at 57–58), but the court questions whether it has the authority to issue such an equitable remedy, given that these potential private litigants are not before the court. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("Supposing the attorney general did have some enforcement authority under S.B. 8, the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S.B. 8 suits."); *see also Ill. Pol'y Inst. v. Flanagan*, 802 F. Supp. 3d 1071, 1078–82 (N.D. Ill. 2025); *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,* 51 F.4th 1182, 1184 n.1 (9th Cir. 2022) (Berzon, J., respecting the denial of rehearing *en banc*).

3

RSA.003

4867 "to speech alone." *Id.* at *10–11. Plaintiffs have not presented a persuasive basis for chilling-effect standing here.

For now, the court concludes only that Plaintiffs' Complaint does not establish constitutional standing. The Complaint [1] is dismissed, and Plaintiffs are directed to file, within 21 days, an amended complaint that includes additional information on the extent to which Plaintiffs have disciplined employees in the past for their reproductive health decisions, and the extent to which such discipline is likely to occur in the future. The court will also grant Defendants' request for limited jurisdictional discovery. The parties are directed to confer and contact the court, also within 21 days, with: (1) a proposed plan for a compressed round of jurisdictional discovery, and (2) their views on whether an evidentiary hearing is necessary in this case. *See Craig v. Ontario Corp.*, 543 F.3d 872, 877 (7th Cir. 2008) (reversing and remanding to the district court with instructions to hold an evidentiary hearing on a jurisdictional question). Given the dismissal of the Complaint, the court will strike Plaintiffs' request for a preliminary injunction without prejudice to renewal following the filing of the amended complaint. The court will endeavor to rule promptly on any renewed application, if one is filed.

ENTER:

Dated: March 31, 2026

REBECCA R. PALLMEYER
United States District Judge

4

RSA.004

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| The Pregnancy Care Center of Rockford and the Diocese of Springfield in Illinois,<br><br>               Plaintiffs,<br><br><br>          v.<br><br>James Bennett, in his official capacity as Director of the Illinois Department of Human Rights, and Kwame Raoul, in his official capacity as Illinois Attorney General,<br><br>               Defendants. | No. 3:25-cv-50127<br>Hon. Rebecca R. Pallmeyer |

**JUDGMENT**

IT IS HEREBY ORDERED AND ADJUDGED that Defendants' motion to dismiss [40] is GRANTED, and Plaintiffs' motion for preliminary injunction [29] is STRICKEN. For the reasons set out in the Court's opinion [51], and because Plaintiffs have not filed an amended complaint, the complaint is hereby DISMISSED without prejudice on the ground that Plaintiffs failed to allege Article III standing.

IT IS SO ORDERED.

_____
REBECCA R. PALLMEYER
United States District Judge

Date:  5/11/2026

1

RSA.005