No. 26-1861

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

THE PREGNANCY CARE CENTER OF ROCKFORD; THE DIOCESE OF SPRINGFIELD IN ILLINOIS,

*Plaintiffs-Appellants,*

v.

JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; KWAME RAOUL, in his official capacity as Illinois Attorney General,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 3:25-cv-50127 / Hon. Rebecca R. Pallmeyer

## BRIEF FOR THOMAS MORE SOCIETY
## AS AMICUS CURIAE IN SUPPORT
## OF PLAINTIFFS-APPELLANTS AND REVERSAL

Peter Breen
  *Counsel of Record*
THOMAS MORE SOCIETY
121 West Wacker Drive, Suite 650
Chicago, IL 60601
(312) 782-1680
pbreen@thomasmoresociety.org

Timothy Belz
J. Matthew Belz
CLAYTON PLAZA LAW GROUP, L.C.
112 South Hanley Road, Suite 200
St. Louis, Missouri 63105
(314) 726-2800
tbelz@olblaw.com
jmbelz@olblaw.com

*Counsel for Amicus Curiae*

**[insert rule 26.1 disclosure statement – form online https://www.ca7.uscourts.gov/assets/pdf/discstat.pdf]**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................iii

INTERESTS OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT ..................................................... 3

ARGUMENT............................................................................... 6

I.    Pre-enforcement standing is essential to First Amendment guarantees. ...................................... 6

    A. First Amendment rights are injured when protected activity is chilled, not only when sanctions are imposed. ............................... 6

    B. The Supreme Court has repeatedly rejected "bet the farm" standing requirements. ................. 9

II.    Appellants have pre-enforcement standing. ............... 11

    A.    Appellants' intended conduct is arguably affected with constitutional interests. ................ 11

    B.    Appellants' conduct is arguably proscribed by the Act. ............................................... 13

    C.    The State's refusal to disavow enforcement confirms a credible threat. ..................................... 14

    D.    Appellants also suffer present, actionable chilling injury. ......................................... 16

    E.    The State's refusal to honor the Act's religious-organization exemption confirms—and aggravates—the credible threat.........................Error! Bookmark not defined.

III. The District Court's "chain of possibilities" analysis is inconsistent with long-standing pre-enforcement doctrine. ....................................................... 17

IV. Pre-enforcement review is especially important for religious and expressive associations ..................... 21

V. The Court should not adopt a rule that privileges post-enforcement review. .............................................. 22

CONCLUSION .................................................................... 23

Certificate of Compliance ................................................. 26

Certificate of Service .......................................................... 27

Page(s)

Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ...................... 3, 5, 17, 22

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ........................... 12

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ............... 3, 10, 28

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) . 7, 11, 17

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ............................... 13

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023) ........................................ 19

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026) ................................ 6, 8, 10, 18

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006) ............. 14

*Citizens United v. FEC*, 558 U.S. 310 (2010) ................................. 3, 9, 28

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988).. 3, 10, 26

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ................ 23

*Davis v. FEC*, 554 U.S. 724 (2008) ........................................................ 23

*Edenfield v. Fane*, 507 U.S. 761 (1993) ................................................... 9

*Evergreen Ass'n, Inc. v. City of New York*, No. 20-CV-0580, 2025 WL 416903 (E.D.N.Y. Feb. 6, 2025) ................................................................. 2, 24

*Evergreen Ass'n, Inc. v. Hochul*, No. 1:20-CV-0112, 2025 WL 359074 (N.D.N.Y. Jan. 31, 2025) ............................................................. 2, 24

*Hedges v. Obama*, 724 F.3d 170 (2d Cir. 2013) ....................................... 8

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..... 11, 15, 17, 19

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012) ........................ 14

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) ........................ 13

*Laird v. Tatum*, 408 U.S. 1 (1972) ........................ 23

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010) ........................ 3

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ........... 4, 12, 22

*National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ........................ 15

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ........................ 8

*Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020) ........................ 14

*Pennsylvania v. West Virginia*, 262 U.S. 553 (1923) ........................ 8

*Reno v. ACLU*, 521 U.S. 844 (1997) ........................ 9, 28

*Schneider v. State (Town of Irvington)*, 308 U.S. 147 (1939) ........................ 27

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ........................ 14

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) ........................ 19, 26

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022) ........................ 21

*Steffel v. Thompson*, 415 U.S. 452 (1974) ........................ 4, 8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................ passim

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ... 5, 11, 17

*Watchtower Bible & Tract Society of New York, Inc. v. Village of
    Stratton*, 536 U.S. 150 (2002) .............................................. 3, 10, 27

*Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006) ....................... 9

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................ 15


Statutes
775 ILCS 5/2-101(B)(2) .................................................................. 6, 17, 18

775 ILCS 5/2-101(E-1) .......................................................................... 22

Ill. Pub. Act 103-785 ............................................................................ 17

IRC § 501(c)(3) ....................................................................................... 1


Other Authorities
Brief of Amici Curiae Virginia, Illinois, et al., Our Lady of Guadalupe
    School v. Morrissey-Berru, No. 19-267 (U.S. Mar. 11, 2020) ........ 18

**INTERESTS OF AMICUS CURIAE[1]**

Thomas More Society ("TMS") is a national public interest law firm dedicated to restoring respect in law for religious freedom, free speech and expressive associations. Incorporated as an IRC § 501(c)(3) not-for-profit corporation under the laws of the State of Illinois with principal offices in Chicago, TMS pursues its organizational mission through education, litigation, friend-of-the-court briefs, and related activities. It has represented many individuals and organizations in federal and state courts and has filed *amicus curiae* briefs with the aim of protecting the rights and immunities of individuals and organizations to express and practice their religion as safeguarded by the First Amendment to the U.S. Constitution and similar guarantees in state laws.

TMS often represents plaintiffs in pre-enforcement cases, as churches and other religious non-profit clients can rarely afford to defend enforcement actions (public and/or private) or to pay the cost of government fines and penalties. In particular similarity to the case at bar, TMS lawyers have two appeals pending in the Second Circuit where the client, a pregnancy help center, seeks pre-enforcement review of laws in New York that bar it from making employment decisions on the basis of reproductive health decisions. *Evergreen Ass'n, Inc. v.*

---

[1] This brief was authored by counsel for amicus curiae Thomas More Society as listed above. No other person or entity besides TMS has contributed to the costs of preparing and submitting this brief.

*City of New York*, No. 20-CV-0580, 2025 WL 416903 (E.D.N.Y. Feb. 6, 2025), *appeal docketed*, No. 25-520 (2d Cir. 2025); *Evergreen Ass'n, Inc. v. Hochul*, No. 1:20-CV-0112, 2025 WL 359074 (N.D.N.Y. Jan. 31, 2025), *appeal docketed*, No. 25-422 (2d Cir. 2025). And the district court below relied on the district-court decisions in both *Evergreen* cases in support of its ruling here. RSA.2–3. TMS has also regularly represented religious organizations in Illinois, both advising them of their rights as employers under the Illinois Human Rights Act ("the Act") and, when necessary, defending them against employment-related claims.

## SUMMARY OF ARGUMENT

Pre-enforcement challenges to laws that burden protected expression have been indispensable to the development and protection of First Amendment rights. The Supreme Court has repeatedly considered and sustained such challenges across many categories of speech, including campaign advocacy, commercial expression, sexually explicit expression, online speech, and speech licensing regimes. Cases such as *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003)*, overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010), *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), *City of Lakewood v. Plain Dealer Publishing Co*., 486 U.S. 750 (1988), *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), and *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) show that courts have preserved substantial amounts of protected expression by allowing speakers, including expressive associations, to sue before unlawful restrictions are enforced against them.

The rule urged below would undermine that tradition. By limiting pre-enforcement review to cases in which prosecution or enforcement is effectively present or definitely impending, courts would force speakers into choices the First Amendment does not permit. A speaker could comply with an unconstitutional law and remain silent. Or the speaker could violate the law, risk criminal or civil

3

penalties, and attempt to raise constitutional objections only after the machinery (and cost) of enforcement has begun. That burden is not merely inconvenient. It suppresses speech. It deters speakers from entering public debate, reduces the amount and diversity of expression available to the public, and allows unconstitutional laws to achieve their censorial effect without ever being tested in court.

The Supreme Court has repeatedly rejected that approach. A plaintiff need not "bet the farm" before seeking court protection, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007), expose itself to prosecution, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), or otherwise await consummated injury before seeking preventive relief regarding a law that deters constitutionally protected activity. That principle is especially important in First Amendment cases, where delay itself can inflict irreparable injury. Speech lost to self-censorship is often lost forever.

Nor is the harm limited to individual speakers. When anticipatory review is unavailable, businesses, advocacy groups, religious organizations, publishers, and other expressive actors may avoid lawful speech rather than risk ruinous enforcement consequences. Commercial speakers may forgo advertising or solicitation. Political speakers may stay out of election debates. Online speakers may suppress lawful material. Religious and political advocates may abandon outreach rather than submit to licensing or permitting schemes. In each setting, the

result is the same: constitutionally protected expression is chilled before a court can decide whether the government's restriction is lawful.

The district court's "chain of possibilities" analysis transforms pre-enforcement standing into post-enforcement standing. Every pre-enforcement case involves contingencies: the plaintiff must engage in the intended conduct, a regulator or complainant must invoke the law, and sanctions must follow. If those universal features defeated standing, *Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014), *Virginia v. American Booksellers Ass'n, Inc*., 484 U.S. 383 (1988), *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), and many other cases would have been rejected on standing grounds. Article III requires a credible threat, not a completed enforcement record.

The threat to Appellants is aggravated by the State's own treatment of the Act's religious-organization exemption, 775 ILCS 5/2-101(B)(2). The General Assembly was assured that the exemption would continue to protect religious organizations. The Department of Human Rights has since insisted that applying the Act's restrictions "to religious organizations has been and will continue to be appropriate," SA.168, and the State maintains that the exemption's scope may be tested only by a "target of an enforcement action" who "raises it as a defense," SA.384. A religious organization that must litigate its way out of the Act's coverage, charge by charge, faces a credible threat of enforcement, not a

speculative one. The district court's contrary conclusion also rests on an overreading of the *Evergreen* decisions: whatever force that reasoning has as to employment decisions, it says nothing about the Act's Notice, Benefit, and Accommodation Clauses, which Appellants openly violate today—present, ongoing conduct involving no "chain of possibilities" at all.

Amicus writes to emphasize that pre-enforcement review is not a procedural indulgence. It is a necessary safeguard for First Amendment freedoms. The Court should preserve the settled rule that speakers may bring anticipatory challenges to speech-restrictive laws before those laws are enforced, and should reject any standing rule that would require speakers to wait until enforcement is imminent or underway. To protect the core values of the First Amendment, and to ensure that the government restricts no more speech than the Constitution permits, the judgment should be reversed.

## ARGUMENT

### I.     Pre-enforcement standing is essential to First Amendment guarantees.

**A. First Amendment rights are injured when protected activity is chilled, not only when sanctions are imposed.**

The First Amendment protects more than the right to raise constitutional defenses after the government has acted. It protects the breathing space necessary for speech, association, and religious expression to occur in the first place. For that

reason, the Supreme Court has long permitted speakers to challenge laws before penalties are imposed. Accordingly, parties wishing to challenge a statute before its enforcement must demonstrate a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). As the Second Circuit has recognized, the *Babbitt* standard sets a "low threshold" and is "quite forgiving" to plaintiffs seeking such pre-enforcement review. *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) (footnote omitted). Courts presume that the government will enforce a recently enacted law, absent a disavowal of enforcement or another reason to conclude that no such intent exists. *Id.*; *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026) (Colorado "expressly declined to disavow enforcement" and, "[a]s the lower courts held, no more is required under this Court's precedents").

A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). Nor must a plaintiff "first expose himself to actual arrest or prosecution" before challenging a statute that deters constitutionally protected conduct. *Steffel*, 415 U.S. at 459. And in the modern formulation, a pre-enforcement plaintiff establishes injury in fact by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest," where that conduct is "arguably proscribed"

by the challenged law and there is a credible threat of enforcement. *Susan B. Anthony List*, 573 U.S. at 159, 162.

Those rules reflect the nature of First Amendment injury. When a law threatens penalties for speech or expressive association, rational speakers often do not wait to be sued. They remain silent, alter their message, avoid controversial topics or decline to publish employment criteria, mission statements, advertisements, or public-facing explanations of their beliefs. The resulting injury is not speculative; the chill has done its work because no enforcement action becomes necessary.

That is why pre-enforcement challenges have shaped First Amendment doctrine in various contexts. Election-speech cases, commercial-speech cases, online-speech cases, counseling-speech cases and licensing cases have all proceeded before penalties were imposed. *See, e.g., Citizens United v. FEC*, 558 U.S. 310 (2010); *Wisconsin Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006); *Edenfield v. Fane*, 507 U.S. 761 (1993); *Reno v. ACLU*, 521 U.S. 844 (1997); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002); *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988); *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002); *Chiles v. Salazar*, 146 S. Ct. 1010 (2026). Those cases were not advisory opinions. They were concrete disputes because the challenged laws altered what speakers could safely say or do.

The stakes are obvious. Without pre-enforcement review, speakers must either comply with an allegedly unconstitutional law or violate it and hope to prevail later. That dilemma is especially intolerable for religious and expressive organizations, as their speech and associational choices are often inseparable from their identity. Forcing such organizations to wait until a complainant appears or an agency proceeding begins means requiring them to risk the very constitutional injury they seek to prevent.

**B. The Supreme Court has repeatedly rejected "bet the farm" standing requirements.**

The Supreme Court's pre-enforcement decisions reject the notion that Article III requires a plaintiff to risk ruinous consequences before seeking judicial review.

In *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), the Court held that plaintiffs could challenge a statute before prosecution where they intended to engage in conduct arguably affected with a constitutional interest, the statute arguably proscribed that conduct, and the fear of enforcement was not imaginary. *Id.* at 298-302. In *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988), booksellers could challenge a statute regulating sexually explicit materials before enforcement because the law was aimed directly at them and they faced a credible enforcement threat. *Id.* at 392-93. In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), plaintiffs had standing to challenge a statute

prohibiting material support to terrorist organizations because they intended to engage in arguably proscribed speech-related activity and the government had not disavowed enforcement. *Id*. at 15-16. And in *Susan B. Anthony List*, the Court unanimously held that speakers could challenge Ohio's false-statement election law before a new enforcement proceeding, even though future enforcement depended on future speech, future complaints, and future action by state officials. 573 U.S. at 161-67.

The same principle animated *MedImmune*. There, the Court rejected a rule that would have required a licensee to breach its agreement and risk treble damages before seeking declaratory relief. 549 U.S. at 128-29. The Court explained that Article III does not require a plaintiff to "bet the farm" before obtaining judicial review. *Id*. at 129. The point applies with greater force in First Amendment cases, where the threatened harm is not merely economic but constitutional.

Finding standing existed, the Supreme Court in MedImmune surveyed four pre-enforcement cases, and explained that, "[i]n each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do …. That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *Id*. at 129. Indeed, "the very purpose of the Declaratory Judgment Act" was to "ameliorate" "[t]he dilemma

posed by that coercion." *Id*. (citing and *quoting Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)).

The case at bar fits comfortably within those precedents. Appellants intend to continue policies and speech practices tied to their religious and pro-life missions. The Act arguably proscribes those policies and speech practices, the State has not disavowed enforcement, and the Act's penalties and procedures create the precise pressure to conform that pre-enforcement review exists to address.

## II. Appellants have pre-enforcement standing.

### A. Appellants' intended conduct is arguably affected with constitutional interests.

The first *Susan B. Anthony List* requirement is easily satisfied. Appellants' conduct is at least "arguably affected with a constitutional interest." 573 U.S. at 159. That is a deliberately modest threshold. The Court need not decide the merits of Appellants' First Amendment claims to recognize that their employment, association, speech, and notice objections implicate constitutional interests.

Appellants allege that their missions require them to employ persons who can faithfully carry their religious and pro-life message. The Supreme Court has repeatedly recognized that expressive associations have a First Amendment interest in choosing the persons who speak for them and embody their message. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 648-56 (2000); *Hurley v. Irish-American*

*Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 568-75 (1995); *see also Slattery v. Hochul,* 61 F.4th 278, 290 (2d Cir. 2023) ("The right of Evergreen to choose those who promote its views 'is not protected by the First Amendment simply because it 'communicates' a message, but because an expressive association's membership and leadership is integral to its ability to play an important role in nurturing the 'freedom of speech.'"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) ("It would be difficult [for an organization] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct."). Religious organizations also have constitutional interests in internal governance, religious autonomy, and communicating their faith without state compulsion. *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020).

Appellants also object to compelled notice requirements. A law requiring an organization to post or distribute the State's message implicates the compelled-speech doctrine. *See Wooley v. Maynard*, 430 U.S. 705 (1977); *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018). Whether the State can ultimately justify its requirement is a merits question. For standing, it is

enough that Appellants' refusal to convey the State's message is arguably protected by the First Amendment.

The district court erred to the extent it treated these merits questions as jurisdictional barriers. Standing asks whether the plaintiff is injured by the challenged law, not whether the plaintiff will ultimately prevail. *Holder* proves the point: the plaintiffs had standing to challenge the material-support statute but lost on the merits. 561 U.S. at 15-16, 39. The same separation between jurisdiction and merits applies here.

**B. Appellants' conduct is arguably proscribed by the Act.**

The second requirement is likewise satisfied. Appellants need not prove that the Act certainly applies to every challenged policy. Their conduct need only be "arguably proscribed." *Susan B. Anthony List*, 573 U.S. at 162. That low bar is met when a regulated party's intended conduct falls within the statute's plausible reach and the government has not taken the position that the law does not apply. Appellants are undoubtedly regulated employers, and the Act regulates employment decisions, workplace notices, accommodations, benefits, and allegedly offensive workplace speech concerning reproductive decisions.

Appellants allege that their religious and pro-life commitments require them to make employment decisions, impose employment conditions, decline accommodations or benefits, and refuse compelled notices in ways the Act forbids.

The State's guidance and litigation position confirm, at minimum, that the Act arguably reaches those practices.

The district court's contrary reasoning required too much of Appellants. A pre-enforcement plaintiff need not identify the exact future complainant, the precise date of a future enforcement action, or the specific administrative path enforcement will take. Nor must the plaintiff first complete the allegedly forbidden act. *Susan B. Anthony List* rejected that approach. There, future enforcement depended on future campaign speech, a future complaint by an opponent, and future action by the Ohio Elections Commission. Yet the Court found standing. 573 U.S. at 161-67. This Court should do the same here.

Indeed, Appellants' position is stronger than that of many pre-enforcement plaintiffs. They are not contemplating a new business line that might one day be regulated, as in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), where the plaintiff wanted to expand her business but was concerned about an interfering anti-discrimination law. They are presently regulated by the Act and presently maintain policies and objections that place them within its arguable reach. The "arguably proscribed" requirement demands no more.

### C. The State's refusal to disavow enforcement confirms a credible threat.

The credible-threat requirement is also met. A regulated party ordinarily faces a credible threat when its intended conduct is arguably proscribed and the

government refuses to disavow enforcement. *See Babbitt*, 442 U.S. at 302; *Virginia v. American Booksellers*, 484 U.S. at 393; *Holder*, 561 U.S. at 15-16; *Susan B. Anthony List*, 573 U.S. at 164-65.

That principle makes sense. Courts generally presume that governments enact laws to enforce them. When a plaintiff is regulated by a law, intends conduct arguably covered by that law, and asks whether the government will enforce it, the government can eliminate the controversy by disavowing enforcement. If it refuses, the threat is credible.

The State has not disavowed enforcement here, and "no more is required under this Court's precedents" to establish a credible threat of enforcement. *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026). To the contrary, it has defended the Act's applicability and urged dismissal on standing grounds while preserving its ability to enforce later. That is enough for standing. Article III does not require Appellants to wait until an employee, applicant, tester, advocacy group, or agency official initiates proceedings. A credible threat exists because the law applies to Appellants now, Appellants' conduct is arguably prohibited now, and the State retains and defends its enforcement authority now.

And here, the State did not merely reject the Catholic Conference of Illinois's proposal to clarify that a religious exemption reaches the Act's reproductive-decisions coverage but declared to the contrary that "the application

of these protections, existing and new, to religious organizations has been and will continue to be appropriate." SA.168. In this litigation, the State has further maintained that any religious exemption's scope must be "adjudicated when a target of an enforcement action raises it as a defense." SA.384.

The State has thus told religious employers, in terms, that the Act's restrictions apply to them, and that they may test any exemption only from the defendant's chair in an enforcement proceeding—charge by charge, complaint by complaint. An organization facing that posture does not harbor a "speculative" fear: its conduct is at least "arguably proscribed," *Susan B. Anthony List*, 573 U.S. at 162, and the State's refusal to disavow enforcement completes the showing. The coerced dilemma the State's position creates—comply, or risk the very proceedings an exemption exists to spare you—is precisely what pre-enforcement review exists to relieve. *MedImmune*, 549 U.S. at 129.

**D. Appellants also suffer present, actionable chilling injury.**

The Court need not rely only on future enforcement; Appellants also allege present self-censorship. They wish to publish employment-related statements explaining that employees must comply with their religious and pro-life beliefs. They refrain from doing so because the Act restricts or penalizes employment statements that indicate a preference, limitation, or discrimination based on protected reproductive decisions.

That is a present injury. A plaintiff suffers injury when it "self-censors" in response to a law that objectively chills protected speech. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638-39 (7th Cir. 2020); *Brown v. Kemp*, 86 F.4th 745, 761-62 (7th Cir. 2023). The injury is not the plaintiff's paranoia; it is the plaintiff's forgoing of speech it otherwise would engage in because the challenged law makes that speech legally risky.

The district court's conclusion that the Act regulates conduct rather than speech does not defeat standing. RSA.3-4. First, the Act includes provisions that directly affect speech, including employment notices and allegedly offensive workplace expression. Second, even a law regulating conduct can chill speech when the regulated conduct is expressive or when speech is evidence of, or a trigger for, enforcement. Third, whether the Act ultimately violates the First Amendment is a merits question. A plaintiff can have standing to bring a First Amendment claim even if a court later holds that the challenged law permissibly regulates conduct. *Holder*, 561 U.S. at 15-16, 39.

**III. The District Court's "chain of possibilities" analysis is inconsistent with long-standing pre-enforcement doctrine.**

The district court treated Appellants' injury as speculative because several events must occur before enforcement: an employee or applicant must engage in conduct implicating the Act, disclose it or otherwise bring it to light, suffer an

employment consequence, and initiate or trigger enforcement. RSA.2–3. That reasoning cannot be reconciled with the Supreme Court's pre-enforcement cases. Every pre-enforcement case involves future steps. In *Susan B. Anthony List*, the plaintiffs' injury depended on future election speech, a future complaint, future commission action, and possible future proceedings. 573 U.S. at 161-67. In *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), the plaintiff had not yet begun offering wedding websites, had not yet refused a same-sex wedding website request, and had not yet been subjected to enforcement. Yet the Court resolved the merits after the lower courts found standing, because the plaintiff intended to offer expressive services in a way Colorado law arguably forbade and faced a credible threat of enforcement. *Id*. at 580-84. In *Davis v. FEC*, 554 U.S. 724 (2008), injury depended on future campaign events and choices by third-party donors and an opponent. The Court nonetheless found standing. *Id*. at 734.

The lesson is not that Article III ignores speculation. It does not. The lesson is that courts must distinguish between speculative fears and credible threats. A fear is speculative when the plaintiff is not regulated by the challenged law, does not intend to engage in arguably proscribed conduct, or relies on an attenuated theory of government action unrelated to the law's operation. *See Clapper v. Amnesty International USA*, 568 U.S. 398 (2013); *Laird v. Tatum*, 408 U.S. 1 (1972). A threat is credible when the plaintiff is subject to the law, intends to act in

a way arguably covered by the law, and the government retains authority to enforce it. That is this case.

The district court's approach inverts pre-enforcement doctrine. It would require Appellants to wait until a complainant appears or an agency proceeding begins. But once that happens, the damage is done: Appellants will have been forced either to compromise their religious and expressive practices or to endure enforcement proceedings for adhering to them. The First Amendment, and courts interpreting it, do not require that.

The district court's reliance on the *Evergreen* decisions illustrates the error. Whatever force the *Evergreen* district courts' reasoning may have, it addressed employment decisions: whether an organization's refusal to hire a particular applicant turns on the applicant's reproductive "decisions" or on her "beliefs," *Evergreen Ass'n, Inc. v. Hochul*, No. 1:20-CV-0112, 2025 WL 359074, at *5 (N.D.N.Y. Jan. 31, 2025), and whether an enforcement action arising from such a refusal is likely, *Evergreen Ass'n, Inc. v. City of New York*, No. 20-CV-0580, 2025 WL 416903, at *10, 12 (E.D.N.Y. Feb. 6, 2025). *See* RSA.2–3. Even taken on its own terms, that reasoning speaks only to the Act's Employment Clause.

That reasoning says nothing about the provisions of the Act that Appellants violate openly, presently, and continuously. Appellants refuse, today, to post or distribute any notice referencing the Act's provisions about reproductive decisions,

as the Notice Clause requires. SA.36. The Diocese's health plan excludes, today, abortion, contraception, sterilization, and certain reproductive technologies from coverage, and both ministries withhold equal benefits for reproductive decisions they oppose, contrary to the Benefit Clause. SA.34–35, 239. And Appellants' written policies deny, today, the accommodations the Accommodation Clause requires. SA.33–34. None of this involves a "chain of possibilities." No future applicant, disclosure, or complaint is needed for these existing policies to violate the Act: the conduct is complete and ongoing, the State's own guidance confirms the Act's coverage, and the State refuses to disavow enforcement. Where ongoing conduct arguably affected with a constitutional interest is arguably proscribed and the government refuses to disavow enforcement, standing follows. *Susan B. Anthony List*, 573 U.S. at 161–64. The district court did not address the Notice Clause at all—an independent ground for reversal.

Nor can the Offensive Speech Clause be dismissed on the district court's "conduct, not speech" rationale. RSA.3–4. The Act's harassment provisions reach "unwelcome conduct" that creates what the Act deems a hostile or offensive working environment, 775 ILCS 5/2-101(E-1), and much of the speech Appellants' ministries engage in daily about abortion and other reproductive decisions is unwelcome to some hearers by design. SA.30–33. A statute that exposes an employer to harassment liability for workplace speech regulates speech. And a

speaker who curbs that speech now suffers injury now. *See Speech First*, 968 F.3d at 638–39.

## IV. Pre-enforcement review is especially important for religious and expressive associations.

The need for pre-enforcement review is especially acute where, as here, a law burdens the internal decisions of religious and expressive organizations. Such organizations often speak through the people they hire, train, and hold out as representatives. Their employees are not fungible labor inputs; they are message bearers. A law that threatens liability for selecting employees consistent with the organization's message pressures the organization to change who speaks for it and what it can credibly say.

That pressure cannot be remedied fully after enforcement. Once an organization changes its hiring criteria, dilutes its public statements, posts a message it believes false, or refrains from explaining its religious standards, the expressive loss has already occurred. The constitutional harm is not merely a fine at the end of the process. It is the compelled alteration of message and association along the way.

Licensing and permitting cases illustrate the same point. In *City of Lakewood*, the Court recognized that unfettered licensing discretion chills speech even before discretion is abused, because speakers self-censor rather than risk denial or retaliation. 486 U.S. at 757-59 (identifying "self-censorship by speakers"

as one of "two major First Amendment risks" of unbridled licensing schemes). In *Watchtower*, the Court invalidated a permitting scheme for door-to-door advocacy without requiring Jehovah's Witnesses to violate the ordinance and face prosecution first. 536 U.S. at 162, 165-69 (finding that the law's censorship impeded "free and unhampered" speech and "str[uck] at the very heart of the constitutional guarantees" (quoting *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 164 (1939))).

The same logic applies here. When the law makes religious and pro-life employment speech risky, regulated organizations will predictably say less. That result is antithetical to the First Amendment. Public debate loses when speakers remain silent. Religious liberty suffers when religious organizations must obscure their standards.

## V. The Court should not adopt a rule that privileges post-enforcement review.

Post-enforcement review is not an adequate substitute in this case or many others. Waiting for enforcement may produce a more developed factual record, but it does so by forcing someone to suffer an often-irreversible injury. Post-enforcement review may be acceptable in ordinary regulatory disputes where the alleged harm is a calculable fine or a routine compliance cost. It is not acceptable where the alleged harm is loss of First Amendment freedom.

The Supreme Court has recognized that distinction in practice. Many of the Court's most important First Amendment cases arose because plaintiffs could sue before enforcement destroyed their speech. *Reno* protected online speech before the Communications Decency Act could be enforced broadly. *Ashcroft* protected lawful expression before speakers had to risk criminal prosecution. *Citizens United* addressed a nationwide chill on political speech rather than requiring each speaker to violate federal election law and litigate later. These cases reflect a settled constitutional judgment: First Amendment freedoms require breathing space, and breathing space requires pre-enforcement review.

## CONCLUSION

The Court should reaffirm the longstanding principle that speakers and expressive organizations may challenge laws burdening First Amendment rights before those laws are enforced against them. Pre-enforcement review has played a critical role in the development of First Amendment doctrine, enabling courts to prevent constitutional injuries before they occur and preserving a substantial amount of protected expression that otherwise would have been chilled or suppressed.

The consequences of a contrary rule are substantial. If regulated parties must wait until enforcement proceedings are imminent or underway before seeking judicial review, many will alter their speech, associations, employment practices,

or religious expression rather than risk liability. Others will remain silent altogether. In either event, the challenged law will accomplish its censorial purpose before any court has the opportunity to determine whether it is constitutional.

Those concerns are particularly acute where, as here, the challenged law affects the ability of religious and mission-driven organizations to communicate their beliefs, select individuals who further their message, and decline to convey messages with which they disagree. The First Amendment does not require speakers to choose between abandoning their convictions and exposing themselves to enforcement proceedings in order to obtain judicial review.

Preserving meaningful pre-enforcement standing protects both speakers and the public. It ensures that constitutional questions may be resolved before protected expression is chilled, before expressive associations alter their conduct, and before government regulation achieves through deterrence what it may not achieve directly through coercion. By permitting regulated parties to seek review before constitutional injuries are complete, courts safeguard the robust exchange of ideas that the First Amendment exists to protect.

For these reasons, the Court should reverse the judgment below.

Respectfully submitted this 9th day of June, 2026.


<u>/s/ *Peter Breen*</u>
Peter Breen                                         Timothy Belz
   *Counsel of Record*                          J. Matthew Belz

THOMAS MORE SOCIETY
121 West Wacker Drive, Suite 650
Chicago, IL 60601
(312) 782-1680
pbreen@thomasmoresociety.org

CLAYTON PLAZA LAW GROUP, L.C.
112 South Hanley Road, Suite 200
St. Louis, Missouri 63105
(314) 726-2800
tbelz@olblaw.com
jmbelz@olblaw.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Seventh Circuit Rule 29 because it contains 5,100 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Seventh Circuit Rule 32(b) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

Dated: June 9, 2026

/s/ *Peter Breen*

Attorney for Amicus Curiae

# CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ *Peter Breen*

Attorney for Amicus Curiae