No. 26-1861

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

THE PREGNANCY CARE CENTER OF ROCKFORD; and DIOCESE OF
SPRINGFIELD IN ILLINOIS,

*Plaintiffs-Appellants,*

v.

JAMES BENNETT, in his official capacity as Director of the Illinois Department of
Human Rights; and KWAME RAOUL, in his official capacity as Illinois Attorney
General,

*Defendants- Appellees.*

On Appeal from the United States District Court for the
Northern District of Illinois, Western Division
The Honorable Rebecca R. Pallmeyer, Judge

**BRIEF OF AMICI CURIAE STATE OF INDIANA AND**
**19 OTHER STATES IN SUPPORT OF PLAINTIFFS-APPELLANTS**

<table>
<tr><td></td><td>THEODORE E. ROKITA<br>Attorney General of Indiana</td></tr>
<tr><td>Office of the Attorney General<br>IGC South, Fifth Floor<br>302 W. Washington Street<br>Indianapolis, IN 46204<br>(317 232-0709<br>James.Barta@atg.in.gov</td><td>JAMES A. BARTA<br>Solicitor General<br><br>JOHN P. LOWREY<br>Deputy Solicitor General</td></tr>
</table>

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici curiae are not required to file a disclosure statement. Fed. R. App. P. 26.1(a); 7th Cir. R. 26.1(a).

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................ ii

TABLE OF AUTHORITIES ................................................................................ iv

INTERESTS OF AMICI CURIAE .......................................................................... 1

ARGUMENT ..................................................................................................... 1

I.  The First Amendment Protects the Right of Religious Organizations to Decide Who Will Teach Their Message and Promote Their Mission ............ 3

II.  Illinois May Not Compel Religious Groups to Subordinate Their Missions and Messages to Its Preferred Views ................................................. 7

CONCLUSION ................................................................................................. 10

ADDITIONAL SIGNATORIES ............................................................................ 11

CERTIFICATE OF COMPLIANCE ..................................................................... 12

CERTIFICATE OF SERVICE ............................................................................ 13

# TABLE OF AUTHORITIES

**CASES**

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) .......................................................................................... 3, 4

*Cath. Charities Bureau, Inc. v. Wis. Labor & Indus. Rev. Comm'n,*
605 U.S. 238 (2025) .......................................................................................... 3, 6

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ................................................................................ 4

*CompassCare v. Hochul,*
125 F.4th 49 (2d Cir. 2025) .................................................................................. 3

*Demkovich v. St. Andrew the Apostle Par., Calumet City,*
3 F.4th 968 (7th Cir. 2021).......................................................................... 3, 6, 7

*Hernandez v. Comm'r,*
490 U.S. 680 (1989) ............................................................................................. 7

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
565 U.S. 171 (2012) ............................................................................. 3, 4, 5, 6, 8

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.
Am.,*
344 U.S. 94 (1952) ............................................................................................... 6

*McCarthy v. Fuller,*
714 F.3d 971 (7th Cir. 2013) ................................................................................ 6

*New York State Club Ass'n, Inc. v. City of New York,*
487 U.S. 1, 13 (1988) ........................................................................................... 4

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
591 U.S. 732 (2020) ............................................................................................. 5

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
772 F.2d 1164 (4th Cir. 1985) ............................................................................. 7

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ............................................................................................. 3

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,*
426 U.S. 696 (1976) ............................................................................................. 6

**CASES [CONT'D]**

*Slattery v. Hochul,*
61 F.4th 278 (2d. Cir. 2023) ................................................................ 4

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.,*
41 F.4th 931 (7th Cir. 2022) ............................................................ 5, 6

*Sterlinski v. Catholic Bishop of Chicago,*
934 F.3d 568 (7th Cir. 2019) ............................................................... 5

*Tomic v. Cath. Diocese of Peoria,*
442 F.3d 1036 (7th Cir. 2006) ............................................................. 6

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1871) .............................................................. 6

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. amend. I ............................................................................ 1

775 Ill. Comp. Stat. § 5/1-102(A) .................................................... 2, 8

775 Ill. Comp. Stat. § 5/1-103(O-2) ..................................................... 2

775 Ill. Comp. Stat. § 5/1-103(O-2), (Q) ............................................. 8

775 Ill. Comp. Stat. § 5/2-101(E-1) ................................................. 2, 9

775 Ill. Comp. Stat. § 5/2-102(A) .................................................. 2, 8, 9

775 Ill. Comp. Stat. § 5/2-102(A), (K)(1) ............................................ 8

**OTHER AUTHORITIES**

M. McConnell, *The Origins and Historical Understanding of Free
Exercise of Religion*
103 Harv. L. Rev. 1409 (1990) ............................................................. 6

**INTERESTS OF AMICI CURIAE**

The States of Indiana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, South Carolina, South Dakota, Texas, Utah, West Virginia, and Wyoming submit this brief as *amici curiae* in support of appellants Pregnancy Care Center of Rockford and Diocese of Springfield in Illinois.

*Amici* States are home to countless citizens, organizations, and institutions holding diverse religious beliefs and are committed to upholding their First Amendment freedoms. That gives *amici* an interest in this Court's understanding of the First Amendment and a unique perspective. As sovereigns, *amici* must navigate the competing responsibilities of ensuring their actions comport with the First Amendment while defending state actions from constitutional challenges. *Amici* submit this brief to highlight how Illinois's persistent efforts to promote abortion threaten the rights of religious groups to champion a different theology of life.

**ARGUMENT**

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. This provision broadly protects the principle that Americans are free to believe what they want, to peacefully express those beliefs, and to engage in religious exercise. In Illinois, however, religious employers holding to traditional beliefs regarding the sanctity of human life and sexuality cannot fully enjoy those cherished freedoms.

The Pregnancy Care Center of Rockford and Diocese of Springfield in Illinois hold to traditional Christian teachings on human life and sexuality, including that abortion, contraception, or both are morally wrong, and expect employees to uphold those teachings. SA15, SA69, SA82. Yet the Illinois Human Rights Act prohibits the ministries from disciplining or refusing to hire persons based on their "reproductive health decisions"—a term it defines to include decisions regarding "contraception" and the "termination of pregnancy." 775 Ill. Comp. Stat. §§ 5/1-102(A), 5/1-103(O-2). And the Act further requires the ministries to ensure employees who have made "reproductive health decisions" are not exposed to "[u]nwelcome" or "offensive conduct"—a term that could include remarks that abortion or contraception is sinful and immoral. §§ 5/2-101(E-1), 5/2-102(A). The Act thus threatens religious institutions' ability to uphold the doctrines that they espouse.

Throughout this litigation, Illinois has sought to downplay the Act's impacts, questioning whether it would actually undermine Catholic doctrine for representatives of the church to flout its teaching on contraception and abortion, or whether a pregnancy center employee whose duties include counseling pregnant women from a religious perspective would in fact consider the center's pro-life message offensive. *See, e.g.*, Dkt. 41 at 17, 26–28, 32. But that line of argument does not explain why it is consistent with the First Amendment to force a church to hire, retain, and refrain from commenting on the behavior of key staff who will not abide by its teachings. This Court should reaffirm the principle that a religious institution

can "control" the "selection of those who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012).

**I.  The First Amendment Protects the Right of Religious Organizations to Decide Who Will Teach Their Message and Promote Their Mission**

It is well established that the First Amendment "gives special solicitude to the rights of religious organizations" in deciding who will convey their messages and carry out their religious work. *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021) (en banc) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012)). That protection "derives from at least three sources." *Cath. Charities Bureau, Inc. v. Wis. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 256 (2025) (Thomas, J., concurring).

One source is constitutional protections for the right to associate. *See Cath. Charities*, 605 U.S. at 257 (Thomas, J., concurring). As the Supreme Court has repeatedly observed, the First Amendment's protections for speech, assembly, and religion presuppose "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000); *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (the Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others"). And this "'[f]reedom of association . . . plainly presupposes a freedom not to associate.'" *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623); *see CompassCare v. Hochul*, 125 F.4th 49, 58, 62 (2d Cir. 2025) (compelled employment of "individuals who act or have acted against [an entity's] very mission"

can implicate the right) (internal quotes omitted)); *Slattery v. Hochul*, 61 F.4th 278, 288 (2d. Cir. 2023) (similar).

This freedom to associate or not associate for First Amendment purposes finds expression in a variety of doctrines. For example, the doctrine of "expressive association" protects groups against the "[t]he forced inclusion of an unwanted person in a group" when "the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648 (citing *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988)). The organization determines what its message is, and what will interfere with its ability to express it. *Id.* at 655–56 (rejecting arguments that Boy Scouts needed to be associated for "purpose" of opposing homosexuality, explicitly discuss the subject, or require all members to adhere to official position for expressive association to be protected). Thus, for example, this Court has held that a religious club could exclude active homosexuals from its membership where their forced inclusion would "impair its ability to express disapproval of active homosexuality." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *see Hosanna-Tabor*, 565 U.S. at 200–201 (2020) (Alito, J., concurring) ("Religious groups are the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith.").

Another doctrine that protects religious organizations is the church-autonomy doctrine. This doctrine recognizes that the First Amendment's Religion Clauses "protect the right of churches and other religious institutions to decide matters of

faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (internal quotes omitted). And its protections extend "to internal management decisions that are essential to the institution's central mission," including about "the selection of individuals who play certain key roles." *Id.* This is because matters of faith and doctrine are "closely linked to . . . matters of church government." *Id.* (internal quotes omitted). Without the power to remove a minister, religious teacher, or other key staff "without interference by secular authorities," "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id.* at 747.

That reality is why federal law recognizes a "ministerial exception," which protects a religious organization's "authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady of Guadalupe*, 591 U.S. at 747. And notably a "minister" can include any employee whose "job duties reflected a role in conveying the [ministry's] message and carrying out its mission." *Id.* at 750 (quoting *Hosanna-Tabor*, 565 U.S. at 192). What matters is not job title, but whether the employee has been entrusted with what the organization considers to be religious responsibilities. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 940 (7th Cir. 2022); *see Sterlinski v. Cath. Bishop of Chicago,* 934 F.3d 568, 570 (7th Cir. 2019). This Court thus has applied the ministerial exception to a wide variety of employees who carry out the

religious mission of religious organizations, including guidance counselors, "teachers, music directors, press secretaries, and organists." *Starkey*, 41 F.4th at 940.

A third source of protection for religious organizations is the background constitutional understanding that "church and state are 'two rightful authorities,' each supreme in its own sphere." *Cath. Charities*, 605 U.S. at 257 (Thomas, J., concurring) (quoting M. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1496–97 (1990)); *see Hosanna-Tabor*, 565 U.S. at 183 (noting the First Amendment was adopted "against this background"). Secular authorities have matters they can rightfully regulate, but at the same time, must be on guard that they do not "entangle themselves in essentially religious controversies." *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976); *see Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1871); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ("A federal court will not allow itself to get dragged into a religious controversy even if a religious organization wants it dragged in."). Questions about "faith and doctrine"—such as whether a belief, teaching, or action reflects religious orthodoxy—must be left to spiritual authorities. *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *see McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013) ("Religious questions are to be answered by religious bodies.").

This principle reinforces the ministerial exception by recognizing that secular courts have no place deciding certain questions that can arise in the employment context. *See Demkovich*, 3 F.4th at 980–83. For example, "[i]t is not within the judicial

ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). Nor, for that matter, can a court decide what "character" is required of a minister or similar personnel. *Demkovich*, 3 F.4th at 982 (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventist*s, 772 F.2d 1164, 1171 (4th Cir. 1985)). "How one minister interacts with another . . . is a religious, not judicial, prerogative." *Id.* at 980. It would be an "unprecedented engagement with religious authority" if, say, secular authorities were to undertake to decide what constitutes appropriate "pastoral character." *Rayburn*, 772 F.2d at 1171.

However denominated, these doctrines express a throughline in American law—that religious organizations must have substantial freedom to decide for themselves what their doctrine is and who should spread it. The mere fact that a State happens to label something an "employment matter" does not mean that the authorities can compel a religious group to retain key staff whose conviction or conduct is opposed to official doctrine.

## II. Illinois May Not Compel Religious Groups to Subordinate Their Missions and Messages to Its Preferred Views

Illinois's efforts to promote abortion through the Act exceed what the First Amendment allows. Whatever may be the case for secular organizations, Illinois cannot force religious groups to subordinate their religious teachings on the sanctity of life and human sexuality to its preferred views.

Illinois has made no secret that it will wield the Act to bring religious groups into conformity with its cultural vision. The Act's plain language requires all covered

employers—a category that includes religious employers—to treat "reproductive health decisions" as a protected characteristic. 775 Ill. Comp. Stat. §§ 5/1-102(A), 5/1-103(O-2), (Q). Employers may not refuse to hire or discipline employees based on someone's use of contraception or decision to obtain an abortion. §§ 5/1-103(O-2), 5/2-102(A). Instead, employers must actively accommodate those decisions, provide related benefits, and notify employees of Illinois's requirement—even when those decisions contravene the employer's religious teachings. § 5/2-102(A), (K)(1). And lest there be any doubt that these provisions apply to religious groups, Illinois has expressly stated that it believes "the application of these protections . . . to religious organizations has been and will continue to be appropriate." SA168.

For a Catholic diocese that expects "representative[s] of the Catholic Church" to conduct themselves "in a way that does not contradict the doctrine and moral teaching of the Catholic Church," including on matters like contraception and abortion, the situation is understandably troubling. SA123. The Diocese of Springfield Illinois "cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). Nor can a pregnancy center that expects its employees to promote its mission of seeing "God glorified through loving, empowering, and supporting all those facing pregnancy decisions, so that choosing abundant life today and for future generations is celebrated." SA64, SA79. For a staff member to tell a client "all life is sacred" while taking steps to get an abortion herself does not persuasive advocacy make.

Illinois's response to the Diocese and pregnancy center is revealing. It has sought to minimize their concerns by arguing that the Diocese and pregnancy center are "unlikely to learn" that a staff member has used contraceptives or obtained an abortion. Dkt. 41 at 16. Or Illinois has argued that some people who regret *past* abortions could make for effective pro-life advocates. *Id.* at 28. But those assertions effectively amount to the view that religious groups shouldn't concern themselves with any *current* conduct that violates their teachings. It doesn't explain why the State can tell religious groups they can't treat conduct as sin that they believe is sin.

That is not the only problem with the Act. The Act also requires employers to refrain from "harassment"—a term defined to include "[u]nwelcome" or "offensive" conduct. 775 Ill. Comp. Stat. §§ 5/2-101(E-1), 5/2-102(A). And Illinois itself has argued that such conduct could include a "verbal" component. Dkt. 41 at 31 (citation omitted). As with other provisions of the Act, Illinois has sought to downplay the significance of the prohibition. It doubts an employee working for the Diocese or pregnancy center would object to their views on contraception and abortion. Dkt. 41 at 32 (stating that an employee must "actually find the workplace 'hostile'"). Again, however, that effort does not explain why it is consistent with the First Amendment to find religious groups liable for spreading traditional doctrines should a staff member decide to embrace the very conduct they teach is immoral and sinful and, feeling guilt, decide that the groups' views are "unwelcome" or "offensive."

At bottom, Illinois may not use anti-discrimination laws to eradicate, prosecute, or undermine religious beliefs of which it does not approve. The special

solicitude required for religious organizations demands greater respect than what is afforded in the Act.

## CONCLUSION

This Court should reverse and remand.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General

/s/ James A. Barta
JAMES A. BARTA
Solicitor General
*Counsel of Record*

JOHN P. LOWREY
Deputy Solicitor General

Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

*Counsel for Amici Curiae*

# ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

CORI MILLS
Acting Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL LABRADOR,
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Circuit Rule 32(f) and Circuit Rule 29 because this document contains 2,447 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

  June 9, 2026       /s/ James A. Barta
               James A. Barta

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

June 9, 2026                                                                    /s/ James A. Barta
                                                                               James A. Barta