No. 26-1861

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| THE PREGNANCY CARE CENTER OF ROCKFORD; and THE DIOCESE OF SPRINGFIELD IN ILLINOIS,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>JAMES BENNETT, in his official capacity as Director of the Illinois Department of Human Rights; and KWAME RAOUL, in his official capacity as Illinois Attorney General,<br><br>Defendants-Appellees. | ) | Appeal from the United States District Court for the Northern District of Illinois<br><br>No. 3:25-cv-50127<br><br>The Honorable REBECCA R. PALLMEYER, Judge Presiding. |

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES**


**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for James Bennett, in his official capacity as Director of the Illinois Department of Human Rights, and Kwame Raoul, in his official capacity as Illinois Attorney General

**MEGAN L. BROWN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov


**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS


JURISDICTIONAL STATEMENT .......... 1

ISSUES PRESENTED FOR REVIEW .......... 3

STATEMENT OF THE CASE .......... 4

The Illinois Human Rights Act .......... 4

The 2024 Amendments to the Act .......... 6

Plaintiffs File Suit .......... 7

The District Court's Decision .......... 8

SUMMARY OF THE ARGUMENT .......... 10

ARGUMENT .......... 12

I. The district court correctly held that plaintiffs failed to allege standing. .......... 12

A. In this pre-enforcement challenge, plaintiffs were required to plausibly allege circumstances that render the Act's enforcement against them sufficiently imminent. .......... 12

B. Plaintiffs failed to plausibly allege that they are likely to violate the challenged provisions and that there is a credible threat those provisions will be enforced against them. .......... 14

1. Plaintiffs failed to allege that they are likely to violate the Act's employment-conditions and anti-harassment provisions such that there is a credible threat those provisions will be enforced against them. .......... 14

2. Plaintiffs' counterarguments regarding the employment-conditions and anti-harassment provisions lack merit. .......... 19

3. Plaintiffs failed to allege that they are likely to violate the notice provision such that there is a credible threat that provision will be enforced against them. .......... 28

C. Plaintiffs failed to plausibly allege a "chilling injury." .......... 30

II. If Plaintiffs adequately alleged standing, the court should remand for further proceedings. .... 32

III. Alternatively, plaintiffs are not entitled to a preliminary injunction. .... 35

A. Plaintiffs are unlikely to succeed on the merits of any of their claims .... 35

1. Plaintiffs are unlikely to succeed on the merits of their expressive association claim. .... 35

2. Plaintiffs are unlikely to succeed on the merits of their free-speech claims. .... 41

a. The employment-conditions provisions regulate conduct, not speech .... 41

b. Plaintiffs do not plausibly allege that their activities violate the anti-harassment provision. .... 43

c. The notice provision regulates only commercial speech, and it withstands rational-basis review .... 45

d. The Act is viewpoint-neutral. .... 48

3. Plaintiffs are unlikely to succeed on the merits of their free-exercise claim. .... 48

B. The equitable factors tilt decisively against the entry of injunctive relief .... 53

CONCLUSION .... 55

CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

### Cases

*303 Creative LLC, v. Elenis*,
600 U.S. 570 (2023) ........................................................ 26, 27

*A.C.L.U. of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ........................................................ 32, 33

*Arcidiacono v. Whitehorn*,
178 F.4th 338 (7th Cir. 2026) ........................................................ 12, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................ 13, 20, 26

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ........................................................ 13

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................................ 31

*Bazile v. Fin. Sys. of Green Bay, Inc.*,
983 F.3d 274 (7th Cir. 2020) ........................................................ 1, 33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................ 13

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................ 46

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ........................................................ 36, 38, 39, 40

*Bria Health Servs., LLC v. Eagleson*,
950 F.3d 378 (7th Cir. 2020) ........................................................ 14

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ........................................................ 31, 32

*Choose Life Ill., Inc. v. White*,
547 F.3d 853 (7th Cir. 2008) ........................................................ 48

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........................................................ 37, 40

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................12, 18, 25, 27, 28

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025)....................37, 38, 42, 46, 49

*Cook v. Winfrey*,
141 F.3d 322 (7th Cir. 1998)....................33

*Cook Cnty. Sheriff's Off. v. Cook Cnty. Comm'n on Hum. Rts.*,
2016 IL App (1st) 150718....................44

*Crawford v. United States*,
796 F.2d 924 (7th Cir. 1986)....................33

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ....................27

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003)....................5

*Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*,
494 U.S. 872 (1990) ....................48, 49, 50

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ....................43, 44

*Evergreen Ass'n, Inc. v. Hochul*,
No. 1:20-cv-112, 2025 WL 359074 (N.D.N.Y. Jan. 31, 2025)....................39

*F.D.A. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ....................12

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ....................52

*Geise v. Phoenix Co. of Chi., Inc.*,
159 Ill. 2d 507 (1994)....................22

*Gen. Tel. Co. of the N.W., Inc. v. E.E.O.C.*,
446 U.S. 318 (1980) ....................54

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ....................22, 41, 44, 45

*Heller v. Doe*,
509 U.S. 312 (1993) ........ 47

*Hill v. Colorado*,
530 U.S. 703 (2000) ........ 43

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ........ 36

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........ 31-32

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ........ 39

*Ill. Bible Colls. Ass'n v. Anderson*,
870 F.3d 631 (7th Cir. 2017) ........ 52

*Ind. Right to Life Victory Fund v. Morales*,
66 F.4th 625 (7th Cir. 2023) ........ 13

*Jones v. Das*,
164 F.4th 1024 (7th Cir. 2026) ........ 22, 23, 41

*K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) ........ 53-54

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........ 49

*Kondilis v. City of Chi.*,
160 F.4th 866 (7th Cir. 2025) ........ 49

*Lewert v. P.F. Chang's China Bistro, Inc.*,
819 F.3d 963 (7th Cir. 2016) ........ 2

*Lewis v. AbbVie Inc.*,
152 F.4th 807 (7th Cir. 2025) ........ 30

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 34

*MacDonald v. Chi. Park Dist.*,
132 F.3d 355 (7th Cir. 1997) ........ 33

*McDonald v. Trs. of Ind. Univ.*,
No. 25-2366, 2026 WL 2349271 (7th Cir. Aug. 13, 2026) .................. 23, 24, 26, 53

*Michigan v. U.S. Army Corps of Eng'rs*,
667 F.3d 765 (7th Cir. 2011) .................. 53

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .................. 12

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
108 F.4th 458 (7th Cir. 2024) .................. 32

*Norwood v. Harrison*,
413 U.S. 455 (1973) .................. 36

*Niskey v. Kelly*,
859 F.3d 1 (D.C. Cir. 2017) .................. 21

*N.Y. State Club Ass'n v. City of N.Y.C.*,
487 U.S. 1 (1988) .................. 36

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
95 F.4th 501 (7th Cir. 2024) .................. 12, 13, 14, 21, 28, 29

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .................. 9, 30, 42, 45

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
487 U.S. 781 (1988) .................. 45

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .................. 36, 47

*Robertson v. Allied Sols., LLC*,
902 F.3d 690 (7th Cir. 2018) .................. 29

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*,
547 U.S. 47 (2006) .................. 30, 32, 42

*Scaife v. U.S. Dep't of Veterans Affs.*,
49 F.4th 1109 (7th Cir. 2022) .................. 22

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) .................. 38, 42

*Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*,
129 F.4th 437 (7th Cir. 2025) ........ 49

*Speech First, Inc. v. Killeen*,
968 F.3d 629 (7th Cir. 2020) ........ 13, 34

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ 12, 13, 26

*Tagami v. City of Chi.*,
875 F.3d 375 (7th Cir. 2017) ........ 41

*Texas v. Johnson*,
491 U.S. 397 (1989) ........ 41

*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
76 F.4th 569 (7th Cir. 2023) ........ 42, 43

*Ty, Inc. v. Jones Grp.*,
237 F.3d 891 (7th Cir. 2001) ........ 53

*UAW-Lab. Emp. & Training Corp. v. Chao*,
325 F.3d 360 (D.C. Cir. 2003) ........ 46

*United States v. Adigun*,
703 F.3d 1014 (7th Cir. 2012) ........ 29

*United States v. Banas*,
712 F.3d 1006 (7th Cir. 2013) ........ 35, 52

*United States v. Indianapolis Baptist Temple*,
224 F.3d 627 (7th Cir. 2000) ........ 49

*W. Coast Hotel Co. v. Parrish*,
300 U.S. 379 (1937) ........ 37

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 625 (1943) ........ 46

*Wis. Educ. Ass'n Council v. Walker*,
705 F.3d 640 (7th Cir. 2013) ........ 47, 52

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 35, 38, 53
*Zaderaka v. Ill. Hum. Rts. Comm'n*,
131 Ill. 2d 172 (1989) .......... 20

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
471 U.S. 626 (1985) .......... 11, 45, 46

**Statutes and Regulations**

20 ILCS 5/5-550 .......... 51

20 ILCS 2405/1b .......... 51

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1331 .......... 1

42 U.S.C. § 1983 .......... 1

42 U.S.C. §§ 2000e(f) .......... 51

42 U.S.C. §§ 2000e-2 *et seq.* .......... 37

42 U.S.C. §§ 2000e-2(e)(1) .......... 51

775 ILCS 5/1-101 *et seq.* .......... 1, 4

775 ILCS 5/1-102(A) .......... 4, 47, 52

775 ILCS 5/1-103(O-2) .......... 6, 48

775 ILCS 5/1-103(Q) .......... 4, 16, 20, 24

775 ILCS 5/2-101(A)(1) .......... 50

775 ILCS 5/2-101(B)(2) .......... 4, 15, 20, 50

775 ILCS 5/2-101(E-1) .......... 5

775 ILCS 5/2-102(A) .......... 4,5

775 ILCS 5/2-102(J) .......... 4

775 ILCS 5/2-102(K)(1) .......... 5, 28, 29, 46

775 ILCS 5/2-104(A) .......... 51

775 ILCS 5/7-101(B) .......... 6

775 ILCS 5/7A-102(A)(1) .......... 5

775 ILCS 5/7A-102(D)(3) .......... 5

775 ILCS 5/7A-102(D)(4) .......... 6

775 ILCS 5/8-102(I)(4) .......... 6

775 ILCS 5/7A-111(B)(4) .......... 6

775 ILCS 5/8A-102 .......... 6

775 ILCS 5/10-104 .......... 6

Cal Gov't Code § 12940 .......... 52

Fla. Stat. § 760.10(9)(a) .......... 52

Ga. Code Ann. § 45-19-34 .......... 52

Ill. Pub. Act 88-178 (1993) .......... 4

Ill. Pub. Act 93-1078 (2006) .......... 4

Ill. Pub. Act 98-1050 (2015) .......... 4

Ill. Pub. Act 103-785 (2024) .......... 6

N.Y. Exec. Law § 296(1)(d) .......... 52

Tex. Labor Code Ann. § 21.119 .......... 52

Title VII of the Civil Rights Act of 1964,
Pub. L. No. 88-352 § 701(f),78 Stat. 241, 253 .......... 51

**Rules**

7th Cir. R. 28(b) .......... 1

Fed. R. App. P. 4(a)(2) .......... 2

Fed. R. Civ. P. 12(b)(1) .......... 1

Fed. R. Civ. P. 12(i) .......... 33

Fed. R. Civ. P. 58 .......... 2

**Other Authorities**

118 Cong. Rec. 4096-97 (1972) .......... 51

*All Guidance, Publications, and Key Resources*, Ill. Dep't of Hum Rts., https://dhr.illinois.gov/rights/reports-and-guidance.html .......... 46

Annual Report 2025, Ill. Dep't of Hum. Rts. (2006), https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/ar/FY2025-IDHR-Annual-Report.vf.pdf .......... 5

H.R. Conf. Rep. No. 92-899, at 15-16 (1972) .......... 51

Ill. Dep't of Hum. Rts., *You Have the Right to Be Free from Job Discrimination and Sexual Harassment* (Sept. 2026), https://dhr.illinois.gov/content/dam/soi/en/web/dhr/documents/shpd/employer-poster-sh-and-discrimination-idhr-2026.pdf .......... 5, 28

*Required Posters and Disclosures*, Ill. Dep't of Labor, https://labor.illinois.gov/employers/posters.html .......... 46

## JURISDICTIONAL STATEMENT

The jurisdictional statement of plaintiffs-appellants the Pregnancy Care Center of Rockford ("Center") and the Diocese of Springfield ("Diocese") is not complete and correct. As required by 7th Cir. R. 28(b), defendants-appellees James Bennett, in his official capacity as Director of the Illinois Department of Human Rights, and Kwame Raoul, in his official capacity as the Illinois Attorney General, provide this statement.

Plaintiffs filed a complaint in the district court under 42 U.S.C. § 1983 contending that certain amendments to the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, violated their rights under the First Amendment to the United States Constitution. Doc. 1.[1] As explained *infra* pp. 12-32, the district court lacked subject-matter jurisdiction over plaintiffs' action because plaintiffs failed to allege standing. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) ("standing is an essential ingredient of subject-matter jurisdiction"). The district court otherwise had subject-matter jurisdiction over plaintiffs' action under 28 U.S.C. § 1331 because it raised federal questions.

On March 31, 2026, the district court dismissed plaintiffs' complaint under Fed. R. Civ. P. 12(b)(1) because it concluded plaintiffs had failed to allege standing, thereby disposing of all claims against all parties. RSA1-4. Dismissals for lack of

---

[1] The district court docket, which is the record on appeal, is cited as "Doc. __." Plaintiffs' opening brief is cited as "AT Br. __." The required short appendix to plaintiffs' opening brief is cited as "RSA__." Plaintiffs' two-volume supplemental appendix is cited as "A__" because the volumes are consecutively paginated.

subject-matter jurisdiction are "without prejudice," *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 969 (7th Cir. 2016), and the district court's decision was not yet final and appealable because it gave plaintiffs 21 days to amend their complaint. RSA4. Plaintiffs filed their notice of appeal on April 22, 2026. On May 11, 2026, a separate judgment was entered on the district court docket pursuant to Fed. R. Civ. P. 58, RSA5, so plaintiffs' premature notice of appeal was treated as timely filed on that date, *see* Fed. R. App. P. 4(a)(2). No motion to alter or amend the judgment was filed. This court has jurisdiction over plaintiffs' appeal from a final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court properly dismissed plaintiffs' complaint for failure to allege standing.

2. Alternatively, whether the court should remand the case for further proceedings, including adjudication of plaintiffs' motion for a preliminary injunction or for the parties to conduct jurisdictional discovery.

3. Alternatively, whether plaintiffs are entitled to a preliminary injunction from this court.

## STATEMENT OF THE CASE

### The Illinois Human Rights Act

Since 1979, the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq*. ("Act"), has protected Illinois residents from discrimination based on certain protected characteristics, including religion, race, sex, and sexual orientation. The purpose of the Act is to "secure for all individuals within Illinois the freedom from discrimination." *Id.* § 5/1-102(A). Relevant here, the Act makes it a civil rights violation for "any employer to refuse to hire" or to engage in certain other employment actions "on the basis of unlawful discrimination." *Id.* § 5/2-102(A). The Act defines "unlawful discrimination" by reference to specific protected grounds and characteristics, including sex, race, and religion. *Id.* § 5/1-103(Q). Since the Act's enactment, the Illinois General Assembly has frequently amended it to expand those protections. Ill. Pub. Act 88-178 (1993) (military status); Ill. Pub. Act 93-1078 (2006) (sexual orientation); Ill. Pub. Act 98-1050 (2015) (pregnancy and childbirth). The Act does not apply to places of worship and certain other religious entities insofar as they employ "individuals of a particular religion to perform work connected" with the organization's religious activities. 775 ILCS 5/2-101(B)(2).

This case concerns three specific obligations imposed by the Act on Illinois employers. First, the Act bars employers from discriminating in "recruitment . . . , hiring, or . . . privileges or conditions of employment" based on a protected ground. *Id.* § 5/2-102(A) ("employment-conditions" provisions). As part of its obligation to provide equal privileges to all employees, an employer must make reasonable accommodations for its pregnant employees. *Id.* § 5/2-102(J). Second, the Act

prohibits employers from harassing employees based on a protected ground or creating a hostile working environment for such an employee. *Id.* §§ 5/2-102(A), 5/2-101(E-1) ("anti-harassment" provision). Third, the Act requires employers to post a notice "summarizing" the Act's requirements in a "conspicuous location" and in any employee handbook. *Id.* § 5/2-102(K)(1) ("notice provision"). The Department promulgates the text employers are required to use, and neither the notice provision nor the current text of the notice requires employers to disclose the specific grounds protected by the Act, as opposed to the general rights the Act confers. *See id*; Ill. Dep't of Hum. Rts., *You Have the Right to Be Free from Job Discrimination and Sexual Harassment* (Sept. 2026).[2]

The Act establishes a multi-step process for its enforcement. An employee may file a "charge" of discrimination with the Department of Human Rights. 775 ILCS 5/7A-102(A)(1). If the Department concludes that a charge is not supported by "substantial evidence," it is dismissed. *Id.* § 5/7A-102(D)(3).[3] If the Department determines that a charge *is* supported by substantial evidence, the employee may either commence a civil action in state court or request that the Department file a

---

[2] https://dhr.illinois.gov/content/dam/soi/en/web/dhr/documents/shpd/employer-poster-sh-and-discrimination-idhr-2026.pdf (last visited Sept. 4, 2026). *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (this court may take judicial notice of information on government websites).

[3] Most charges are dismissed at this stage. *See* Annual Report 2025, Ill. Dep't of Hum. Rts., at 11 (2026), dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/ar/FY2025-IDHR-Annual-Report.vf.pdf (last visited Sept. 4, 2026) (in 2025, the Department determined that less than 13% of fully investigated charges were supported by substantial evidence).

complaint on his or her behalf with the Human Rights Commission. *Id.* § 5/7A-102(D)(4). If the complaint is filed with the Commission, an evidentiary hearing is conducted, after which the hearing officer issues a recommended order. *Id.* § 5/8A-102. The hearing officer's order is submitted to the Commission, which issues a formal decision subject to appellate review. *Id.* §§ 5/8-102(I)(4), 5/8 -111(B)(1). In addition to charges brought by individuals, the Department's Director and the Attorney General may investigate and initiate civil rights charges before the Commission or in the Illinois circuit courts. *Id.* §§ 5/7-101(B), 5/10-104.

**The 2024 Amendments to the Act**

In 2024, the Act was amended to expand antidiscrimination protections to individuals who have made "reproductive health decisions." Ill. Pub. Act 103-785 (2024). A "reproductive health decision" is defined as a "decision[] regarding the person's use of: contraception; fertility or sterilization care; assisted reproductive technologies; miscarriage management care; healthcare related to the continuation or termination of pregnancy; or prenatal, intranatal, or postnatal care." 775 ILCS 5/1-103(O-2).

The 2024 amendments were meant to complement existing protections for pregnant women by giving to all Illinoisians the freedom "to make decisions concerning whether, when, and how to start a family" without fear of discrimination. A138 (statement of Rep. Moeller). The amendments covered not only employment, but also housing, public accommodations, education, and financial credit. A137.

**Plaintiffs File Suit**

Plaintiffs are two religiously affiliated entities that object to the 2024 amendments. The Center, which has operated "for more than 40 years," is a nonprofit organization providing medical and pro-life counseling services to pregnant individuals. A7 ¶¶ 36-38. Its stated mission is to help people to make pro-life choices regarding their pregnancies, A8 ¶ 43, and it requires employees to "have a personal relationship with Christ" and believe that "abortion is never an acceptable option," A10 ¶ 49. The Diocese, which has been established for more than a century, is a religious organization and subdivision of the Catholic church. A14 ¶¶ 70-73. The Diocese opposes abortion and other forms of reproductive health care, like contraception, sterilization, and certain fertility treatments. A14 ¶ 74. Diocese employees are expected to "represent the Catholic church," A16 ¶ 82, and any individual applying for employment must be a "[p]racticing Catholic in full communion with the teachings of the Church," A127, 130.

Plaintiffs filed this case in March 2025, alleging that the amended Act violated their First Amendment rights to expressive association, free speech, free exercise, and religious autonomy. A41-56 ¶¶ 194-281. Specifically, plaintiffs argued that the employment-conditions, anti-harassment, and notice provisions violated the First Amendment to the extent they prohibited plaintiffs from discriminating against individuals based on reproductive health decisions. *Id.* Plaintiffs also argued the amendments violated their Fourteenth Amendment equal-protection rights. A56

¶¶ 273-81. Plaintiffs sought a preliminary injunction against the Act's enforcement. A171-214.

Defendants moved to dismiss plaintiffs' complaint for lack of standing. A243-90. Defendants also argued that, if the district court were to hold that plaintiffs had alleged standing, the court should authorize discovery into plaintiffs' standing allegations so that the court could confirm that it had subject-matter jurisdiction. A263-65. Further, defendants argued that plaintiffs failed to state a claim under either the First or Fourteenth Amendment. A265-84. Lastly, defendants argued that plaintiffs were not entitled to a preliminary injunction because they were unlikely to succeed on the merits of their First and Fourteenth Amendment claims, A284-86; they would not suffer irreparable harm absent an injunction, A286-89; and the equitable factors weighed in defendants' favor, A289-90.

**The District Court's Decision**

In March 2026, the district court granted defendants' motion to dismiss on standing grounds. RSA1-4. The court found that plaintiffs' concerns about the enforcement of the Act against them were "hypothetical." RSA2. It reasoned that, under the Act, plaintiffs were free to refuse to hire an individual based upon his or her pro-choice beliefs. *Id.* The court also noted that neither plaintiff alleged "that any of their employees ha[d] *ever* made an objectionable reproductive health decision, nor" that either plaintiff had ever taken adverse employment action against an employee for making such a decision. *Id.* (emphasis in original) At bottom, the court observed, plaintiffs' complaint rested on their "highly speculative fear" that (1) an

employee or prospective employee would make an objectionable-to-plaintiffs reproductive health decision; (2) the employee would continue to work for or apply to work for one of the plaintiffs; (3) one of the plaintiffs would discover the reproductive health decision; (4) the employee or applicant would refuse to disavow or "repent" from the decision; (5) a plaintiff would take adverse employment action against the employee or applicant; and (6) a lawsuit or charge would be brought. RSA3.

The district court also held that plaintiffs failed to allege standing based on any potential "chilling effect" the amended Act might have on their speech. *Id.* The court explained that what plaintiffs called chilled speech — that, in response to the Act, plaintiffs were ostensibly refraining from publishing written statements "on career websites and job postings" clarifying that applicants who made "objectionable reproductive decisions" would not be hired — was actually conduct. *Id.* (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992)). Thus, no "speech" could be chilled. *Id.*

Finally, the district court explained that while plaintiffs' complaint did not establish standing, it would give plaintiffs an opportunity to amend to include additional information about how they had disciplined employees for their reproductive decisions in the past. RSA4. The court also granted defendants' request for limited jurisdictional discovery. *Id.* Given the dismissal of the complaint, the court struck plaintiffs' preliminary-injunction motion without prejudice. *Id.*

Plaintiffs did not seek to amend the complaint but instead appealed to this court. Doc. 53.

## SUMMARY OF THE ARGUMENT

This court should affirm the judgment below because the district court correctly held that plaintiffs failed to plausibly allege standing. Plaintiffs' principal standing theory is that they are likely to violate the employment-conditions provisions of the amended Act, which will prompt enforcement proceedings. But neither plaintiff alleged that it has ever fired or otherwise discriminated against a current employee — or refused to hire a prospective employee — based on his or her reproductive decisionmaking, and the district court correctly reasoned that such an event is implausible, given plaintiffs' professed commitment to hiring individuals who share plaintiffs' pro-life views (a choice the Act permits them to make). Similarly, plaintiffs are unlikely to violate the anti-harassment provision, and plaintiffs satisfy the notice provision simply by continuing to post the notices that were sufficient before the Act was amended. Plaintiffs allegations thus do not demonstrate that it is plausible that they will in fact violate the Act in the future. Nor do plaintiffs' allegations demonstrate that the Act has somehow "chilled" their speech, given that the only statements they say they are forbearing to make are job postings, which are conduct, not speech. Plaintiffs thus failed to plausibly allege standing.

If the court concludes that plaintiffs alleged standing, it should remand rather than addressing plaintiffs' request for a preliminary injunction in the first instance. This court does not ordinarily consider a request for a preliminary injunction for the first time on appeal, and plaintiffs identify no reason to diverge from that practice

here. Indeed, the district court indicated that it believed jurisdictional discovery was appropriate, given the substantial questions raised about plaintiffs' standing, which further militates toward remand, rather than plenary review of plaintiffs' motion for preliminary relief.

If this court reaches the merits, it should deny the request for preliminary relief. First, plaintiffs are unlikely to succeed on the merits of any of their claims. Plaintiffs' expressive-association claim is unlikely to succeed because such claims have not been extended to the employment context by either this court or the Supreme Court, and even if expressive-association claims are cognizable in the employment context, plaintiffs failed to show that the limitations placed on them by the Act would significantly affect their ability to express their views. Plaintiffs are also unlikely to succeed on their free-speech claims: the employment-conditions provisions regulate conduct, not speech; plaintiffs cannot show they will violate the anti-harassment provision; the notice provision triggers only rational-basis review under *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985), and easily survives that review; and the Act is viewpoint-neutral. Plaintiffs are equally unlikely to succeed on the merits of their free-exercise claim because the Act is neutral and generally applicable. Finally, plaintiffs have not shown that they are likely to suffer irreparable injury if a preliminary injunction is not granted, and the equities tip decidedly against the entry of injunctive relief.

## ARGUMENT

### I. The district court correctly held that plaintiffs failed to allege standing.

#### A. In this pre-enforcement challenge, plaintiffs were required to plausibly allege circumstances that render the Act's enforcement against them sufficiently imminent.

Article III limits federal courts to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. "No matter how important a legal question or how sincere a worry," courts must ensure that a case or controversy exists before addressing the merits of a case. *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 504 (7th Cir. 2024). This requires "(1) an injury in fact, (2) a sufficient casual connection between the injury" and the challenged action; and "(3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (cleaned up).

To satisfy the injury-in-fact requirement, the injury "must be 'concrete,' meaning that it must be real and not abstract." *F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Additionally, it "must be . . . 'actual or imminent,'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)), with the result that a "threatened injury must be *certainly impending*" and that "[a]llegations of *possible* future injury are not sufficient." *Id.* (internal quotations omitted) (emphasis in original). In other words, "[a]rguments couched in 'coulds,' 'maybes,' and 'ifs' are far too speculative to support standing to sue for prospective relief." *Arcidiacono v. Whitehorn*, 178 F.4th 338, 345 (7th Cir. 2026)

Plaintiffs filed this suit in a pre-enforcement posture — *i.e.*, absent any actual complaint by any employee or any express threat of enforcement by defendants. They therefore were required to show either that they intend to engage in a course of action "arguably affected with a constitutional interest, but proscribed by a statute" and that "there exists a credible threat of prosecution" under that statute, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), or that they are currently injured because the Act creates a "chilling effect" on their speech that is "objectively reasonable" and that they have chosen to "self-censor[ ] as a result," *Speech First, Inc. v. Killeen*, 968 F.3d 629, 638 (7th Cir. 2020). Either way, plaintiffs needed to demonstrate circumstances that render threatened enforcement "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 159. "[C]onjecture about speculative or possible harm is inadequate," *Parents Protecting Our Child.*, 95 F.4th at 505, as are "purely hypothetical" harms, *Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 631 (7th Cir. 2023) (cleaned up).

Moreover, because this case was decided at the motion-to-dismiss stage, plaintiffs were required to "clearly allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Plaintiffs therefore needed to plead facts creating an "plausible" inference that their injuries will occur. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Recitals of a cause of action "supported by mere conclusory statements" will not suffice. *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On the contrary, where a complaint's allegations permit a court to infer only the "mere possibility" of an

injury, the plaintiffs have not met their burden to establish standing. *See id.* at 679. This court reviews *de novo* a dismissal for lack of standing. *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 381 (7th Cir. 2020).

As now explained, the district court correctly held that plaintiffs failed to satisfy these standards. This court thus should affirm the dismissal of the complaint for failure to plead standing.

### B. Plaintiffs failed to plausibly allege that they are likely to violate the challenged provisions and that there is a credible threat those provisions will be enforced against them.

Plaintiffs' primary argument is that they have standing to challenge the Act's employment-conditions, anti-harassment, and notice provisions because they intend to violate those provisions and credibly fear that they will be enforced against them. AT Br. 22-29. The district court correctly concluded that plaintiffs had failed to plausibly allege any risk of such injury.

#### 1. Plaintiffs failed to allege that they are likely to violate the Act's employment-conditions and anti-harassment provisions such that there is a credible threat those provisions will be enforced against them.

The district court correctly held that plaintiffs' standing theory rested entirely on "conjecture about speculative or possible harm," *Parents Protecting Our Child.*, 95 F.4th at 505, which is insufficient for standing. RSA2-3. As the district court explained, for plaintiffs to violate either the Act's employment-conditions provisions or the anti-harassment provision, plaintiffs would need to (1) hire (or plan to hire) an individual who does not share their beliefs about reproductive health and who has made a reproductive health decision to which plaintiffs object, (2) learn about the

employee or potential employee's objectionable-to-plaintiffs reproductive health decision; and (3) take adverse employment action against or harass that employee. RSA2. But plaintiffs' own allegations show why any violation of the Act, and thus any enforcement proceedings against them, is unlikely.

*First*, it is implausible that plaintiffs would hire someone who does not share their pro-life views. The Center's employee handbook requires that all employees believe that "abortion is never a morally acceptable option." A82. Center employees must sign a document stating, among other things, that they "reject abortion" on moral grounds, and that they will refrain from "sexual conduct outside the biblical covenant of marriage between a man and a woman." A110. And in the Center's job postings, "pro-life commitment" and "a lifestyle of sexual purity" are requirements. A117, 120. The Center does not hire individuals who are not aligned with its anti-abortion mission. A12 ¶ 56. For its part, the Diocese requires its employees to "conduct themselves in a way that does not contradict the doctrine and moral teaching of the Catholic Church." A123. Its job postings require applicants to be "[p]racticing Catholic[s] in full communion with the teachings of the Church." A127. The Diocese expressly states that it will not hire individuals who are unaligned with its mission, A18 ¶ 91, which involves anti-abortion advocacy, A15-16 ¶¶ 77-81; *see also* A126-27 (posting for an "Advocate" in the "Office for Respect Life and Human Dignity" and requiring an "interest" in "pro-life matters").[4]

---

[4] The Act permits plaintiffs to refuse to hire an individual based on his or her pro-choice beliefs, and plaintiffs do not contend otherwise. *See* 775 ICLS 5/2-101(B)(2) (Act's exemption allowing religious organization to hire certain employees based on

Because plaintiffs candidly profess their pro-life missions and each plaintiff admits that it will not hire employees who are not aligned with those missions, it is implausible that plaintiffs will hire someone who does not share their beliefs about reproductive health. Indeed, a declaration from the Center recounted a recent experience in which a prospective candidate for a receptionist position inquired about applying and, after learning about the Center's pro-life mission and policies, voluntarily decided not to apply. A344 ¶ 15. Thus, plaintiffs' postings and interview processes weed out individuals who do not share their beliefs about reproductive health, and for the same reasons weed out individuals who have made reproductive health decisions to which plaintiffs object. Indeed, the only individuals who have made such decisions but who nonetheless wish to work for plaintiffs are presumably those who regret their decisions. But plaintiffs admit that they *will* hire individuals of that sort (whom they term "repentant"). *See* A14 ¶ 67; A17 ¶ 85.

*Second*, even if an individual who would choose to make a reproductive health decision objectionable to plaintiffs and does not "repent" that decision was hired or progressed through the application processes, plaintiffs would need to learn about that reproductive health decision before a violation of the Act could occur. But any employee who was hired by plaintiffs or progressed sufficiently far in the application process would know that disclosing an objectionable-to-plaintiffs reproductive health decision would be awkward at best. Furthermore, applicants are not necessarily

their religious beliefs); *id.* § 5/1-103(Q) (Act does not prohibit discrimination based on political beliefs).

required to discuss their reproductive health decisions at work or during the hiring process. For example, the Diocese's interview questions (an exhibit to the complaint) do not explicitly ask whether an applicant is using birth control, has had an abortion, or is attempting to conceive a child through in vitro fertilization, A162-66, though the Diocese contends that it designs its interview questions "to uncover conduct" that does not comply with "faith-based policies," A366. And although the Center asks about applicants' "personal experiences" with abortion, A352, as discussed, an applicant who has had an abortion may still be hired: "Some of the most powerful pro-life advocates are those who repent from past reproductive decisions." A27 ¶ 132.

*Third*, if plaintiffs hired or considered hiring a person who made a reproductive health decision to which they objected and if plaintiffs learned about that decision, plaintiffs would need to take adverse employment action against or harass that employee or prospective employee. Again, the complaint's allegations do not establish that this is plausible. Neither plaintiff alleged that they ever took adverse employment action against or harassed an employee or denied an applicant because of reproductive health decisions. *See generally* A1-60. And while the Diocese says that it has taken employment action against employees for violating policies "in matters of human sexuality," A233, those allegations do not allege a violation of the Act. Both plaintiffs may take adverse employment action against their employees based on the employees' pro-choice views or other political beliefs, at least the Diocese can take adverse employment action on the basis of its employees' religious views, and nothing in the Act prevents plaintiffs (or, for that matter, any other

employer) from acting against an employee who, say, has sex outside of marriage. *Supra* p. 15 n.4. And even if plaintiffs *were* to harass or take adverse employment action against an employee in a context implicating these issues, the employee would still have to invoke the Act's multi-step enforcement procedures and establish that the action was motivated by any reproductive health decisions he or she had made, rather than his or her political views, his or her religion, or some other factor. *Supra* pp. 5-6.

At bottom, plaintiffs' principal theory of injury turns on a string of events, each of which are unlikely, but which are even more improbable in combination. They did not plead that anything they fear will happen has ever happened before. And these are not new organizations. The Center has operated "for more than 40 years," A7 ¶ 36, and the Diocese has been established for over a century, A14 ¶ 70. Neither plaintiff points to a circumstance where it has *ever* done what the amended Act forbids. Thus, plaintiffs have failed to plausibly allege that their employment practices will imminently conflict with the Act, and their allegations show that their allegedly impending injury is "too speculative to satisfy the well-established requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 401 (internal quotation omitted). Plaintiffs lack standing on this basis. *Arcidiacono*, 178 F.4th at 345 ("Arguments couched in 'coulds,' 'maybes' and 'ifs' are far too speculative to support standing to sue for prospective relief.").

### 2. Plaintiffs' counterarguments regarding the employment-conditions and anti-harassment provisions lack merit.

Plaintiffs contest the district court's conclusion that they failed to plausibly allege standing, but their counterarguments lack merit.

*First*, plaintiffs argue that they are currently violating or plan to violate the Act's employment-conditions provisions in several ways. AT Br. 24-27. But these arguments either are contradicted by plaintiffs' own statements or do not describe a violation of the Act.

Plaintiff assert, for instance, that they already threaten to discharge any employee who terminates her pregnancy, and they argue that, should an employee be hired who made such a decision before, she would be denied "equal benefits" and accommodations. AT Br. 24-25. As discussed, however, the chances that a current employee would have an abortion are exceedingly low, given plaintiffs' explicitly pro-life hiring criteria. A117, 120, 127. And the fact that neither plaintiff pleaded that it has ever discharged an employee or denied benefits to an employee for receiving an abortion, despite operating for decades, suggests that plaintiffs will not ever face this problem. *See generally* A1-60.

Plaintiffs also state that they currently violate the Act by refusing to hire applicants who have made or facilitated "objectionable reproductive choices." AT Br. 25. But, again, plaintiffs' own allegations belie this claim in multiple ways. Neither plaintiff alleges that it has *actually* ever declined to hire an applicant based on his or her reproductive decisionmaking, and it is implausible that any such person would seek to work for either plaintiff. Plaintiffs, moreover, refuse to hire only those who

are *unrepentant* about any objectionable reproductive choices. A14 ¶ 67; A17 ¶ 85; A27 ¶ 132. So it is implausible that plaintiffs could violate the Act to the extent it applies to "repentant" applicants and, as to "unrepentant" applicants, plaintiffs could violate the Act only if a court were to conclude that they refused to hire such an applicant based on his or her reproductive decisionmaking, rather than his or her pro-choice views or other political beliefs. 775 ILCS 5/1-103(Q), 5/2-101(B)(2). Plaintiffs quibble with this, arguing that the Act applies not only when the protected characteristic is the "exclusive" reason behind an adverse employment action but also when it simply "play[s] a part." AT Br. 27. Under the Act, however, if an employer articulates a legitimate, nondiscriminatory reason for an adverse employment decision (such as an employee's failure to adhere to the mission of the organization), then it becomes the employee's burden to prove by a preponderance of the evidence that the employer's stated reason is pretextual. *Zaderaka v. Ill. Hum. Rts. Comm'n*, 131 Ill. 2d 172, 179 (1989). The Center makes clear that it is a requirement for employment to have a "strong pro-life commitment," A117, and the Diocese specifically instructs that employees must be "[p]racticing Catholic[s] in full communion with the teachings of the Church," A130. So plaintiffs could violate the Act if they were to decline to hire someone (a) who has made an objectionable reproductive decision and (b) is "unrepentant" about that decision, but (c) who is otherwise ideologically and religiously aligned with plaintiffs. Plaintiffs pleaded no facts that would allow a court to conclude that such a scenario is "plausible," not merely "possibl[e]." *Iqbal*, 556 U.S. at 678.

Plaintiffs finally contend that they already violate the employment-conditions provisions by requiring repentant employees to undergo "post-abortion healing program[s]." AT Br. 26 (citing A237, A343-44). But it is not clear that these programs — which the Center calls a "one-to-one Bible study," A344, and which the Diocese does not describe — are a privilege or condition of employment under the Act. *See* 775 ILCS 5/2-102(A) (Act prohibits discrimination in "privileges or conditions of employment"). And even if the programs were a privilege or condition under the Act, asking an employee to engage in additional training might not rise to the level of discrimination. *See e.g.*, *Niskey v. Kelly*, 859 F.3d 1, 8 (D.C. Cir. 2017) (in the Title VII context, "the prohibition on discrimination applies" only if the terms and conditions of employment are affected "in such a way that a reasonable trier of fact could find *objectively tangible harm*" (emphasis added) (cleaned up)). Plaintiffs provided no allegations about how either training works, the rigor of any such program, or how it might affect the privileges and conditions of employment. When all the court has before it is "a policy on paper" without any "concrete facts about its implementation," *Parents Protecting Our Child.*, 95 F.4th at 505-06, plaintiffs have not satisfied their standing burden.

*Second*, plaintiffs argue that they currently violate the anti-harassment provision because "much of the speech the ministries engage in about abortion and other objectionable reproductive choices" could be perceived as "unwelcome or offensive," thus creating a hostile working environment. AT Br. 25. This argument further illustrates that plaintiffs' fears of enforcement are implausible. To determine

whether an employee has stated a claim for harassment, Illinois courts and the Commission have adopted the test from the Title VII context, *see Geise v. Phoenix Co. of Chi., Inc.*, 159 Ill. 2d 507, 517 (1994) — namely, the employee must establish that (1) the employer engaged in behavior that was "severe or pervasive enough to create" a work environment that a reasonable person would find to be "hostile or abusive," and (2) the employee subjectively perceived that behavior as "hostile or abusive," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Minor hostility and abuse do not qualify. *Jones v. Das*, 164 F.4th 1024, 1034 (7th Cir. 2026) ("rude behavior" and "minor slights" "do not amount to severe or pervasive harassment"). Courts instead consider the frequency and severity of the conduct, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance. *Harris*, 510 U.S. at 22-23. And, as this court has explained, whether conduct constitutes harassment under Title VII requires investigating "whether it is directed at the victim." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). Mere "unwelcome" speech as the plaintiffs describe it, AT Br. 25, does not constitute "harassment," *see Jones*, 164 F.4th at 1034. Indeed, the Act typically requires a pattern of abuse that is so pervasive that an employee cannot do his or her job. *Harris*, 510 U.S. at 23 (considering whether discriminatory conduct "interferes with an employee's work performance").

Preaching a pro-life ministry (or indeed, delivering a homily or administering confession, A31-32 ¶ 149) is not sufficiently "hostile or abusive" to rise to the level of

harassment, particularly when the pro-life nature of the job was made explicit from the time an employee was hired. *See* A117, 120, 123-24 127, 130. And without specific allegations regarding what humiliating and threatening language would be used, it is implausible to suggest that plaintiffs could be subject to charges of harassment. *See Jones*, 164 F.4th at 1032 (courts look to the "totality of the circumstances" when considering whether conduct constitutes harassment (internal quotations omitted)). In short, the anti-harassment provision is demanding; it is not a "general civility code." *See id.* at 1033 (cleaned up). Plaintiffs have not alleged sufficient facts to show that they violate the anti-harassment provision of the Act. And in turn, they have not shown that the Act's anti-harassment provisions will be enforced against them.

*Third*, plaintiffs argue that defendants' refusal to disavow enforcement of the Act against them proves that they have standing to pursue their claim. AT Br. 27-29. But a defendant's refusal to explicitly disavow enforcement, without more, does not establish standing. Indeed, this court recently reaffirmed that principle in *McDonald v. Trustees of Indiana University*, No. 25-2366, 2026 WL 2349271, at *9 (7th Cir. Aug. 13, 2026). The plaintiffs there, as here, argued that they faced a credible threat of enforcement, giving rise to standing, because the defendants "ha[d] not disclaimed enforcing" the statute in question against them. *Id.* This court rejected that argument, explaining that, although "failing to disclaim enforcement is some evidence of a credible threat," it is not "enough" to give rise to standing absent additional evidence, including evidence of past enforcement against nearly identical

conduct and explicit threats to prosecute against similar individuals for identical conduct. *Id.* Here, plaintiffs cannot point to either.[5] Without some other indicia that enforcement is imminent, plaintiffs lack standing to pursue their challenge to the Act.

*Fourth*, plaintiffs say that the district court wrongly refused to credit certain of their allegations. AT Br. 31-33. Even setting aside that this court's review is *de novo*, the district court did not err. It simply considered plaintiffs' complaint in its entirety. For example, plaintiffs argue that the district court failed to credit their allegation that they sometimes receive applications from people who disagree with their pro-life mission. *Id.* at 31-32; *see also* A12 ¶ 56; A18 ¶ 91 (plaintiffs receive applications from people who are "not aligned" with their missions). But the district court correctly noted that plaintiffs also alleged that they refuse to hire such individuals, A12 ¶ 56; A18 ¶ 91 — which is permissible under the Act, given that political beliefs are not a protected characteristic, 775 ILCS 5/1-103(Q). And, again, neither plaintiff alleged that they refused to hire a candidate specifically because that candidate communicated that they had an abortion in the past. The district court thus correctly held that plaintiffs had not plausibly alleged they might violate the Act by rejecting an applicant because of a past abortion or other objectionable-to-plaintiffs reproductive health decision.

---

[5] Plaintiffs point to various supposed indicia of defendants' "hostility" to religious organizations, AT Br. 27-28 (describing, among other things, defendants' "vigorous[] defen[se]" of this litigation and amicus briefs joined by the Attorney General in other, unrelated cases), but these data points are far too attenuated to constitute evidence of likely enforcement.

Plaintiffs also argue that the district court erred in "assum[ing] that none of the ministries' current employees would ever make an objectionable reproductive decision." AT Br. 32. But it was plaintiffs' burden to allege facts that would "nudge[ ]" their theory of injury "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs point to no specific allegation that the district court supposedly disregarded in concluding that plaintiffs had not done so. Indeed, as discussed, plaintiffs' own allegations emphasize the implausibility of their asserted injury, given that, as noted, plaintiffs screen for pro-choice candidates who believe that abortion is morally wrong. A117, 120, 127, 130. While "a co-religionist filter" may not be a perfect screen, AT Br. 32, plaintiffs' allegations fail to show that the screen is porous enough to give rise to a plausible risk that they will actually disobey the law. *See Clapper*, 568 U.S. at 409 (injury be "*certainly impending*" to establish standing (emphasis in original)).

Further, plaintiffs argue that the district court improperly concluded that they would not find out about their employees' or potential employees' reproductive health decisions. AT Br. 33. As evidence, plaintiffs invoke the specter of late-term abortion and cite a website where women share stories about ending their pregnancies. *Id.* But plaintiffs have not alleged that any of *their* employees have ever "shout[ed their] abortion" or received a late-term abortion. *Id.* And while both plaintiffs structure interviews to try to receive information about past reproductive health decisions to which they may object, A352, 366, neither alleged that they

learned about such a decision and subsequently took adverse employment action against that applicant.

*Finally*, plaintiffs argue that they did not need to allege that they have terminated an employee based on reproductive health decisionmaking because past injury is not required in pre-enforcement actions. AT Br. 34-36. To be sure, a plaintiff in a pre-enforcement case need not "expose [itself]" to liability to bring suit. *Id.* at 34. But such plaintiff must allege that it actually *does* intend to violate the challenged statute and face enforcement proceedings, and such allegations must convince a court that the asserted injury is "plausible," not merely "possib[le]." *Iqbal*, 556 U.S. at 678. Here, plaintiffs' failure to allege any conduct that would have violated the Act in the past (if the 2024 amendments had been in effect) strongly suggests that it is not plausible plaintiffs will violate the Act going forward. As explained, plaintiffs have been established for decades, A7 ¶ 36; A14 ¶ 70. That plaintiffs have not pointed to even a single instance in which they took action that would have violated the amended Act shows that plaintiffs' feared injury is purely speculative. *See McDonald*, 2026 WL 2349271, at *9 (citing caselaw relying on "past conduct" and "past enforcement" history).

Plaintiffs' cited cases, AT Br. 34-35, are easily distinguishable. The plaintiffs in *Susan B. Anthony List*, 573 U.S. 149, had previously been sued under the challenged statute for conduct they planned to continue doing, which the Supreme Court determined was compelling evidence that the statute would be enforced against them again. *Id.* at 164. The plaintiffs in *303 Creative LLC v. Elenis*, 600 U.S.

570 (2023), by contrast, had not previously engaged in the conduct that was proscribed by the law they challenged, but there was no serious question that they intended to do so, and Colorado had a history of enforcing the challenged law in nearly identical contexts. *Id.* at 582-83. Here, plaintiffs have *not* plausibly alleged that they will, in fact, violate the Act, nor have they alleged that the amended Act has been enforced against religiously affiliated organizations. Finally, *Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008), is of no use to plaintiffs: although the plaintiffs there, as here, also relied on an attenuated chain of events to support standing, the Supreme Court explained that the "record at summary judgment indicated that" at least some links in that chain were likely to occur. *Id.* at 734-35. Here, by contrast, there are no plausible allegations tending to show that the injury plaintiffs posit will ever come to pass.

At bottom, plaintiffs' case is more like *Clapper* than any of their cited cases. Just like in *Clapper*, plaintiffs here rely on an attenuated series of events, and at every step in the series, plaintiffs do not plausibly allege, much less point to evidence, that they face any risk of injury. *See* 568 U.S. at 411 ("[R]espondents fail to offer any evidence that their communications have been monitored . . . , a failure that substantially undermines their standing theory."); *id.* at 412 (respondents "can only speculate as to whether the government" would seek to use the Foreign Intelligence Surveillance Act to target foreign contacts). Again, plaintiffs do not point to any history of taking adverse employment action that would violate the amended Act, and they cannot show that the Department or the Attorney General has sought to use the

Act to curtail the actions they would hypothetically take. Plaintiffs' injury is thus merely conjectural, rather than "concrete, particularized, and actual or imminent." *Id.* at 409 (internal quotation omitted). And without an imminent injury, the proper course of action for federal courts is to "stay on the sidelines." *Parents Protecting Our Child.*, 95 F.4th at 507.

### 3. Plaintiffs failed to allege that they are likely to violate the notice provision such that there is a credible threat that provision will be enforced against them.

Plaintiffs lack standing to challenge the notice provision, AT Br. 36-37, for separate reasons. That provision requires that employers post a notice in workplaces and handbooks summarizing aspects of the Act, including informing employees that they have a right to be free from discrimination. 775 ILCS 5/2-102(K)(1); *supra* p. 5. But the provision directs the Department to promulgate the text of the notice, and neither the provision nor the notice promulgated by the Department, *see* Ill. Dep't of Hum. Rts., *You Have the Right to Be Free from Job Discrimination and Sexual Harassment* (Sept. 2026),[6] has substantially changed since the Act was amended in 2024. That means that neither the statutory provision nor the Department-promulgated notice requires employers to inform their employees that discrimination based upon reproductive health decisionmaking is prohibited. *See id.* In fact, the model notice says nothing about reproductive health decisions at all. Therefore, plaintiffs simply need to continue to post the notices they published before the 2024

[6] https://dhr.illinois.gov/content/dam/soi/en/web/dhr/documents/shpd/employer-poster-sh-and-discrimination-idhr-2026.pdf (last visited Sept. 4, 2026).

amendments. *See Parents Protecting Our Child.*, 95 F.4th at 505 (no standing where it was unclear how policy would injure or affect concerned parents).

On appeal, plaintiffs argue that they would refuse to post any notice that even indirectly references the amended Act's protections. AT Br. 36. But their complaint states only that they will not "broadcast or include" the Act's protections for reproductive health decisionmaking. A36 ¶ 169. The notice requirement does not require plaintiffs to do either. All it requires them to do is to explain that employees are protected from discrimination. 775 ILCS 5/2-102(K)(1). And plaintiffs did not allege that they had any issue with the model notice before the 2024 amendments were enacted. Nor did plaintiffs allege that they have removed the required notices from employee handbooks or from common areas. *See* A1-60. Indeed, the Center's employee handbook appears to provide a notice that complies with the Act. *See* A82. At bottom, the 2024 amendments did not change employers' responsibilities under the Act's notice provision, and plaintiff's own allegations suggest that the amendments did not change their actual behavior. In such circumstances, plaintiffs failed to allege standing to challenge the provision.

Plaintiffs finally criticize the district court for failing to address the notice provision in its standing discussion. AT Br. 36. But "Article III's requirements must be continuously met throughout the life of a case," *Robertson v. Allied Sols., LLC*, 902 F.3d 690, 698 (7th Cir. 2018), meaning that this court must enforce the lack of subject-matter jurisdiction even if the district court did not address the issue. *United States v. Adigun*, 703 F.3d 1014, 1022 (7th Cir. 2012). Furthermore, at the motion-

to-dismiss stage, this court can affirm based on "any ground supported by record." *Lewis v. AbbVie Inc.*, 152 F.4th 807, 813 (7th Cir. 2025). Plaintiffs' argument that the district court's omission of a discussion of the notice provision "requires reversal," AT Br. 36, is therefore incorrect.

### C. Plaintiffs failed to plausibly allege a "chilling injury."

Plaintiffs alternatively contend that they alleged a "chilling injury" sufficient to give rise to standing, separate and apart from their claimed intent to violate the Act. AT Br. 37-40. The district court correctly rejected that argument, too. RSA3-4.

First, plaintiffs' "written statements clarifying that they cannot employ people who make objectionable reproductive decisions" — that is, their employment policies — are not speech. AT Br. 37-38 (citing A27 ¶134; A29 ¶ 139). "[W]ords can in some circumstances violate laws directed not against speech but against conduct." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992). Employment policies fall within this category: as the Supreme Court has explained, state and federal governments may forbid employers from posting signs declaring, "White Applicants Only," but that "hardly means" that a law forbidding such signs "should be analyzed as one regulating the employer's speech rather than its conduct." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 62 (2006). So too here. Plaintiffs state that they wish to "clarify[ ]" in job postings and career websites that "they cannot employ people who make objectionable reproductive decisions." AT Br. 38. But doing so would be no different than posting the signs described in *Rumsfeld*: it would be conduct, not

speech. Plaintiffs cannot rely on their decision not to post such statements to show chilling-effect standing.

Plaintiffs cite *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-68 (1963), to argue that the Act's prohibition on discriminatory hiring notices is only "nominally aimed at conduct" and creates a First Amendment injury because it "target[s]" and foreseeably suppresses speech. AT Br. 39. But in *Bantam Books*, the Supreme Court found that a Rhode Island law was "designed[ ]" to stop the circulation of certain publications, and that law was also enforced by "thinly veiled threats" of "criminal proceedings" by "public officers," even though the law was phrased as voluntary. 372 U.S. at 68. This case is unlike *Bantam Books* in that there is no foreseeably suppressed speech separate from the job postings, nor is there any "thinly veiled threat" that would create a First Amendment injury.

Plaintiffs finally argue that the district court improperly "conflate[d]" the First Amendment merits issue with the question whether plaintiffs alleged standing. AT Br. 39. To be sure, "plaintiffs are not required to show that they will win on the merits of their constitutional claims" to establish standing. *Brown v. Kemp*, 86 F.4th 745, 761-62 (7th Cir. 2023). But to demonstrate standing based on an asserted decision to "refrain[ ] from speech," AT Br. 39, one must at minimum show that one will refrain from speech, not refrain from conduct. Neither *Brown* nor *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), is to the contrary: although both courts held that the plaintiffs had standing, both also concluded that the laws in question affected speech, not conduct. *See Holder*, 561 U.S. at 25-27 (rejecting

argument that the "only thing actually at issue in this litigation is conduct"); *Brown*, 86 F.4th at 779 (holding that the statute at issue in the case "target[ed] fundamental speech activities"). Neither case holds that a plaintiff is permitted to obtain access to federal court simply by describing its conduct as speech — particularly when similar practices have been described as "conduct" by the United States Supreme Court. *Rumsfeld*, 547 U.S. at 62.

## II. If plaintiffs adequately alleged standing, the court should remand for further proceedings.

If this court concludes that plaintiffs adequately alleged standing, it should remand for further proceedings. The district court reached only the question of whether plaintiffs had alleged standing in the complaint. RSA4. Although plaintiffs ask this court to consider their motion for a preliminary injunction in the first instance, and to grant them injunctive relief, AT Br. 40, the court should decline that invitation, for multiple reasons.

First, this court's "ordinar[y]" practice is to remand a case in this posture to the district court, rather than "weigh the preliminary-injunction factors in the first instance." *A.C.L.U. of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). That practice makes good sense: appellate courts are "court[s] of review, not . . . of first view," *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 478 (7th Cir. 2024) (cleaned up), and here the district court is best positioned to consider the appropriate course of action, including the plaintiffs' entitlement (or not) to a preliminary injunction. Although, in cases involving the First Amendment, this court has on occasion addressed the preliminary-injunction factors in the first

instance, *see Alvarez*, 679 F.3d at 589, such a course of action is inappropriate where, as here, it is dubious that plaintiffs' "First Amendment rights have been compromised" or are "likely to be compromised during the pendency of this case," *MacDonald v. Chi. Park Dist.*, 132 F.3d 355, 358 (7th Cir. 1997). Even assuming that plaintiffs adequately alleged standing, there is no evidence that defendants have threatened enforcement against either plaintiff, nor any record evidence of past enforcement of the 2024 amendments, and so no reason to think plaintiffs will suffer First Amendment injury as the case proceeds. The proper course of action is thus to remand and allow the district court to consider the preliminary-injunction factors in the first instance.

Remand is particularly appropriate here, given defendants' request for — and the district court's decision to grant — jurisdictional discovery. RSA4. If a court has "reason to believe that there is a serious jurisdictional issue, [the court] is obliged to resolve it before proceeding to the merits." *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986); *accord* Fed. R. Civ. P. 12(i). Indeed, this court has "no choice" but to remand a case to the district court if jurisdictional questions depend on answers to factual questions. *Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir. 1998). Thus, even when a plaintiff has "alleged a concrete injury" at the pleading stage, if a defendant "challenge[s] the truth of the jurisdictional facts underlying" those allegations, the action "may not proceed without additional inquiry" into whether the plaintiff's alleged harm is genuine. *Bazile*, 983 F.3d at 281. Here, defendants challenged the truth of the jurisdictional facts underlying plaintiffs' claims. In their

motion to dismiss, defendants not only challenged the sufficiency of plaintiffs' allegations, but they also challenged the *fact* of plaintiffs' injury, seeking discovery into plaintiffs' employees and employment practices in order to ascertain whether (among other things) plaintiffs had ever taken adverse employment action against an employee or prospective employee based on a reproductive health decision. A264-65; *see, e.g.*, *Evergreen Ass'n, Inc. v. Hochul*, No. 1:20-cv-112, 2025 WL 359074, at *4 (N.D.N.Y. Jan. 31, 2025) (finding, after discovery and on summary judgment, that employer had failed to demonstrate standing in challenge to similar law), *appeal docketed*, No. 25-422 (2d Cir.). That the district court agreed that such discovery would be appropriate, RSA4, further underscores the need for remand, so that that court can appropriately tailor the proceedings to the facts of the case.

Likewise, even if this court were convinced plaintiffs have standing at the motion-to-dismiss stage, the burden to establish standing increases as a case progresses. At the preliminary-injunction stage, plaintiffs' burden "is 'at least as great as the burden of resisting a summary judgment motion.'" *Speech First*, 968 F.3d at 638 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)). Thus, if this court were to choose to move forward to the preliminary-injunction analysis, plaintiffs must have satisfied the standing requirements by "set[ting] forth by affidavit or other specific facts" evidence that the Act's enforcement against them was sufficiently imminent, rather than just "general allegations of injury." *Id.* (cleaned up). Whether plaintiffs have done so is not a question that any court has yet addressed, and for the reasons discussed, *supra* pp. 12-32, plaintiffs have not met

their burden to show standing on the current record. For all these reasons, the case should be remanded for further proceedings.

## III. Alternatively, plaintiffs are not entitled to a preliminary injunction.

If the court reaches plaintiffs' request for a preliminary injunction, it should reject it. To obtain a preliminary injunction, plaintiffs must make a "clear showing" that they are "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Plaintiffs have met none of those factors. Their First Amendment claims are unlikely to succeed, and the equitable factors tip decidedly against the entry of injunctive relief.[7]

### A. Plaintiffs are unlikely to succeed on the merits of any of their claims.

#### 1. Plaintiffs are unlikely to succeed on the merits of their expressive association claim.

Plaintiffs' primary claim is that the Act, as amended, violates their First Amendment right to expressive association. AT Br. 40-47. But that novel claim is highly unlikely to succeed, for multiple reasons. Plaintiffs do not engage in "expressive association" in their capacities as employers, and even if they could show

[7] Below, plaintiffs also argued that the Act could not be enforced against them because of the "church autonomy doctrine" and the ministerial exception, and that the Act violated the Fourteenth Amendment's Equal Protection Clause. A208-212; A56-57 ¶¶ 273-81. Plaintiffs did not raise these arguments on appeal, and they are therefore forfeited. *United States v. Banas*, 712 F.3d 1006, 1010 n.1 (7th Cir. 2013).

that they engage in "expressive association" in that capacity, they cannot show that the Act significantly affects their ability to express their views.

First, plaintiffs cannot show that they engage in expressive association in their capacity as employers. While "the First Amendment's protection of expressive association is not reserved for advocacy groups" alone, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000), the Supreme Court has never extended the expressive associational right to traditional employment relationships, as opposed to voluntary membership organizations. *See, e.g.*, *id.* (extending right to boy scouts); *N.Y. State Club Ass'n v. City of N.Y.C.*, 487 U.S. 1 (1988) (same for private social clubs); *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) (same for men's civic organizations).

Indeed, the Supreme Court has expressly rejected an expressive association claim in the context of employment. In *Hishon v. King & Spalding*, 467 U.S. 69, 71-72 (1984), a former law firm associate sued her law firm, alleging that the firm's failure to consider her for partnership violated Title VII's prohibitions on sex-based discrimination. The firm argued (as plaintiffs do here) that the application of Title VII "would infringe [their] constitutional rights of expression or association," *id.* at 78, but the Supreme Court rejected that argument. As the Court explained, although "'[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment,'" in the sense that an employer might prefer to choose whom to associate with, "'it has never been accorded affirmative constitutional protections.'" *Id.* (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973)).

The Court's decision not to afford constitutional protection to employment discrimination makes sense. In membership organizations, the member's identity can be integrally linked to the organization's own identity. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) (forcing membership organization to accept those who opposed its defining values would "cause the group as it currently identifies itself to cease to exist.") Not so in the employment context. An employer has direct control over an employee's actions for the purpose of producing goods or delivering services to its customers or clientele; membership organizations act in the interest *of their membership* to forward a shared social cause. The contrary rule, moreover, would threaten to swallow whole federal and state antidiscrimination protections in the employment context. Many businesses engage in protected expression to some degree, but that fact should not grant them blanket immunity from employment restrictions, especially given America's long history of government regulation of the relationship between employers and employees. *See, e.g.*, 42 U.S.C. § 2000e-2 *et seq*. (Civil Rights Act of 1964); *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 393 (1937) ("In dealing with the relation of employer and employed, the Legislature has necessarily a wide field of discretion . . . ."). If private employers enjoyed a constitutional right to choose whom to employ, "*any* employer" could "claim that it expresses its beliefs through its business activities, and that the retention of certain employees burdens that expression." *CompassCare v. Hochul*, 125 F.4th 49, 60 (2d Cir. 2025) (emphasis in original). That rule could "destabilize

the protections that state and federal governments have established to protect employees from exclusions based on protected characteristics." *Id.*

At bare minimum, as the Second Circuit recently held, an employer alleging that an employment-discrimination law impairs its expressive associational rights must "allege (and eventually prove) that the [law] threatens 'the very mission of its organization'" to obtain relief. *Id.* at 57-62 (quoting *Slattery v. Hochul*, 61 F.4th 278, 288 (2d Cir. 2023)). And this showing must be made in "the context of a specific employment decision," which would "presumably require assessment of (1) the responsibilities of the position at issue . . . and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employers' mission." *Id.* Plaintiffs have made no such showing here, or even attempted to do so; instead, they seek the "extraordinary remedy," *Winter*, 555 U.S. at 24, of a preliminary injunction against the challenged provisions as applied to *all* of their employment activities. The court should deny that request, or, at minimum, remand to allow the parties and the district court to litigate the case below, as in *CompassCare*. 125 F.4th at 69.

Even under the standards set out by the Supreme Court for traditional membership organizations, however, plaintiffs have not shown that employing an individual who is "unrepentant" about reproductive health decisions to which plaintiffs object would "significantly affect" their ability to express their views. *Dale*, 530 U.S. at 650. *Dale* makes this clear. There, a troop leader actively and publicly supported gay rights, even though the Boy Scouts opposed homosexual conduct. *See*

*id.* at 652-53. Indeed, the troop leader was the co-president of a gay and lesbian organization at college and was a "leader" of community of gay scouts who were "open and honest about their sexual orientation." *Id.* at 653 (internal quotation omitted). But the Court expressly stated that expressive associations could not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* It was the troop leader's active and public advocacy of a political stance *against* the position taken by the Boy Scouts that allowed the Scouts to revoke his membership. Likewise, in *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995), parade organizers could prevent a group from marching in their parade not because of the group members' sexual identities, but because the group wanted to march behind a banner *proclaiming* the sexual identities of its members, with which the parade organizers disagreed. In other words, although the organizers could not entirely ban gay, lesbian, and bisexual individuals from the parade, they could exclude the group because of the viewpoint that a "contingent marching behind the organization's banner" might imply. *Id.*

Here, plaintiffs have not shown how an employee's reproductive health decision could significantly affect plaintiffs' ability to advocate for their views. Plaintiffs assert that the Act would require them to "accept employees who" cannot "credibly convey their religious beliefs" or pro-life positions, AT Br. 44, but, again, the Act does not forbid employers from hiring or firing employees based on political views, and it permits certain religious entities to hire or fire based on religious

beliefs, so it simply does not have the effect that plaintiffs posit. *Supra* p. 15 n.4. Plaintiffs' concern that the Act requires them to hire or retain individuals who are "unrepentant" and "unapologetic[ ]" about their reproductive health decisions, AT Br. 43, is to the same effect: the Act does not prohibit plaintiffs from choosing employees based on their pro-life views, which is the thrust of what they would like to do. At bottom, all the Act does is restrict plaintiffs' ability to take adverse employment action against employees based on their past private conduct.

Plaintiffs cite *Christian Legal Society*, 453 F.3d 853, for the proposition that the mere inclusion of certain categories of people could significantly affect an organization's advocacy, and *Dale* for the proposition that the court must defer to plaintiffs' opinion about what would impair their expression. AT Br. 42-43. But *Christian Legal Society* addressed a school membership organization rather than a private employer, 453 F.3d at 857, and, as noted, in *Dale*, the Supreme Court explained that expressive associations may not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message," 530 U.S. at 653. Thus, plaintiffs' assertion that the mere employment of individuals who in plaintiffs' view have made objectionable reproductive health decisions would — on its own — somehow taint their advocacy is not an argument that this court should recognize.

Plaintiffs finally argue that even limited internal knowledge of an employee's reproductive health decision would impair intra-organizational functions, especially given the anti-harassment provision of the Act. AT Br. 46-47. But as discussed

*supra* pp. 21-23, the anti-harassment provision is not a "general civility code." *Jones*, 164 F.4th at 1032. The discussion of pro-life policies at an organization that is expressly pro-life is unlikely to unreasonably interfere with an employee's work performance. *See Harris*, 510 U.S. at 21-22. At bottom, plaintiffs have not shown that simply hiring a person who has made an "objectionable" reproductive health decision, without more, would significantly affect their pro-life advocacy. Plaintiffs are thus unlikely to succeed on the merits of their expressive association claim.

### 2. Plaintiffs are unlikely to succeed on the merits of their free-speech claims.

Plaintiffs are equally unlikely to succeed on the merits of their claims that the amended Act violates their free-speech rights. The employment-conditions provisions regulate professional conduct, not speech; plaintiffs have not shown that they are likely to violate the anti-harassment provision; and the notice provision is commercial speech that withstands rational-basis review.

#### a. The employment-conditions provisions regulate conduct, not speech.

Plaintiffs are unlikely to succeed on the merits of their free-speech challenge against the employment-conditions provisions because the provisions regulate conduct, not speech. Under this court's precedent, only "inherently expressive" conduct is protected as speech. *Tagami v. City of Chi.*, 875 F.3d 375, 378 (7th Cir 2017) (internal quotations omitted). To be inherently expressive, "the conduct in question must comprehensively communicate its own message without additional speech," meaning that "the conduct *itself* must convey a message that can be readily 'understood by those who view[ ] it.'" *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397,

404 (1989)). "Otherwise, an apparently limitless variety of conduct [could] be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 575 (7th Cir. 2023) (internal quotation omitted). "Conduct that does not convey a message without the aid of additional speech, however, receives no First Amendment protection." *Id.*

Here, plaintiffs fail to show that any of the conduct regulated by the employment-conditions provisions — hiring, firing, benefits, accommodations, and privileges and conditions — are "inherently expressive." Plaintiffs do not allege that any of this conduct is itself inherently expressive. *See generally* A1-60. And the Second Circuit, in similar cases about a New York law preventing employment discrimination based on reproductive health decisionmaking, also rejected the argument that "the acts of hiring, terminating, or continuing to employ persons are themselves expressive conduct that communicate[ ]" an employer's views. *Slattery*, 61 F.4th at 291; *accord CompassCare*, 125 F.4th at 68. Furthermore, regarding plaintiffs' job postings and proposed "clarifications" of their job postings, the Supreme Court has recognized that discriminatory hiring notices are conduct, not speech. *See, e.g.*, *Rumsfeld*, 547 U.S. at 62; *R.A.V.*, 505 U.S. at 385; *see also supra* pp. 30-32.

In response, plaintiffs argue that the employment-conditions provisions violate the First Amendment because they are "content based," in that they "appl[y] only to certain employment communications relating to reproductive health choices." AT

Br. 48. Specifically, plaintiffs say, employers can "make statements . . . expressing preferences for education requirements, work experience, community involvement, and other subjects," but not employee's reproductive health decisions. *Id.* But the same could be said for all employment-discrimination provisions, which likewise restrict employers' ability to express preferences in job positions based on race, sex, pregnancy, military status, or disability. And regardless, plaintiffs have skipped to arguing that hiring, firing, and benefits are content-based speech before establishing that they are speech at all. They are not, and so they do not receive First Amendment protection. *The Bail Project*, 76 F.4th at 575.

Because the employment-conditions provisions regulate conduct, not speech, plaintiffs are unlikely to succeed on the merits of this claim.

#### b. Plaintiffs do not plausibly allege that their activities violate the anti-harassment provision.

Plaintiffs are also unlikely to succeed on the merits of their claim that the anti-harassment provision violates the First Amendment. Courts have generally held that laws prohibiting the discriminatory harassment of employees do not impermissibly restrict speech. This is because, in cases of harassment, it is not "the content of the speech, as much as the deliberate verbal . . . assault, that is prohibited." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 n.6 (1975) (internal quotations omitted); *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) ("[T]he protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it."). This standard lines up well with the standard for establishing a harassment claim under the Act. Specifically, an

employee needs to show that the harassment "was severe or pervasive enough to create a work environment that a reasonable person would find to be 'hostile or abusive'" and the employee subjectively perceived the environment to be hostile or abusive. *Cook Cnty. Sheriff's Off. v. Cook Cnty. Comm'n on Hum. Rts.*, 2016 IL App (1st) 150718, ¶ 32; *accord Harris*, 510 U.S. at 21-22; *see also supra* pp. 21-23. Illinois courts, like federal courts analyzing federal antidiscrimination law, "consider[ ] the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cook Cnty. Sherrif's Off.*, 2016 IL App (1st) 150718, ¶ 32 (quoting *Harris*, U.S. at 21-22). Thus, Illinois courts interpret harassment not to be "speech," but more akin to a deliberate verbal assault that can be constitutionally restricted. *Erznoznik*, 422 U.S. at 211 n.6.

Plaintiffs, for their part, do not allege that they intend to create a humiliating or threatening environment at work for any of their employees. They state only that they would like "express [their] message that all life is sacred and that sex should be reserved for marriage." A30 ¶ 143; *see also* A31 ¶ 148 (similar). These allegations, without more, cannot establish that an ordinary person would find their conduct "hostile or abusive," *see Harris*, 510 U.S. at 21-22. Plaintiffs certainly do not allege that they intend to be "physically threatening or humiliating," *id.* at 23. And preaching a pro-life message would not "interfere[ ] with an employee's work performance," *id.*, at an explicitly pro-life job. Plaintiffs cannot show that they are

likely to succeed on the merits of their free-speech claim because they cannot show that they will violate the Act at all.

Plaintiffs have no effective response. Plaintiffs assert that the anti-harassment provision is content-based because it "'depends entirely on the communicative content' of an employer's message." AT Br. 47-48. But if that were true, then every anti-harassment law would violate an employer's freedom of speech, including laws that the Supreme Court has continuously explained are constitutional. *See, e.g.*, *R.A.V.*, 505 U.S. at 390 (noting that Title VII's general prohibition against sexual discrimination includes some sexually derogatory words, and such words would not be shielded from regulation "merely because they express a discriminatory idea or philosophy"); *Harris*, 510 U.S. at 21-22 (describing severity required for hostile work environment claims). Plaintiffs are thus unlikely to succeed on the merits of their free-speech claim against the anti-harassment provision of the Act.

#### c. The notice provision regulates only commercial speech, and it withstands rational-basis review.

Plaintiffs are not likely to succeed on the merits of their free-speech claim targeting the notice provision of the Act, because that provision regulates only commercial speech and withstands rational-basis review. In general, the degree of scrutiny that courts apply to a law that compels speech depends on the "nature of the speech taken as a whole" and the "effect of the compelled statement" on the affected party. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988). As relevant here, a statute that mandates disclosure only of "purely factual and uncontroversial information," as is common in consumer-protection and other contexts, should be

evaluated only under rational-basis review, and are constitutional as long as they are "reasonably related to the State's interest." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). This is because these statements do not "prescribe what shall be orthodox," but instead operate to "prevent[ ] deception." *Id.*

The notices required by the notice provision satisfy this standard. The notice provision only requires disclosure of the Act's existence and the fact that employees in Illinois have a right to be free from unlawful discrimination, 775 ILCS 5/2-102(K)(1), which is "purely factual and uncontroversial information," *Zauderer*, 471 U.S. at 651. A requirement to let employees know that a statute exists is far different from prescribed statements about "what shall be orthodox in politics, nationalism, religion, or other matters of opinion" at issue in other cases in which strict scrutiny applies. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 625, 642 (1943). Plus, notice requirements for employees are commonplace in Illinois and elsewhere: Illinois alone provides at least two compilations to aid employers in complying with the law.[8] As the Second Circuit explained in *CompassCare*, "such notice requirements are part of 'a longstanding tradition in this country' supported by a 'historical warrant.'" 125 F.4th at 65 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792, 795 (2011)); *see also UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003) ("[A]n employer's right to silence is sharply

[8] *See, e.g.*, *Required Posters & Disclosures*, Ill. Dep't of Labor, https://labor.illinois.gov/ employers/posters.html (last visited Sept. 4, 2026); *All Guidance, Publications, and Key Resources*, Ill. Dep't of Hum. Rts., https://dhr.illinois.gov/rights/reports-and-guidance.html (last visited Sept. 4, 2026);

constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks."). The notice provision thus falls easily within *Zauderer*'s ambit.

The notice provision also easily withstands rational-basis review. Under this standard, "a law avoids constitutional scrutiny as long as it bears a rational relationship to a legitimate government interest." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013). This low standard does not require defendants to "'articulate' the law's purpose or 'produce evidence to sustain the rationality'" of the law; the law is "presumed constitutional." *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). The notice provision clears this threshold. The Act's stated purpose is "to secure for all individuals within Illinois the freedom from discrimination." 775 ILCS 5/1-102(A). There is no serious argument that this is not a legitimate government interest, *see Roberts*, 468 U.S. at 723, nor that the notice provision furthers it.

Plaintiffs' only response is that the notice provision forces them to lie, in that plaintiffs wish to communicate to their employees that they *will* discriminate against them based on their reproductive health decisions. AT Br. 50-51. But regardless of whether plaintiffs would knowingly violate Illinois law, a notice informing employees that the law exists and plaintiffs are legally required to follow it is not a lie. Thus, the fact that plaintiffs are required to "cross-reference[ ] the Act" itself does not make the notice "controversial." *Id.* at 51. That "anyone with internet access can"

read the Act's text is proof that the Act's existence is a statement of fact, not opinion. *Id.* Plaintiffs are unlikely to succeed on the merits of their free-speech claims.

#### d. The Act is viewpoint-neutral.

Finally, despite plaintiffs' scattered assertions to the contrary, AT Br. 20, 23, 47-48, the Act is viewpoint-neutral. It broadly encompasses many reproductive health decisions, including those with which neither plaintiff disagrees. 775 ILCS 5/1-103(O-2) (protecting decisions to use healthcare related to the continuation of pregnancy and pre-, intra-, and postnatal care). The Act does not solely target reproductive health care to which plaintiffs are religiously opposed; indeed, it protects individuals from discrimination on the basis of their decisions *not* to obtain reproductive healthcare (including an abortion) as well as their decisions *to* obtain such care. Nor does it target religiously motivated discrimination in favor of secular conduct. *See id.* Instead, the Act was meant to complement existing protections by giving to all Illinoisians "the freedom to make decisions concerning whether, when, and how to start a family" without fear of discrimination. A138 (statement of Rep. Moeller). The Act's antidiscrimination scheme therefore does not engage in viewpoint discrimination. *See Choose Life Ill., Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008) (rule prohibiting abortion-related license plates did not favor one viewpoint on abortion over the other).

### 3. Plaintiffs are unlikely to succeed on the merits of their free-exercise claim.

Plaintiffs are unlikely to succeed on the merits of their free-exercise claim because the Act is neutral and generally applicable. The right of free exercise "does

not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 879 (1990). Under this standard, the government may enforce neutral rules even when they have some incidental impact on religious practice. *Soc'y of Divine Word v. U.S. Citizenship & Immigr. Servs.*, 129 F.4th 437, 451 (7th Cir. 2025). Laws lack neutrality when they are "'specifically directed at a religious practice,'" *Kondilis v. City of Chi.*, 160 F.4th 866, 871 (7th Cir. 2025) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022)), and laws are not generally applicable if they prohibit religious conduct "while permitting secular conduct that undermines the government's asserted interests" or if they "provide[ ] a mechanism for individualized exemptions," *Kennedy*, 597 U.S. at 526 (internal quotation omitted).

To begin, the Act is facially neutral. The challenged provisions apply to both religious and nonreligious employers in equal measure. *See United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000) (finding that plaintiff "could not" contest the neutrality of tax laws where those law were not restricted to plaintiff "or even religion-related employers generally"); *see also CompassCare*, 125 F.4th at 68 (finding that New York's similar law is "facially neutral, applying to religious and non-religious employers alike").

Plaintiffs do not seriously dispute that the Act is facially neutral. Instead, they argue that the law is not neutral in substance because the amendments were motivated by hostility to religion. AT Br. 54-55. But the legislative history attached to plaintiffs' complaint explains that the stated purpose of the Act was to provide the

"freedom to make decisions concerning whether, when, and how to start a family without the fear of discrimination or retaliation," A138, rather than to discriminate against religious employers. Plaintiffs argue that the Department's refusal to create a special exception for religious employers shows "hostility" to those employers. AT Br. 54-55. But that argument is circular: "an individual's religious beliefs" do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. at 878-79. The refusal to provide an exception to a neutral law of general applicability cannot render that law unconstitutional. Plaintiffs also point to statements made by the Attorney General, the Department's Director, and Illinois' Lieutenant Governor regarding abortion and reproductive care. AT Br. 55-56. But public policy in favor of reproductive rights does not render an entire government hostile to religion, particularly when the law was crafted to apply to all employers in the State, and perhaps especially to secular employers. *See* 775 ILCS 5/2-101(B)(2) (excepting certain religious organizations from the definition of "employer" under the Act). The Act is therefore neutral.

The Act is also generally applicable in that the challenged provisions do not exempt similar secular conduct or provide individualized exemptions. Plaintiffs argue that some exceptions in the Act generally exempt "comparable secular conduct." AT Br. 52-53 (citing 775 ILCS § 5/2-101(A)(1)). But these provisions do not cover the typical employer–employee relationship that plaintiffs have with their employees. Section 5/2-101(A)(1) exempts from the Act's definition of "employee": (i) elected public officials or members of their immediate or personal staff;

(ii) principal administrative officers of the State or any political subdivision thereof; or (iii) any "person in a vocational rehabilitation facility certified under federal law who has been designated an evaluee, trainee, or work activity client." The first two categories mirror exceptions within Title VII excluding public officers from employment discrimination claims. 42 U.S.C. § 2000e(f). Although Title VII did not originally contain these exceptions, they were added to protect voters' ability to elect their own state officers and those officers' ability to select the close advisers who would help run their governments. *See* Pub. L. No. 88-352, § 701(f) (law as originally enacted), 78 Stat. 255; 118 Cong. Rec. 4096-97 (1972) (floor discussion on the need to protect the right to choose elected officials on any basis, regardless of whether that basis is discriminatory); H.R. Conf. Rep. No. 92-899, at 15-16 (1972) (similar). The third category excepted are certain disabled individuals who receive vocational rehabilitation services from the State. *See* 20 ILCS 5/5-550. Rather than engaging in a more typical employment relationship, these individuals also receive services from the State to increase their "opportunities for competitive . . . employment." 20 ILCS 2405/1b. These exceptions to the definition of "employee" thus address wholly different employment relationships than the ones in which plaintiffs are engaged, and are not "comparable" to the challenged provisions in any respect.

Plaintiffs also argue that the Act is not generally applicable because it has a bona fide occupational qualification provision, which permits employers to assert in an enforcement proceeding that employment decisionmaking based on a protected trait is necessary for the normal operation of the employer's business. *See* AT Br. 53-

54 (citing 775 ILCS 5/2-104(A)). But this provision (which, again, is borrowed from Title VII, *see* 42 U.S.C. §2000e-2(e)(1)) is not a "mechanism" for defendants to use to target religious organizations; indeed, defendants have no power to grant employers exceptions from the Act. *Contra Fulton v. City of Phila.*, 593 U.S. 522, 537 (2021) (provision unconstitutional because it gave "sole discretion" to agency to grant exceptions). Instead, this provision provides employers an affirmative defense that they can use in enforcement proceedings, depending on the facts and circumstances of each case. Moreover, most state antidiscrimination statutes recognize this defense, *see, e.g.*, Cal. Gov't Code § 12940; Fla. Stat. § 760.10(9)(a); Ga. Code Ann. § 45-19-34, N.Y. Exec. Law § 296(1)(d); Tex. Labor Code Ann. § 21.119, and so if the Act is unconstitutional for this reason, the same is true of substantially every antidiscrimination law in the United States. Thus, plaintiffs are unlikely to succeed on the merits of their free-exercise claim because the Act is neutral and generally applicable.

Because the amended Act is neutral and generally applicable, it is subject to rational-basis review. *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017) ("[A] neutral law of general applicability is constitutional if it is supported by a rational basis."). As discussed, *supra* p. 47, a law survives rational-basis review when it "bears a rational relationship to a legitimate government interest." *Wis. Educ. Ass'n Council*, 705 F.3d at 653. The Act, which serves the important government interest of preventing employment discrimination, *see* 775 ILCS 5/1-102(A), furthers this goal. And plaintiffs do not argue that the Act would not withstand rational-basis

review, *see generally* AT Br., thus forfeiting any such argument, *Banas*, 712 F.3d at 1010 n.1.

### B. The equitable factors tilt decisively against the entry of injunctive relief.

In addition to likelihood of success on the merits, plaintiffs seeking a preliminary injunction must make a "clear showing" that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 22. When considering these factors, this court applies a "sliding scale approach," in which the less likely a plaintiff is to succeed on the merits, the more the balance of harms needs to favor the plaintiffs' position. *Ty, Inc. v. Jones Grp.*, 237 F.3d 891, 895-96 (7th Cir. 2001).

To begin, plaintiffs are unlikely to face irreparable harm without a preliminary injunction. As discussed, *supra* pp. 12-32, plaintiffs have not alleged that they possess a sufficiently concrete injury-in-fact for standing purposes, not to mention one that would entitle them to the extraordinary relief of a preliminary injunction. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787 (7th Cir. 2011). Plaintiffs thus have failed to show that any First Amendment injury is likely, particularly given their inability to provide evidence that they have taken adverse employment action against an employee based on his or her reproductive health decisions, and given the fact that (to defendants' knowledge) the amended Act has yet to be enforced against any religious employer. *See McDonald*, 2026 WL 2349271, at *9.

And even were this court to consider the balance of harms, it weighs in favor of defendants. Enjoining a State's duly enacted law causes significant harm to the State and the public interest. *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, 121 F.4th 604, 633 (7th Cir. 2024). And that is particularly true here, where the state law was enacted to prevent discrimination. *Gen. Tel. Co. of the N.W., Inc. v. E.E.O.C.*, 446 U.S. 318, 326 (1980) (acknowledging the "public interest in preventing employment discrimination"). That purpose, when weighed against the speculative possibility that plaintiffs may encounter an employee or prospective employee who they learn has made a reproductive decision with which they disagree, demonstrates that the equities favor denying a preliminary injunction.

## CONCLUSION

For these reasons, this court should affirm the district court's judgment in favor of defendants.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for James Bennett, in his official capacity as Director of the Illinois Department of Human Rights, and Kwame Raoul, in his official capacity as Illinois Attorney General

/s/ Megan L. Brown
**MEGAN L. BROWN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov

September 4, 2026

**CERTIFICATE OF COMPLIANCE WITH PAGE LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Microsoft 365, in 12-point Century Schoolbook BT font, and complies with Seventh Circuit Rule 32(c) in that the brief contains 13,836 words.

/s/ Megan L. Brown
MEGAN L. BROWN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on September 4, 2026, I electronically filed the foregoing Response Brief of Defendants-Appellees with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I certify that the other participants in this appeal, named below, are CM/ECF users and will be served by the CM/ECF system.

James A. Barta
james.barta@atg.in.gov

Peter Breen
pbreen@thomasmoresociety.org

John J. Bursch
jbursch@adflegal.org

James A. Campbell
jcampbell@adflegal.org

David Andrew Cortman
dcortman@adflegal.org

Caroline Cook Lindsay
clindsay@adflegal.org

Mark Lippelmann
mlippelmann@adflegal.org

John P. Lowrey
john.lowrey@atg.in.gov

Ryan J. Tucker
rtucker@adflegal.org

/s/ Megan L. Brown
MEGAN L. BROWN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(224) 204-9642 (office)
(312) 415-6318 (cell)
Megan.Brown@ilag.gov